LATHAM & WATKINS LLP
  Sadik Huseny (pro hac vice)
    *sadik.huseny@lw.com*
  Amit Makker (pro hac vice)
    *amit.makker@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 395-0600
Facsimile: (415) 395-8095

ASIAN AMERICANS ADVANCING JUSTICE-AAJC
  Niyati Shah (pro hac vice forthcoming)
    *nshah@advancingjustice-aajc.org*
  Terry Ao Minnis (pro hac vice forthcoming)
    *tminnis@advancingjustice-aajc.org*
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 296-2300
Facsimile: (202) 296-2318

SPENCER FANE
  Andrew M. Federhar
    *afederhar@spencerfane.com*
2415 East Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 333-5430
Facsimile: (602) 333-5431

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Asian American Native Hawaiian And Pacific Islander For Equity Coalition, Plaintiff, <br><br> vs. <br><br> Katie Hobbs, in her official capacity as Arizona Secretary of State; Mark Brnovich, in his official capacity as Arizona Attorney General; and the County Recorder Defendants, Apache County Recorder Larry Noble; Cochise County Recorder David W. Stevens; Coconino County Recorder Patty Hansen; Gila County Recorder Sadie Jo Bingham; Graham County Recorder Wendy John; Greenlee County Recorder Sharie Milheiro; La Paz County Recorder Richard Garcia; Maricopa County Recorder Stephen Richer; Mohave County Recorder Kristi | Case No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Blair; Navajo County Recorder Michael Sample; Pima County Recorder Gabriella Cázares-Kelly; Pinal County Recorder Virginia Ross; Santa Cruz County Recorder Suzanne Sainz; Yavapai County Recorder Michelle M. Burchill; and Yuma County Recorder Richard Colwell, in their official capacities,

Defendants.

The state government of Arizona has a long history of seeking to unjustly restrict or outright deny the voting rights of Arizona's voters of color and naturalized voters.  In its 2022 legislative session, Arizona enacted two more election laws as the most recent chapter of this voter-cancellation opus: House Bill 2492 ("H.B. 2492"), signed into law on March 30, 2022, and House Bill 2243 ("H.B. 2243"), transmitted to the governor on the last day of the legislative session and signed into law on July 6, 2022—just over a month ago.  These laws establish various citizenship and "proof" requirements for voting, along with swift voter cancellation and criminal investigations.  Each is designed and serves to suppress voters of color and naturalized voters.  Combined, they do this by (1) making it harder to register to vote, (2) chilling voters from registering to vote, (3) cancelling already-registered voters for certain elections, at times without notice, for failure to provide documentary proof of citizenship ("DPOC"), and (4) creating an anyone-can-accuse "investigation of those we have reason to believe are not U.S. citizens" scheme, whereby county recorders are commanded to arbitrarily investigate and cancel accused voters who are unable to provide onerous evidence of citizenship within 35 days—and then refer them to the county attorneys and the attorney general for criminal investigation.

And one of the new laws, H.B. 2243, is set to go into effect on September 24, providing just enough time—through convenient selection of the 35-day "provide proof or else" period—to push through an illegal voter purge *just days* before the November election.

Arizona's actions are in contravention of the U.S. Constitution, the Civil Rights Act of 1964, and the National Voter Registration Act ("NVRA").  Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition ("AZ AANHPI for Equity Coalition" or "Plaintiff") is a state-wide, non-profit and non-partisan organization committed to the mission of improving the participation of marginalized communities in Arizona, with a particular focus on expanding representation and increasing civic engagement for the more than 357,000 Asian Americans, Native Hawaiians, and Pacific

- 1 -

Islanders (AANHPI) in the state.  Plaintiff seeks to prevent these violations and preserve the right to vote, fairly and equally, by all citizens of Arizona—whatever their race, country of origin, or path taken to citizenship.  Plaintiff brings this Complaint for Declaratory and Injunctive Relief against Katie Hobbs, in her official capacity as the Secretary of State of Arizona ("Secretary Hobbs"), Mark Brnovich, in his official capacity as the Attorney General of Arizona ("Attorney General Brnovich"), and the above-captioned County Recorder Defendants, each named in their official capacities (collectively, "Defendants").

**INTRODUCTION**

1.    H.B. 2492 and H.B. 2243 are the latest entries in a nearly two-decade attempt by Arizona to unduly burden voting rights via "proof of citizenship" requirements and punishment schemes.  It is a story of Arizona repeatedly being told by the courts—including the U.S. Supreme Court—that its "proof of citizenship" requirements are in contravention of law.  And it is a story of Arizona's defiance of those rulings, and a focused attempt to restrict and deny the voting rights of Arizona's voters of color and naturalized voters under the false and xenophobic cries of non-citizens stealing elections that are simply made up.

2.    In 2004, Arizona adopted Proposition 200, a ballot initiative purportedly designed to "combat voter fraud by requiring voters to present proof of citizenship when they register to vote and to present identification when they vote on election day." *Purcell v. Gonzalez*, 549 U.S. 1, 2 (2006).  However, the Supreme Court held that Proposition 200 directly violated the NVRA, which requires states to "accept and use" the standard federal registration form from the United States Election Assistance Commission (the "Federal Form") for voter registration, which does not require applicants to provide DPOC.  *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) ("*ITCA*").

3.    On the heels of the Supreme Court's rejection of the DPOC requirement for Federal Form users, Arizona did two things.  First, Arizona sought to have the Federal

- 2 -

Form *changed* by challenging the Election Assistance Commission's decision to not include DPOC on the Federal Form.  Then, as now, the purported justification was voter registration fraud.  And it failed again—because the justification was made up again.  In rejecting Arizona's challenge, the Tenth Circuit found that Arizona "failed to advance proof that registration fraud in the use of the Federal Form prevented Arizona . . . from enforcing [its] voter qualifications," and thus failed to meet the burden set out by the Supreme Court in *ITCA*.  *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1188, 1196-97 (10th Cir. 2014), *cert. denied*, 576 U.S. 1055 (2015).

4.    Second, Arizona implemented a bifurcated voter registration system, allowing individuals to register to vote with the Federal Form for federal elections only, but requiring voters in state and local elections to satisfy the DPOC requirement of Proposition 200.  The bifurcated system was challenged in court as violating potential voters' First and Fourteenth Amendment rights, which resulted in Arizona entering into a consent decree requiring Arizona to treat Federal Form applicants and state form applicants without DPOC the same (the "Consent Decree").  *LULAC v. Reagan*, No. 2:17-cv-04102-DGC (June 18, 2018), ECF No. 37.

5.    One might think these repeated legal determinations would have convinced Arizona to stop disenfranchising its voters of color and naturalized voters on the back of a "voter fraud!" lie.  Not so.  Despite having voluntarily entered into the Consent Decree and despite the holdings by the Supreme Court and Tenth Circuit in *ITCA* and *Kobach*— *including* the Tenth Circuit expressly finding Arizona unable to substantiate claims of voter fraud in the use of the Federal Form that would warrant a change to the Federal Form—Arizona passed H.B. 2492 a few months ago, over the advice of the legislature's attorneys.

6.    This is straight defiance of the law, multiple federal court rulings, and the Consent Decree.  Indeed, H.B. 2492 and the even more recent H.B. 2243 go even further than before in their attempts to violate voters' and potential voters' rights and to suppress the vote.  The voter-suppression and voter-cancellation schemes set forth by these laws:

- 3 -

- prevent applicants registering with the Federal Form without DPOC from voting in presidential elections or casting a ballot by mail;

- strip already-registered voters who did not provide DPOC of voting in presidential elections or casting a ballot by mail;

- require applicants registering with the Arizona state form to provide their place of birth—a requirement with no material connection to an applicant's qualifications to register to vote;

- require that an investigation be initiated should a county recorder decide, based on outdated and unreliable information, that a Federal Form applicant is not a U.S. citizen—without due process to contest any such decision;

- create an "investigation of citizenship" system where anyone, in an effort to cancel and nullify voter registrations, can accuse thousands of voting illegally; and

- allow county recorders to simply erase voters from the voter rolls as a result of these citizenship investigations—without strict process or standards.

7.    The onerous provisions of H.B. 2492 and H.B. 2243 will have a disproportionate impact on voters of color and naturalized voters.  That is, of course, the point—the Arizona state politicians who passed and enacted H.B. 2492 and H.B. 2243 know that their claimed justifications are disproven and/or nonexistent election anomalies, and are, therefore pretextual and false.

8.    After the most recent Presidential election in November 2020, there was a partisan-fueled audit of votes cast in Maricopa County, ordered precisely to weed out alleged "voter fraud."  It found *no evidence of voter fraud*.[1]  And Arizona Governor Douglas Ducey publicly rejected then-President Trump's claims of voter fraud in Arizona:

> *In Arizona, we have some of the strongest election laws in the country, laws that prioritize accountability and clearly lay out*

---

[1] Jeremy Duda, *Arizona 'audit' finds Biden won (by more votes) and no evidence of fraud*, AZ MIRROR (September 23, 2021), https://www.azmirror.com/2021/09/23/arizona-audit-finds-biden-won-by-more-votes-and-no-evidence-of-fraud/.

- 4 -

*procedures for conducting, canvassing, and even contesting the results of an election. We've got ID at the polls. We review EVERY signature (every single one) on early ballots — by hand — unlike other states that use computers. Prohibitions on ballot harvesting. Bipartisan poll observers. Clear deadlines, including no ballots allowed after Election Day.*[2]

9.      Governor Ducey's message was clear: no fraud, and stringent election laws already in existence.[3]  Nonetheless, H.B. 2492 was subsequently introduced and then signed into law on March 30, 2022 by Governor Ducey, who failed to mention his prior statements and instead claimed that the law sought to protect "[e]lection integrity" and to "prohibit[] any attempt to illegally cast a vote."[4]  Passing a law to solve a "problem" that (1) you previously stated you did not have, (2) has been rejected by the courts as having no evidentiary support, and (3) has been found by your own audits to have no evidentiary support, is the quintessence of pretext.

10.      Likewise, H.B. 2243—which allows county recorders to explore citizenship on an open-ended "reason to believe" basis and then simply erase voters from the voter rolls as a result of these citizenship investigations—was signed into law on July 6, 2022 by Governor Ducey.  The Governor had previously vetoed a similar bill, H.B. 2617, stating: "Our lawfully registered voters deserve to know that their right to vote will not be disturbed without sufficient due process.  This provision leaves our election system vulnerable to bad actors who could seek to falsely allege a voter is not a qualified

---

[2] Chris Cillizza, *How one Trump-loving governor totally shut down the President's voter fraud claims*, CNN (December 1, 2020), https://www.cnn.com/2020/12/01/politics/doug-ducey-donald-trump-arizona-voter-fraud-claims/index.html.

[3] Arizona Attorney General Mark Brnovich himself recently sent a letter to the Arizona State Senate stating that his office's detailed investigations found that allegations of widespread voter fraud in the 2020 election related to "deceased" voting were insufficient and not corroborated, and in some cases simply "absurd."  He noted that specific to the "Cyber Ninjas' audit" and complaint that 282 deceased individuals voted, that "only one of the 282 individuals on the list was deceased at the time of the election"—and that those claimed to be dead, when interviewed, "were very surprised to learn they were allegedly deceased."  https://www.azag.gov/sites/default/files/2022-08/Letter%20to%20Fann%20-%20EIU%20Update%20080122.pdf.

[4] https://azgovernor.gov/sites/default/files/hb2492_signing_letter.pdf.

elector."[5]  But the exact same problems (or worse) apply to H.B. 2243, which was nevertheless signed into law.

11.     Indeed, it is worth noting that H.B. 2243 itself—in treating some allegedly "improper" voters differently from others—reveals its own discriminatory purpose and effects.

12.     For those accused or "believe[d]" not to be U.S. citizens, and therefore not properly registered voters, H.B. 2243's command is harsh, punitive, and immediate: the county recorder conducts a flawed, standardless inquiry to try to match a voter's information against sources and databases not designed for such queries, and if the recorder has purportedly "confirmed" (a term that remains undefined) that the accused is not a U.S. citizen, the accused has 35 days to respond with "satisfactory" DPOC or their voter registration is canceled, and they are referred to the county attorney and attorney general for criminal investigation.  H.B. 2243 § 2 (amendments to A.R.S. § 16-165 A.10, G, H, I, J).

13.     The 35-day period is a convenient selection, of course: all indications are that H.B. 2243 will go into effect upon the legislative session effective date of September 24, 2022[6]—which means that Arizona has given itself just enough time to conduct one systematic voter purge of naturalized voters and voters of color just *days* before the mid-term general election on November 8, 2022.

14.     But for other voters who may not be eligible to vote—i.e., those appearing to be not properly registered voters because they are purportedly no longer residents of Arizona and thus are voting elsewhere—the county recorders do not get to run a standardless, "reason to believe" witch hunt under H.B. 2243, and there is no purge of

---

[5] https://www.azleg.gov/govlettr/55leg/2r/hb2617.pdf.

[6] *See, e.g.*, https://www.azleg.gov/alisPDFs/council/TOSA_55th_2nd_Regular.pdf at 11 (Arizona Legislative Council Table of Sections Affected identifying H.B. 2243 (Chapter 370) amendments to Section 16-165 having the general effective date ("G"); https://www.azleg.gov/legtext/55leg/2R/summary/S.2243GOV_ASPASSEDCOW.pdf at 4 (Senate Fact Sheet for H.B. 2243 stating that it "[b]ecomes effective on the general effective date").

any such voters before the upcoming election, because such individuals are given 90 days to sign a document attesting (without evidence) that they are a resident.  So only certain groups get purged before the next election: naturalized voters and voters of color.

15.    The history of H.B. 2243 demonstrates its improper intent.  As noted, the first version of H.B. 2243 was H.B. 2617—the bill appropriately vetoed by Governor Ducey on May 27, 2022 as violating due process.  Following that veto, Governor Ducey was excoriated by the proponents and supporters of the bill.  Arizona Free Enterprise Club—a group behind both H.B. 2617 and the as-passed version, H.B. 2243, said the following:



16.    Note the claimed justification for why H.B. 2617 should be passed: the bill provides 90 days prior to voter-cancellation—plenty of time in the proponents' minds for a voter to confirm they are "eligible."  H.B. 2617 *did* in fact provide for a 90-day response period for both (1) voters appearing to not be residents and thus ineligible to vote (the other-state-driver-license category), and (2) voters accused of not being U.S. citizens and thus ineligible to vote (the reason-to-believe-you-are-not-a-U.S.-citizen category).  And if there was no adequate response—which involved providing proof— then both categories of voters would have their registration cancelled.  And Governor Ducey vetoed it.

17.    But that core provision quietly changed in the version of the bill that passed and then *was* signed by Governor Ducey: H.B. 2243.  For those accused of lacking citizenship based on "reason to believe," H.B. 2243 (1) still requires actual proof of citizenship (not just a signature); (2) still results in voter cancellation (not just being

placed in inactive status); and (3) still requires referral to the county attorney and attorney general for criminal investigation if there is no adequate response. ***But the time to respond was shortened from 90 days to 35 days***.

18. There is, of course, only one reason for that: the legislators who passed H.B. 2243 and are anticipating its immediate enforcement *want* to cancel the registrations of voters of color and naturalized voters prior to the next election. For Governor Ducey to veto H.B. 2617 on grounds of fairness and process, and then sign the next version of the bill that makes it clear that he actually meant fairness and process only as to some Arizonans—and not as to voters of color and naturalized voters—is remarkable.

19. Plaintiff has no straightforward, speedy, or adequate remedy at law other than the relief requested in this Complaint. Unless enjoined, Arizona's new laws will impermissibly burden voting rights across the state and lead to unprincipled and significant voter cancellations. And time is of the essence. The implementation of H.B. 2492 has been stayed until January 1, 2023 by another Arizona bill (*see* S.B. 1638)—but that is only a few short months away. And as noted, H.B. 2243 is anticipated to have *immediate* impact upon the session effective date of September 24, 2022 if even a single county recorder decides to implement it.

20. And they will. After submitting its NVRA notice letter to the Secretary of State, but prior to filing this Complaint, Plaintiff made efforts to reach out to the county recorders named as a defendants in this lawsuit, asking whether and when, in connection with the passage of H.B. 2243, the county recorder is (1) currently implementing or planning to shortly implement any changes to their procedures or effectuate any new procedures or actions, and/or (2) planning any such changes/new procedures or actions upon the general effective date of bills passed during the Fifty-fifth Legislature (September 24, 2022). As of the filing of this Complaint, six have responded in writing. Of those six, three have said that they believe H.B. 2243 will go into effect in September, upon the general effective date of bills passed during the Fifty-fifth Legislature, and three have not taken a position on when exactly the law will go into effect. But every one who

- 8 -

has responded in writing has stated that they will implement H.B. 2243 upon its effective date—unless the law is enjoined before then.

21.     H.B. 2492's and H.B. 2243's requirements and punishments violate federal law and will cause irreparable harm to Plaintiff.  Plaintiff respectfully requests that the Court declare the challenged provisions of H.B. 2492 and H.B. 2243 set forth below unlawful and enjoin Defendants from enforcing the challenged provisions.

## JURISDICTION AND VENUE

22.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to redress the deprivation, under the color of state law, of their constitutional and federal rights.

23.     This Court has federal subject matter jurisdiction based on 28 U.S.C. §§ 1331 and 1343 and 52 U.S.C. §§ 10101 and 20510.

24.     This Court has jurisdiction to grant Plaintiff's requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

25.     This Court has jurisdiction to award Plaintiff's requested attorneys' fees and costs under 42 U.S.C. § 1988 and 52 U.S.C. §§ 10310(e) and 20510.

26.     This Court has personal jurisdiction over the Secretary of State; Defendant Hobbs is sued in her official capacity and resides in the State of Arizona.

27.     This Court has personal jurisdiction over the Attorney General; Defendant Brnovich is sued in his official capacity and resides in the State of Arizona.

28.     This Court has personal jurisdiction over the County Recorder Defendants; they are sued in their official capacities and reside in the State of Arizona.

29.     Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district and division.

- 9 -

COMPLAINT

**PARTIES**

I.    **Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition**

30.    As noted, Plaintiff AZ AANHPI for Equity Coalition is a state-wide, non-profit and non-partisan organization committed to the mission of improving the participation of marginalized communities in Arizona, with a particular focus on expanding representation and increasing civic engagement for the more than 357,000 AANHPIs in the state.  Plaintiff has eight team members, one recently hired in the wake of, and working on, the challenged laws.  Plaintiff's constituents actively participate in its self-governance, including through its Civic Engagement Youth Fellowship program. Plaintiff believes that the youth are the drivers for real social change, and its Civic Engagement Youth Fellowship program seeks AANHPI high school and college students, many of whom are Arizona voters, to set Plaintiff's organizational agenda priorities and participate in leadership training.

31.    Plaintiff strives for equity and justice on behalf of this constituency by building power through community directed organizing, increasing civic engagement, and empowering young leaders to participate in the decision-making process.  Civic engagement through voter education, registration, and mobilization is at the heart of Plaintiff's mission, and in the 2020 elections, Plaintiff helped increase the AANHPI voter turnout in Arizona by 58% from the 2016 elections through a multi-pronged voter outreach approach, helping to mobilize both federal-only and full ballot voters.

32.    Plaintiff advances its voter registration and mobilization goals via in-person canvassing, providing voter registration resources at community markets, disseminating educational literature to prospective voters through door-to-door canvassing, and text banking.  To carry out voter registration activities, Plaintiff employs one lead canvasser and up to fifteen canvassers at a time.  The team canvasses in districts with large AANHPI communities six days a week.  For 2022, the voter registration program set an initial goal of collecting and submitting 5,000 completed voter registration forms, but

- 10 -

after H.B. 2492 was passed, the goal was reduced to 2,000.  This goal reduction also resulted in Plaintiff losing approximately $50,000 of funding.  Should Plaintiff fail to meet its registration goal for the year, there is a risk of losing funding for the voter registration program in the future.

33.    Plaintiff's civic engagement work also includes providing resources to guide AANHPI voters through the voter registration process, help them interpret registration forms, and ensure that they are in compliance with state and federal requirements, including information on voter eligibility, key dates, and deadlines for upcoming elections, and ensuring that voters' registration is up to date.  Plaintiff also aims to spread its Democracy Pledge, which states, "No matter our color, background, or zip code, all Arizonans value our freedom to vote.  We deserve practices that protect our access to the ballot and leaders who will protect our democracy."  In signing the Democracy Pledge, voters show their support for policies that ensure that all Arizonans can cast a ballot.  Plaintiff plans to continue its voter registration, voter mobilization, and civic engagement operations in the future beyond the 2022 elections.

## II.    **Defendants**

34.    Defendant Katie Hobbs is sued in her official capacity as Arizona Secretary of State.  Secretary Hobbs is the chief election officer of the State of Arizona.  In that capacity, she is responsible for the implementation of H.B. 2492 and H.B. 2243 relating to voting and voter registration.

35.    Defendant Mark Brnovich is sued in his official capacity as Arizona Attorney General.  Attorney General Brnovich is the chief legal officer of the State of Arizona.  In that capacity, he is responsible for the enforcement of H.B. 2492 relating to the prosecution of individuals registered to vote who are deemed to be not United States citizens, and for submitting a report by March 31, 2023 to the state legislature on the number of individuals who registered with the Federal Form but have not provided DPOC to the Attorney General.  Attorney General Brnovich is also responsible for the

- 11 -

enforcement of H.B. 2243 relating to the investigation of individuals who are registered voters and have not provided DPOC.

36.    The Defendant County Recorders are sued in their official capacities as Arizona County Recorders.  They are the independent chief election officers at the local level in the State of Arizona.  In that capacity, they are responsible for the implementation and enforcement of H.B. 2492 and H.B. 2243 relating to the verification of a voter's citizenship status, processing voter registration forms, rejecting a voter's registration form, and canceling a voter's registration.

**FACTUAL ALLEGATIONS**

37.    H.B. 2492 and H.B. 2243 represent the State of Arizona's latest attempt to restrict the fundamental right to vote, including the exercise of that right by AANHPI voters, by imposing vague, arbitrary, restrictive, and discriminatory requirements for voter registration and cancellation.

38.    Since 2010, Arizona's Native Hawaiian and Pacific Islander population has grown by almost 30%, while the state's Asian population has increased by approximately 46%.  As of 2020, over 40% of AANHPI voting age Arizonans are naturalized U.S. citizens, and broken down further, over 43% of Asian Americans who are of voting age are naturalized U.S. citizens and over six percent of Native Hawaiian and Pacific Islanders are naturalized.  The number is even higher— 61.5%—for citizen voting age AANHPIs in Arizona.

39.    Just over eight percent of Arizonans are limited English proficient ("LEP"), but over a quarter of AANHPI Arizonans are LEP.

I.    **Arizona's Bifurcated Voting System**

40.    Arizona has a long and complex history of applying non-uniform voter registration and voting requirements to different voters.  In 2004, Arizona voters adopted Proposition 200, a ballot initiative purportedly designed to "combat voter fraud by requiring voters to present proof of citizenship when they register to vote and to present

identification when they vote on election day." *Purcell v. Gonzalez*, 549 U.S. 1, 2 (2006).

41.    Proposition 200 amended the state's election code to require county recorders to "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship."  A.R.S. § 16-166(F).

42.    In 2013, the Supreme Court held that Proposition 200's citizenship requirement was inconsistent with the NVRA, which requires states to "accept and use" the Federal Form, which does not require applicants to provide DPOC.  *ITCA*, 570 U.S. at 15.  Instead, the Federal Form requires voters to check a box declaring under penalty of perjury that they are United States citizens and eligible to vote.

43.    On October 7, 2013, then-Attorney General Thomas Horne issued an opinion stating that a dual-system of voter registration was required to comply with both state law and the NVRA.  Ariz. Att'y Gen. Op. No. I13-011 (Oct. 7, 2013).[7]

44.    Following Horne's opinion, Arizona created a bifurcated voting system: voters who registered with the Federal Form were allowed to cast ballots in federal elections, but not in state or local elections; while voters who registered with the Arizona state form, which required DPOC, could vote in all elections.  In essence, Arizona has two voter rolls—one for federal-only elections and one for all elections (federal, state, and local).

45.    In 2017, a lawsuit alleged that Arizona's voter registration policies violated the First and Fourteenth Amendments by treating voter registration applicants differently depending on whether they used Arizona's state registration form or the Federal Form. *See* Consent Decree at 1-2, *LULAC v. Reagan*, No. 2:17-cv-04102-DGC (June 18, 2018), ECF No. 37.

46.    To end the litigation, the parties in that case entered into the Consent Decree, which requires that: (1) Arizona treat all registrants the same, regardless of

_____

[7] https://www.azag.gov/sites/default/files/2018-06/I13-011.pdf.

- 13 -

whether they use the state or Federal Form, when registering all voters for federal elections; and (2) state and county officials check the motor vehicles database for U.S. citizenship documentation before limiting voters to federal-only elections. *See id.* at 7-16.

47.    As a result of the Consent Decree, voters using the Arizona state voter registration form whose U.S. citizenship could not be ascertained through the motor vehicle database were put on the federal-only voter roll if additional DPOC was not provided.

## II.    Passage and Purpose of H.B. 2492

48.    The first House reading of H.B. 2492 was on January 24, 2022.  On February 22, 2022, the House Committee on Rules had a hearing during which its staff attorney told the committee that H.B. 2492 likely presents a preemption issue with the NVRA and is in conflict with the Supreme Court's *ITCA* opinion.[8]  In response, Chairman Travis Grantham said that he found it "troubling" that Arizona was required to abide by Supreme Court precedent and that he "strongly rejects" that notion.[9]  Rather than comport with the law, he expressed his willingness to take the fight back to the Supreme Court.[10]  It was reported that the staff attorney in the Senate provided the same advice to the Senate as the House's attorney.[11]

49.    On information and belief, the Arizona Free Enterprise Club helped craft H.B. 2492, along with numerous other voter laws this session targeting voters of color.[12]

---

[8] https://www.azleg.gov/videoplayer/?clientID=6361162879&eventID=2022021121 (at 7:19).

[9] *Id.* (at 12:40).

[10] *Id.*

[11] Howard Fischer, *GOP lawmakers seek to reopen legal voting issue*, DAILY INDEPENDENT (March 26, 2022), https://www.yourvalley.net/stories/gop-lawmakers-seek-to-reopen-legal-voting-issue,293949.

[12] *See, e.g.*, Ray Stern, *Why Arizona Republicans pushed hard for a voter proof-of-citizenship bill and why it matters*, AZCENTRAL, https://www.azcentral.com/story/news/politics/arizona/2022/04/03/gop-pushed-voter-proof-citizenship-bill-why-matters/7244271001/; *Lawsuits Against HB2492 Are Attacking a*

- 14 -

Prior to H.B. 2492's passage, the Arizona Free Enterprise Club posted articles on its website promoting the bill, calling for readers to "Help Stop Illegals from Voting!" by supporting H.B. 2492.[13] In particular, the Arizona Free Enterprise Club pointed out that in 2020, more than 11,600 individuals voted in elections for federal office without having provided DPOC, and that the 2020 presidential election was decided by 10,457 votes, but provided no evidence of voter fraud.[14] At the March 10, 2022 Senate Judiciary Committee Hearing prior to H.B. 2492 becoming law, Greg Blackie, on behalf of the Arizona Free Enterprise Club, was the only person who provided testimony supporting H.B. 2492.[15] Moreover, despite a 1.5 minute cap for testimony, Mr. Blackie was the only speaker permitted additional time, and the chair of the committee looked to Mr. Blackie to explain how the law would operate and how it purportedly does not run afoul of *ITCA*.[16]

---

*Commonsense Bill Backed by the Constitution*, ARIZONA FREE ENTERPRISE CLUB (July 14, 2022), https://azfree.org/blog/2022/07/14/lawsuits-against-hb2492-are-attacking-a-commonsense-bill-backed-by-the-constitution/; https://www.votervoice.net/iframes/AZFEC/Bills (Votervoice page tied to Arizona Free Enterprise Club including H.B. 2492); Rachel Alexander, *Arizonans for Voter ID Act Makes Ballot, and 15 Election Integrity Bills Have Passed the Arizona House*, THE ARIZONA SUN TIMES (March 3, 2022), https://arizonasuntimes.com/2022/03/03/arizonans-for-voter-id-act-makes-ballot-and-15-election-integrity-bills-have-passed-the-arizona-house/.

[13] *The Proliferation of the "Federal Only Voter" List: How Arizona Ended up with 11,600 Voters in 2020 Who Have Never Proven Their Citizenship*, ARIZONA FREE ENTERPRISE CLUB (January 25, 2022), https://azfree.org/blog/2022/01/25/the-proliferation-of-the-federal-only-voter-list-how-arizona-ended-up-with-11600-voters-in-2020-who-have-never-proven-their-citizenship/; *How More Illegals Started Voting in AZ Elections and How House Bill 2492 Is Going to Fix It*, ARIZONA FREE ENTERPRISE CLUB (February 8, 2022), https://azfree.org/blog/2022/02/08/how-more-illegals-started-voting-in-az-elections-and-how-house-bill-2492-is-going-to-fix-it/.

[14] *The Proliferation of the "Federal Only Voter" List: How Arizona Ended up with 11,600 Voters in 2020 Who Have Never Proven Their Citizenship*, ARIZONA FREE ENTERPRISE CLUB (January 25, 2022), https://azfree.org/blog/2022/01/25/the-proliferation-of-the-federal-only-voter-list-how-arizona-ended-up-with-11600-voters-in-2020-who-have-never-proven-their-citizenship/.

[15] https://www.azleg.gov/videoplayer/?clientID=6361162879&eventID=2022031045 (at 15:50).

[16] *Id.* (at 30:45).

- 15 -

50.    In contrast to Mr. Blackie, a number of individuals spoke out against H.B. 2492 and the severe and negative impacts it would have on Arizonan voters.  As Arizona State Senator Martin Quezada stated at the same March 10, 2022 Senate Judiciary Committee Hearing: "[H.B. 2492] has actual impacts on our democracy, that actually impacts real citizen voters of this country and this state.  And that could devastate people's ability to make their voice heard at the polls.  This is something that we should be having an emergency on right here, an emergency in killing this bill.  Because this is a bad bill."[17]  And as Arizona Secretary of State Katie Hobbs explained in her letter to Governor Ducey urging him to veto H.B. 2492 on March 24, 2022: "[H.B. 2492] creates new barriers for voters that are disconnected from any legitimate election integrity purpose.  The bill violates clearly-settled federal law and, if signed, will lead to costly litigation."[18]

51.    Despite such concerns and warnings, on March 30, 2022, Governor Ducey signed H.B. 2492 into law based on false claims of widespread voter fraud and threats to election integrity.

52.    In the signing letter in support of the legislation, he explained that when the Federal Form was introduced to register Arizona voters in 2014, there were 21 registered voters statewide that used the Federal Form.  However, in the 2020 general election, the number of registered voters using the Federal Form had increased to 11,600.[19]  Because the number of registered voters using the Federal Form increased, Governor Ducey stated that the purpose of H.B. 2492 is to ensure that these registered voters are United States citizens:

> Federal law prohibits non-citizens from voting in federal elections.  Arizona law prohibits non-citizens from voting for all state and local offices, and requires proof of citizenship.  H.B. 2492 provides clarity to Arizona law on

[17] https://www.azleg.gov/videoplayer/?clientID=6361162879&eventID=2022031045 (at 43:05).

[18] https://twitter.com/SecretaryHobbs/status/1507436836691464195.

[19] https://azgovernor.gov/sites/default/files/hb2492_signing_letter.pdf.

- 16 -

how officials process federal form voter registration applications that lack evidence of citizenship.  Furthermore, H.B. 2492 ensures that the Attorney General's office has the data needed to properly determine if a person who has registered with the federal form is in fact a non-citizen. Under H.B. 2492, a person who registers with the federal form and who is found to not be a United States citizen will be prosecuted under our existing statutes.

53.    However, there is no evidence that voter fraud occurs in Arizona on a scale that impacts election results, such as the 2020 Presidential election, or threatens election integrity.  Indeed, Governor Ducey admitted as much when he rebuked then-President Trump's allegations of voter fraud in Arizona during the 2020 Presidential election. Moreover, the Arizona legislature financed a partisan-fueled audit of votes cast in Maricopa County during the 2020 election and found no conclusive evidence of voter fraud.[20]  Therefore, the additional restrictions and burdens on voting imposed by H.B. 2492 are not, and cannot be, justified by invoking vague and unproven claims of voter fraud committed by non-citizens and political operatives.

54.    Instead, as also described in Governor Ducey's signing letter, H.B. 2492 is a reaction to Arizona's changing electorate.  As Governor Ducey noted, the number of people who registered to vote with the Federal Form increased from 21 registered voters statewide in 2014 to 11,600 in 2020.  Governor Ducey—and the legislature for that matter—provided no evidence that the uptick in Federal Form registrations in this 6-year period was due to non-citizens registering to vote.  Rather uncoincidentally, it is due to the growing population of naturalized, limited English proficient (LEP) U.S. citizens in Arizona who are registering to vote and find better language access in the Federal Form that has been translated into 21 languages.  According to the Department of Homeland Security's data, in the same 6-year period from 2014 to 2020, Arizona has seen more than 100,000 residents naturalize, with Mexico as the country of origin with the highest

[20] Jeremy Duda, *Arizona 'audit' finds Biden won (by more votes) and no evidence of fraud*, AZ MIRROR (September 23, 2021), https://www.azmirror.com/2021/09/23/arizona-audit-finds-biden-won-by-more-votes-and-no-evidence-of-fraud/.

- 17 -

percentage of this naturalized population, followed next by Asiatic countries of origin.[21] On information and belief, one of H.B. 2492's goals is to curb these communities of color's right to vote.

55.    As discussed above, there is no evidence of wide-spread voter fraud that threatens the integrity of elections in Arizona.  Nevertheless, H.B. 2492 mandates that applicants and registered voters provide DPOC, documentary proof of residence ("DPOR"), and other arbitrary and immaterial information for voter registration.

56.    H.B. 2492 further requires county recorders to investigate the citizenship status of new applicants and reject voter registration applications that fail to meet the new registration requirements imposed by H.B. 2492 for new and previously registered voters.

**III.    Passage and Purpose of H.B. 2243**

57.    H.B. 2617—the previous version of H.B. 2243—was introduced on January 31, 2022.  Like H.B. 2492, H.B. 2617 was pushed by the Arizona Free Enterprise Club.[22] At the February 9, 2022 House Committee on Government & Elections hearing, Greg Blackie again appeared on behalf of the Arizona Free Enterprise Club, and spoke in support of H.B. 2617 as well, espousing the need for "election integrity" and "voter roll maintenance."[23]  Likewise, at the March 14, 2022 Senate Committee on Government hearing, H.B. 2617's sponsor spoke briefly, but deferred to Mr. Blackie to provide a detailed explanation of the bill, similar to the one he had given to the House.[24]

58.    In light of the vague language of the bill and the potential for bad actors to provide names of voters who they suspected, without evidence, of not being citizens, the

---

[21] https://www.dhs.gov/immigration-statistics/naturalizations.

[22] *See, e.g.*, Howard Fischer, *Scottsdale lawmaker calls election bill veto 'shocking'*, DAILY INDEPENDENT (May 29, 2022), https://yourvalley.net/stories/governor-vetoes-elections-bill-sponsored-by-scottsdale-gop-lawmaker,305404.

[23] https://www.azleg.gov/videoplayer/?clientID=6361162879&eventID=2022021045 (at 2:58:00).

[24] https://www.azleg.gov/videoplayer/?clientID=6361162879&eventID=2022031059 (at 1:21:27).

counties opposed the passage of the bill and urged Governor Ducey to veto it.[25] Governor Ducey ultimately did veto H.B. 2617 on May 27, 2022, stating: "Our lawfully registered voters deserve to know that their right to vote will not be disturbed without sufficient due process.  This provision leaves our election system vulnerable to bad actors who could seek to falsely allege a voter is not a qualified elector."[26]

59.    H.B. 2243 was first read on January 18, 2022 but did not contain the provisions challenged in this Complaint at that time.  In response to Governor Ducey's veto of H.B. 2617, on June 22, 2022, the Senate amended H.B. 2243 to include a modified version of H.B. 2617—and it passed the House swiftly, to land on the Governor's desk on June 24, the last day of the legislative session.  As the sponsor of the amendment explained, "this amendment is basically what was House Bill 2617, passed out of here, went to the governor's desk, he vetoed it, and this amendment is that bill but addresses the veto letter and the one concern."[27]  But that was not the full picture.

60.    First, H.B. 2243 is not simply H.B. 2617, with a minor change to address one concern from the Governor.  No one ever suggested—not publicly—that H.B. 2617 needed to be changed to improperly remove voters of color from the voter rolls more drastically.  But that is what the Senate amendment did.  What was a 90-day response period in H.B. 2617 was reduced to a 35-day response period for those likely to be accused of lacking U.S. citizenship (i.e., naturalized citizens) to provide DPOC.

61.    Second, H.B. 2243 does not alleviate the issue of bad actors nor the vague subjectivity resulting in improper voter registration cancellations; and will thus impermissibly interfere with and unduly burden the voting rights of AANHPIs, naturalized citizens, and other voters of color.  On information and belief, one of H.B.

[25] Howard Fischer, *Scottsdale lawmaker calls election bill veto 'shocking'*, DAILY INDEPENDENT (May 29, 2022), https://yourvalley.net/stories/governor-vetoes-elections-bill-sponsored-by-scottsdale-gop-lawmaker,305404.

[26] https://www.azleg.gov/govlettr/55leg/2r/hb2617.pdf.

[27] https://www.azleg.gov/videoplayer/?eventID=2022061052&startStreamAt=2847 (at 48:05).

2243's goals is to curb these communities' right to vote.  Indeed, Arizona State Senator Martin Quezada explained at that same June 23, 2022 Senate Session that H.B. 2617 had numerous problems other than what was identified in the Governor's veto letter and that all of those problems are still present in H.B. 2243.  He further explained that H.B. 2243 creates "different time frames for proving residency versus proving citizenship" and the bill will be "confusing for voters, and I think that's--, it appears as if that is the goal, is to create confusion amongst voters.  And when we do that we suppress the vote.  People don't want to register to vote, they don't want to participate in a process that is too confusing and that is all this is doing is creating more confusion."[28]

## IV.     The Onerous and Discriminatory Provisions of H.B. 2492 and H.B. 2243

### A.  H.B. 2492's Birthplace Requirement for Voter Registration

62.     Section 4 of H.B. 2492 amends Section 16-121.01(A) of the Arizona Revised Statutes such that proper registration requires the applicant to provide the applicant's place of birth.  Moreover, Section 16-121.01(A) as amended by H.B. 2492 further provides that, "ANY APPLICATION THAT DOES NOT INCLUDE ALL OF THE INFORMATION REQUIRED TO BE ON THE REGISTRATION FORM PURSUANT TO SECTION 16-152 AND ANY APPLICATION THAT IS NOT SIGNED IS INCOMPLETE AND THE COUNTY RECORDER SHALL NOTIFY THE APPLICANT PURSUANT TO 16-134, SUBSECTION B, AND SHALL NOT REGISTER THE VOTER UNTIL ALL OF THE INFORMATION IS RETURNED."[29]

63.     Thus, under H.B. 2492, an applicant cannot be properly registered to vote without providing their place of birth.  But an applicant's place of birth is not material in determining whether the applicant is qualified to vote or to assess their eligibility to register to vote, and thus such a requirement improperly singles out naturalized U.S.

---

[28] *Id.* (at 49:45).

[29] Quoted language in all caps related to H.B. 2492 or H.B. 2243 signifies language amended and/or added by that law.

- 20 -

citizens for no rational purpose and will have a chilling effect on the registration of such U.S. citizens.

**B.  H.B. 2492's Proof of Citizenship for Voter Registration**

64.    Section 16-166(F) of the Arizona Revised Statutes defines satisfactory evidence of U.S. citizenship to include: (1) driver license or non-operating identification license indicating that the applicant has provided satisfactory proof of citizenship; (2) legible photocopy of the applicant's birth certificate; (3) legible copy of the applicant's United States passport; (4) presentation to the county recorder of the applicant's United States naturalization documents or number of the certificate of naturalization; (5) other documents or methods of proof established pursuant to the immigration reform and control act of 1986; and (6) the applicant's bureau of Indian Affairs card number, tribal treaty card number or tribal enrollment number.

65.    Section 1 of H.B. 2492 amends Section 16-101 of the Arizona Revised Statutes to require a resident to be both a U.S. citizen and to have "PROVIDED SATISFACTORY EVIDENCE OF CITIZENSHIP AS PRESCRIBED IN SECTION 16-166" in order to be qualified to register to vote.

66.    Section 2 of H.B. 2492 requires applicants for driver's licenses and state IDs to provide DPOR.

67.    Section 3 of H.B. 2492 amends Section 16-121 of the Arizona Revised Statutes to define a qualified elector as: "A person who is qualified to register to vote pursuant to section 16-101 and who is properly registered to vote, if THE PERSON is at least eighteen years of age on or before the date of the election AND HAS PROVIDED SATISFACTORY EVIDENCE OF CITIZENSHIP AS PRESCRIBED IN SECTION 16-166, SHALL be deemed a qualified elector for any purpose for which such qualification is required by law, except as provided in section 16-126.  A person continues to be a qualified elector until that person's registration is canceled pursuant to section 16-165 or until that person does not qualify as a resident as DEFINED IN section 16-101, subsection B."

68.    Section 4 of H.B. 2492 amends Section 16-121.01 of the Arizona Revised Statutes to add a new subsection C which provides that "EXCEPT FOR A FORM PRODUCED BY THE UNITED STATES ELECTION ASSISTANCE COMMISSION, ANY APPLICATION FOR REGISTRATION SHALL BE ACCOMPANIED BY SATISFACTORY EVIDENCE OF CITIZENSHIP AS PRESCRIBED IN SECTION 16-166, SUBSECTION F, AND THE COUNTY RECORDER OR OTHER OFFICER IN CHARGE OF ELECTIONS WHO KNOWINGLY FAILS TO REJECT AN APPLICATION FOR REGISTRATION AS PRESCRIBED BY THIS SUBSECTION IS GUILTY OF A CLASS 6 FELONY.  THE COUNTY RECORDER OR OTHER OFFICER IN CHARGE OF ELECTIONS SHALL SEND A NOTICE TO THE APPLICANT AS PRESCRIBED IN SECTION 16-134, SUBSECTION B."

69.    Section 16-121.01(D) as added by H.B. 2492 mandates that the county recorder verify the citizenship of any voter who submits a Federal Form by consulting databases from Arizona's Motor Vehicle Division, the Social Security Administration, the United States Citizenship and Immigration Services Systematic Alien Verification for Entitlements Program (the "SAVE database") (if practicable), a National Association for Public Health Statistics and Information Systems, and any other state, city, town, county or federal database.

70.    Section 16-121.01(E) as added by H.B. 2492 creates three outcomes for Federal Form voters who attest under penalty of perjury to be U.S. citizens.  First, if the county recorder matches an applicant with information that verifies that the applicant is a U.S. citizen, the applicant will be "properly registered."  Second, if the county recorder matches an applicant with information indicating that the applicant is not a U.S. citizen, then the application is rejected, the applicant is notified of the rejection, and the application is forwarded to the county attorney and attorney general for investigation. Third, if an applicant cannot be matched to information indicating that they are a U.S. citizen, the applicant will not be qualified to vote in any presidential election or by mail

- 22 -

with an early ballot in any election until satisfactory evidence of citizenship is provided to the county recorder.

71.    Section 5 of H.B. 2492 adds Section 16-127 to the Arizona Revised Statutes to limit who is eligible to vote in federal elections.  It provides in part that "A PERSON WHO HAS REGISTERED TO VOTE AND WHO HAS NOT PROVIDED SATISFACTORY EVIDENCE OF CITIZENSHIP AS PRESCRIBED BY SECTION 16-166, SUBSECTION F IS NOT ELIGIBLE TO VOTE IN PRESIDENTIAL ELECTIONS" and "A PERSON WHO HAS NOT PROVIDED SATISFACTORY EVIDENCE OF CITIZENSHIP PURSUANT TO SECTION 16-166, SUBSECTION F AND WHO IS ELIGIBLE TO VOTE ONLY FOR FEDERAL OFFICES IS NOT ELIGIBLE TO RECEIVE AN EARLY BALLOT BY MAIL."

72.    In essence, H.B. 2492 creates three distinct voter rolls in Arizona—one for all local, state, and federal elections, one for U.S. House and Senate elections, and one for Presidential elections.

73.    And, under H.B. 2492, Arizona fails to accept and use the Federal Form to register voters for federal elections.  Additionally, H.B. 2492 seeks to purge voters from federal election rolls in non-uniform and discriminatory ways.  Under H.B. 2492, those who have not provided DPOC cannot vote in presidential elections or vote early by mail, and registrations can be cancelled when a county recorder receives "information" that the person is not a U.S. citizen.  Further, H.B. 2492 creates an avenue for criminal prosecution should the state, using outdated and inaccurate databases and whatever else, match an applicant with vague and undefined "information" that the applicant is not a citizen.  Moreover, under H.B. 2492, Arizona violates the Consent Decree previously agreed to by again rejecting any state form application that does not include DPOC.  *See* Consent Decree at 1-2, *LULAC v. Reagan*, No. 2:17-cv-04102-DGC (June 18, 2018), ECF No. 37.

COMPLAINT

**C. H.B. 2492's Proof of Residency for Voter Registration**

74.    Section 2 of H.B. 2492 requires applicants for driver's licenses and state IDs to provide DPOR.

75.    Section 5 of H.B. 2492 adds Section 16-123 to the Arizona Revised Statutes to require proof of location of residence and provides, in part, that "A PERSON WHO REGISTERS TO VOTE SHALL PROVIDE AN IDENTIFYING DOCUMENT THAT ESTABLISHES PROOF OF LOCATION OF RESIDENCE" and "A VALID AND UNEXPIRED ARIZONA DRIVER LICENSE OR NONOPERATING IDENTIFICATION NUMBER THAT IS PROPERLY VERIFIED BY THE COUNTY RECORDER SATISFIES THE REQUIREMENTS OF THIS SECTION."

76.    Section 16-123 as added by H.B. 2492 further states that "any of the identifying documents" required for identification under Arizona Statute Section 16-579 "constitutes satisfactory proof of location of residence."  Those documents are:

(a) A valid form of identification that bears the photograph, name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including an Arizona driver license, an Arizona nonoperating identification license, a tribal enrollment card or other form of tribal identification or a United States federal, state or local government issued identification.  Identification is deemed valid unless it can be determined on its face that it has expired.

(b) Two different items that contain the name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including a utility bill, a bank or credit union statement that is dated within ninety days of the date of the election, a valid Arizona vehicle registration, an Arizona vehicle insurance card, an Indian census card, tribal enrollment card or other form of tribal identification, a property tax statement, a recorder's certificate, a voter registration card, a valid United States federal, state, or local government issued identification or any mailing that is labeled as "official election material."  Identification is deemed valid unless it can be determined on its face that is has expired.

(c) A valid form of identification that bears the photograph, name and address of the elector except that if the address on the identification does not reasonably appear to be the same as the address in the precinct register or the identification is a valid United States military identification card or a valid

- 24 -

United States passport and does not bear an address, the identification must be accompanied by one of the items listed in subdivision (b) of this paragraph.

77.     In other words, under H.B. 2492, an applicant cannot register to vote using either the Federal or state form without providing identifying documentation that establishes proof of location of residence.

78.     Thus, under H.B. 2492, Arizona fails to accept and use the Federal Form to register voters for federal elections who do not provide DPOR because, as explained above, the Federal Form does not require DPOR.

**D. H.B. 2492's Attorney General Investigation Report**

79.     Section 7 of H.B. 2492 adds Section 16-143, which provides, in part, that the Secretary of State and county recorders submit to the Attorney General a list of individuals who have registered to vote but have not provided DPOC:

A. THE SECRETARY OF STATE AND EACH COUNTY RECORDER SHALL MAKE AVAILABLE TO THE ATTORNEY GENERAL A LIST OF ALL INDIVIDUALS WHO ARE REGISTERED TO VOTE AND WHO HAVE NOT PROVIDED SATISFACTORY EVIDENCE OF CITIZENSHIP PURSUANT TO SECTION 16-166 AND SHALL PROVIDE, ON OR BEFORE OCTOBER 31, 2022, THE APPLICATIONS OF INDIVIDUALS WHO ARE REGISTERED TO VOTE AND WHO HAVE NOT PROVIDED SATISFACTORY EVIDENCE OF CITIZENSHIP PURSUANT TO SECTION 16-166.
. . .
D. THE ATTORNEY GENERAL SHALL PROSECUTE INDIVIDUALS WHO ARE FOUND TO NOT BE UNITED STATES CITIZENS PURSUANT TO SECTION 16-182.

E. THE ATTORNEY GENERAL SHALL SUBMIT A REPORT TO THE SECRETARY OF STATE, THE PRESIDENT OF THE SENATE, AND THE SPEAKER OF THE HOUSE OF REPRESENTATIVES ON OR BEFORE MARCH 31, 2023 DETAILING ALL FINDINGS RELATING TO THE CITIZENSHIP STATUS OF INDIVIDUALS WHO ARE REGISTERED TO VOTE AND WHO HAVE NOT PROVIDED SATISFACTORY EVIDENCE OF CITIZENSHIP PURSUANT TO SECTION 16-166.

COMPLAINT

80.     Thus, H.B. 2492 subjects any voter registered with the Federal Form or registered using the Arizona state form that did not provide DPOC to potential criminal investigation based on potentially outdated and inaccurate databases.

**V.     H.B. 2492's and H.B. 2243's Cancellation of Voter Registrations**

81.     Section 5 of H.B. 2492 adds Section 16-127 to the Arizona Revised Statutes, which strips any already "REGISTERED" voter of their eligibility to vote in presidential elections and to receive an early ballot by mail if they have not provided DPOC.  H.B. 2492 includes no requirements that such registered voters be notified that such eligibility has been terminated.

82.     Section 8 of H.B. 2492 adds Section 16-165(A)(10), which provides that "The county recorder shall cancel a registration: . . . WHEN THE COUNTY RECORDER RECEIVES AND CONFIRMS INFORMATION THAT THE PERSON REGISTERED IS NOT A UNITED STATES CITIZEN."  H.B. 2492 includes no provisions that describe what "information" may be used to determine that a person is not a citizen and includes no provisions that describe how a county recorder is to "confirm[]" such information.

83.     Thus, H.B. 2492 strips already-registered voters of their eligibility to vote in presidential elections and by mail without notification or due process.  H.B. 2492 also allows for vague and undefined "information" to be the impetus for removing a voter from the rolls without due process.

84.     Section 2 of H.B. 2243 contains its own Section 16-165(A)(10) that provides "The county recorder shall cancel a registration: . . . WHEN THE COUNTY RECORDER OBTAINS INFORMATION PURSUANT TO THIS SECTION AND CONFIRMS THAT THE PERSON REGISTERED IS NOT A UNITED STATES CITIZEN . . . ."  Before cancellation, H.B. 2243 requires the county recorder to mail notice to the voter that the voter's registration will be cancelled in 35 days unless the voter provides DPOC.  If no response is provided in 35 days, the voter's registration is

- 26 -

cancelled, and the county recorder must notify the county attorney and the attorney general for investigation.

85.    Section 2 of H.B. 2243 requires that the Secretary of State and/or county recorders engage in a number of database checks, in most cases monthly, to re-confirm the registration status of already-registered voters.  This includes checking for U.S. citizenship information in the driver license database, the Social Security Administration database, the SAVE database maintained by the United States Citizenship and Immigration Services, the Electronic Verification of Vital Events System maintained by a National Association for Public Health Statistics and Information Systems, and other city, town, county, state, and federal databases.  In particular, as added by H.B. 2243, A.R.S. § 16-165(H) provides that, "TO THE EXTENT PRACTICABLE, EACH MONTH THE COUNTY RECORDER SHALL COMPARE PERSONS WHO ARE REGISTERED TO VOTE IN THAT COUNTY AND WHO THE COUNTY RECORDER HAS REASON TO *BELIEVE* ARE NOT UNITED STATES CITIZENS AND PERSONS WHO ARE REGISTERED TO VOTE WITHOUT SATISFACTORY EVIDENCE OF CITIZENSHIP AS PRESCRIBED BY SECTION 16-166 WITH THE SYSTEMATIC ALIEN VERIFICATION FOR ENTITLEMENTS PROGRAM MAINTAINED BY THE UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES TO VERIFY THE CITIZENSHIP STATUS OF THE PERSONS REGISTERED." [emphasis added].

86.    Thus, H.B. 2243 requires that for any voter who a county recorder has "reason to believe" is not a U.S. citizen, their voter registration depends on whether the government's databases, which contain outdated and unreliable data, indicate that they are or are not a U.S. citizen.  H.B. 2243 essentially allows anyone, without evidence, to simply give a list of names of people who are purportedly not citizens to the county recorders, thus triggering a check that can lead to improperly cancelled voter registrations and potential investigation and prosecution of eligible and registered Arizonans.

87.    Moreover, H.B. 2492 requires Arizonans to provide their place of birth in order to register to vote.  This creates a list of U.S. citizens who were not born in the

- 27 -

United States and subjects their U.S. citizenship status to constant suspicion and investigation.

## VI.     The Effects of H.B. 2492's and H.B. 2243's Onerous and Discriminatory Provisions

88.     The legislature's claims of voter fraud and election integrity are pretexts for the legislature's actual purpose in enacting H.B. 2492 and H.B. 2243—namely, to make voting harder for citizens of color, naturalized citizens, and citizens who registered to vote with the Federal Form.  H.B. 2492 and H.B. 2243 both discriminate on the basis of race and national origin, create undue burdens on citizens who seek to exercise their fundamental right to vote, and impermissibly interfere with that right.

89.     In its advisory memorandum to the U.S. Commission on Civil Rights in July 2018, the Arizona Advisory Committee found that in Maricopa County, roughly 96,000 voter registration forms were rejected because applicants were required to resubmit physical documentation of U.S. citizenship.[30]  H.B. 2492 will lead to similar results because it imposes DPOC requirements similar to those in effect at the time of this memorandum.  Such disenfranchisement will disproportionately impact AANHPIs, naturalized citizens, and other voters of color.

90.     H.B. 2492's and H.B. 2243's identification and DPOC requirements disproportionately burden voters of color.  AANHPIs and other ethnic groups—part of Plaintiff's constituency—are disproportionately likely to lack the forms of identification required under H.B. 2492 and H.B. 2243 to register to vote and remain on the voter rolls. As a result, a significant number of people of color will be dissuaded from registering to vote, a significant number of people of color attempting to register to vote will be denied the right to vote, and a significant number of people of color already registered will be

---

[30] U.S. COMM'N ON CIVIL RIGHTS, VOTING RIGHTS IN ARIZONA: AN ADVISORY MEMORANDUM OF THE ARIZONA ADVISORY COMMITTEE TO THE U.S. COMMISSION ON CIVIL RIGHTS 7 (July 2018), https://www.usccr.gov/files/pubs/2018/07-25-AZ-Voting-Rights.pdf.

denied some or all of their voting rights.  And because these voters are disproportionately likely to lack the necessary forms of identification, they are more likely to use the Federal Form and be impacted by H.B. 2492's and H.B. 2243's onerous provisions related to the Federal Form.

91.    In addition, because AANHPIs and other ethnic groups comprise a large proportion of naturalized citizens in Arizona and the population of AANHPIs and other ethnic groups in Arizona is rapidly increasing, the birthplace, DPOC, and DPOR requirements imposed by H.B. 2492 and H.B. 2243 on naturalized citizens has a disproportionately negative impact on voter registrations by AANHPIs.  Each year from 2014 to 2020, Arizona had more than 11,000 residents naturalize and become U.S. citizens, with Mexico being the country of origin with the highest percentage each year, followed by Asiatic countries.  H.B. 2492 and H.B. 2243 both create avenues for potential unwarranted criminal prosecution for naturalized citizens.  For example, both laws provide for a naturalized citizen to be subject to criminal prosecution if the citizen happens to register to vote after naturalization but before obtaining a new driver's license.  Thus, H.B. 2492 and H.B. 2243 will disproportionately dissuade naturalized citizens from registering to vote.

92.    This is particularly meaningful because, according to Census Bureau data from 2020, 61.5% of the AANHPI citizen voting age population are naturalized citizens (or over 40% voting age population).  Also according to Census Bureau data from 2020, Asian Americans are the community with the second-lowest percentage of registered citizen voters in Arizona.  On information and belief, H.B. 2492 and H.B. 2243 were enacted with the intent to suppress the voting power of AANHPIs, naturalized citizens, and other voters of color.  These laws are not Arizona's first attempt at suppressing the vote of naturalized voters and voters of color.  Instead, these laws are part of Arizona's long history of proposing and passing legislation aimed at, and having the effect of, silencing these voices.

COMPLAINT

93.     In Arizona, the fee for obtaining a driver's license can range from $10 to $25, depending on age and type.[31]  And the fee for an identification card is $12 for anyone under the age of 65.[32]  It may take up to 15 days to receive a license or identification card in the mail.[33]  To obtain a license or identification card, an applicant must provide proof of identification, age, and authorized presence, such as a birth certificate, U.S. passport, or naturalization certificate.  Arizona charges a fee of $32.95 to obtain a copy of a birth certificate, though someone born in another state may have a different fee, depending on the state.[34]  For Arizona, the birth certificate would come through regular mail, though additional fees could be paid for expedited shipping.  Costs for U.S. passport books are $130 to $165, assuming an applicant can present evidence of citizenship, with an extra fee of $150 if the applicant cannot.[35]  Routine processing times are 8 to 11 weeks, and even 5 to 7 weeks when paying for expedited processing.[36]  The current cost for replacing a naturalization certificate is $555.00.[37]  The processing time is on the order of 12 months.[38]  Further costs for these documents can be expected should a life event, such as a name change, require a change to the information.  Indirect costs

---

[31] *Fees (Driver License)*, ARIZ. DEP'T OF TRANSP., https://azdot.gov/motor-vehicles/driver-services/driver-license-information/fees-driver-license.

[32] *Id.*

[33] *Card Issuance Process*, ARIZ. DEP'T OF TRANSP., https://azdot.gov/motor-vehicles/driver-services/driver-license-information/card-issuance-process.

[34] *Vital Records*, ARIZ. DEP'T OF HEALTH SERVS., https://www.azdhs.gov/licensing/vital-records/index.php#online-ordering-options.

[35] *United States Passport Fees*, U.S. DEP'T OF STATE, https://travel.state.gov/content/dam/passports/forms-fees/Passport%20Fees%20Chart_TSG_JAN%202022.pdf.

[36] *Need a Passport*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/passports/need-passport.html.

[37] *N-565, Application for Replacement Naturalization/Citizenship Document*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://www.uscis.gov/n-565.

[38] *Check Case Processing Times*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://egov.uscis.gov/processing-times/.

COMPLAINT

associated with travel time and waiting time lead to further expense.[39]  These costs are often too burdensome for members of the AANHPI community, naturalized citizens, and other voters of color in Arizona, and particularly burdensome for voters with limited English proficiency.  And the 35-day timeline requirement of H.B. 2243 makes it very unlikely that a citizen would be able to obtain DPOC and present it to Arizona officials before being improperly purged from Arizona's voter rolls.

94.    Moreover, the birthplace requirement classifies voters by their national origin, segregating out those voters who are naturalized citizens from those born in the United States.  H.B. 2492 provides no explanation for how an applicant's birthplace will be used, and the explanation provided at the March 10, 2022 Senate Judiciary Committee hearing is clearly pretextual.  There, Senator Lupe Contreras questioned Mr. Blackie: "Why is place of birth a requirement on this form for voter registration?"[40]  Mr. Blackie answered that "place of birth is how you can sometimes get a better match of who the individual is, which will help us find proof of citizenship for somebody who didn't provide it when they applied."[41]  However, Section 16-121.01(A) as amended by H.B. 2492 only affects the state form; and given that applicants using the state form are also required to provide DPOC confirming their citizenship, any argument that birthplace helps to further confirm citizenship is pretextual as H.B. 2492 contains no provisions for additional confirmation of citizenship beyond DPOC for state form applicants.  Instead,

---

[39] *See, e.g.*, G.K. Butterfield, U.S. HOUSE OF REPRESENTATIVES SUBCOMM. ON ELECTIONS, VOTING IN AMERICA: ENSURING FREE AND FAIR ACCESS TO THE BALLOT 5 (July 2021), https://cha.house.gov/sites/democrats.cha.house.gov/files/2021_Voting%20in%20America_v5_web.pdf.

[40] https://www.azleg.gov/videoplayer/?clientID=6361162879&eventID=2022031045 (at 33:57).

[41] *Id.*  In fact, it appears that Mr. Blackie's testimony acknowledges that matching voter registration data to government databases is inherently flawed and error-prone. Moreover, there are no standards or requirements in either H.B. 2492 or H.B. 2243 of what constitutes a "match" and what information must be considered by election officials who match voter registration records to the various government databases.

- 31 -

on information and belief, the birthplace requirement will only be used to identify naturalized citizens for differential, unequal treatment by the state and will act to chill voter registration of AANHPIs, naturalized citizens, and other voters of color in a disproportionate manner.

95.     H.B. 2492 further provides that voters must be removed when a county recorder "receives and confirms information that the person registered is not a United States citizen."[42]  However, there are no details regarding how county recorders will receive such information, how to confirm such information, and what information establishes that a person is not a United States citizen.  The consequence is that a potential voter will not have an opportunity to cure the defect by providing DPOC before they are removed from voter registration rolls.  As such, because of the vagueness of H.B. 2492, voters will be arbitrarily removed from voter registration rolls as a result of the subjective decisions of county recorders.  This provision will disproportionately affect AANHPIs, naturalized U.S. citizens, and other voters of color as these groups are the most likely to be accused of being non-U.S. citizens.  Moreover, county recorders or other state officials will be able to use this provision in conjunction with the birthplace requirement to single these voters out.

96.     H.B. 2243 provides that voters must be subject to imprecise, standardless matches against an imprecise and inaccurate database—one not designed for this purpose—when a county recorder "has reason to believe"—based on any unsubstantiated source—that a voter is not a U.S. citizen.  A voter must also be removed when other government databases do not indicate that the voter is a citizen.  The voter is afforded only a single piece of mail and a small window to contest and cure.  But the cure is to provide DPOC, which is unlawful for all the reasons set forth in this Complaint, and is costly and time-consuming to obtain.  This provision will disproportionately affect

---

[42] While this provision is removed by H.B. 2243, it is part of H.B. 2492 and is illegal for the reasons alleged herein.

- 32 -

AANHPIs, naturalized citizens, and other voters of color as those who will be targeted by bad actors seeking to give a county recorder "reason to believe" that these voters are not citizens.  It will also disproportionately affect those voters with limited English proficiency who will have to interpret a notice in English and navigate complicated government channels in order to provide adequate DPOC.  Moreover, county recorders or other state officials will be able to use this provision in conjunction with the birthplace requirement to single these voters out.

97.    Similarly, H.B. 2492 removes voters who do not provide DPOC from the presidential voter rolls and deems them ineligible to vote in presidential elections and use mail-in ballots.  This impermissibly interferes with and unduly burdens the fundamental right to vote, and particularly so for AANHPIs, naturalized citizens, and other voters of color as explained above.  This also deprives such registered voters of their eligibility to vote in presidential elections and using mail-in ballots without due process.  H.B. 2492 provides no notice to these registered voters or an opportunity to cure before losing such eligibility.  Restricting access to mail in voting has a disproportionate and disenfranchising impact on these voters of color because it is a method used with increasing frequency by such voters.[43]  And through its excessive database checks and voter-cancellation provisions, H.B. 2243 will force Federal Form users and others who did not previously provide DPOC to now provide DPOC or else have their registration cancelled altogether.  This also impermissibly interferes with and unduly burdens the fundamental right to vote, and particularly so for AANHPIs, naturalized citizens, and other voters of color, as explained above.

98.    Worst of all, H.B. 2492 and H.B. 2243 mandate that when a county recorder—or anybody else for that matter—questions the citizenship of a voter, based on

---

[43] G.K. Butterfield, U.S. HOUSE OF REPRESENTATIVES SUBCOMM. ON ELECTIONS, VOTING IN AMERICA: ENSURING FREE AND FAIR ACCESS TO THE BALLOT 7-8 (July 2021), https://cha.house.gov/sites/democrats.cha.house.gov/files/2021_Voting%20in%20America_v5_web.pdf.

- 33 -

outdated and unreliable government databases, the Attorney General will investigate and may prosecute such a voter.  As a consequence, H.B. 2492 and H.B. 2243 create a chilling effect on potential voters to register to vote, especially voters with limited English proficiency, AANHPIs, naturalized citizens, and other voters of color.

99.    Upon information and belief, Defendants intend to implement the birthplace, DPOC, DPOR, and voter removal requirements set forth in Sections 1, 3, 4, 5, 7, and 8 of H.B. 2492 and Section 2 of H.B. 2243.

## VII.    Harm to Plaintiff

100.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

101.    As a result of the new birthplace, DPOC, and DPOR requirements and voter purges imposed by H.B. 2492 and H.B. 2243, Plaintiff is impeded in its ability to conduct community-based voter registration and mobilization.  Plaintiff will have to train its staff and volunteers on the new regulations and educate potential voters, who often have limited English proficiency, on the additional documentation required to register to vote.  Further, Plaintiff's voter mobilization and education efforts will be more onerous and less effective as H.B. 2492 and H.B. 2243 will remove more and more AANHPI voters, many of whom are naturalized U.S. citizens, from one or more elections (state, Congressional, or Presidential).

102.    Plaintiff has expended limited and valuable organizational resources informing voters of the new voting requirements as an attempt to prevent H.B. 2492 and H.B. 2243 from blocking qualified voters from voting.  Plaintiff has been injured by the DPOC and DPOR provisions of H.B. 2492 and H.B. 2243 because its resources are drained by the effort to assist voters in understanding and navigating the new documentary requirements.  Without these new requirements imposed by H.B. 2492 and H.B. 2243, Plaintiff would have the ability to use its limited resources in reaching out to more voters through its voter registration, mobilization, and participation efforts.

103.    H.B. 2492 and H.B. 2243 have frustrated Plaintiff's animating organizational purpose by erecting barriers to registration—impediments that disenfranchise the very community whose interests Plaintiff seeks to advance.  Because H.B. 2492 imposes stricter registration requirements, and H.B. 2492 and H.B. 2243 create avenues for wrongful prosecution, registering voters will become more difficult and thus H.B. 2492 and H.B. 2243 frustrate Plaintiff's mission to increase civic engagement, voter participation, and voter registration.

104.    H.B. 2492's DPOC and birthplace requirements and threat of potential investigation and prosecution will have a chilling effect, thus decreasing the number of individuals seeking to register and impairing Plaintiff's ability to register as many AANHPI voters as possible.  H.B. 2492's and H.B. 2243's DPOC requirements will also limit the number of persons that Plaintiff can register to vote and impair the ability of Plaintiff to facilitate voter registration and voter turnout.

105.    Furthermore, the voter removal procedures included in H.B. 2492 and H.B. 2243 directly frustrate Plaintiff's mission of registering voters and increasing civic participation by purging voters from the registration rolls.

106.    Prior to H.B. 2492 and H.B. 2243 being passed, Plaintiff engaged in outreach efforts to educate community members about H.B. 2492 and urge them to voice their opposition to the bill.  Moreover, Plaintiff visited college campuses to educate AANHPI students about the damaging effects of the legislation.  In preparation for these visits, Plaintiff created various educational materials and pamphlets to distribute.  Also prior to these laws being passed, Plaintiff's Youth Community Outreach Director gave testimony before the Senate Judiciary Committee regarding some of the retroactive effects of H.B. 2492.

107.    Since H.B. 2492 and H.B. 2243 were signed into law, Plaintiff has continued to divert its scarce resources to respond to these laws.  It has diverted staff time to understanding the laws and their effects on the AANHPI community.  It has also drafted educational resources to distribute to the community to explain these laws'

- 35 -

changes to the existing law and what those changes mean for the community.  Currently, Plaintiff's entire staff is updating and revamping the process of voter registration, including naturalized citizens, many of whom are AANHPI.  Thus, Plaintiff has already had to divert resources such as staff and volunteer time in response to H.B. 2492 and H.B. 2243.

108.    Plaintiff's Democracy Defender Director, who is responsible for both legislative advocacy and voter registration work, has been forced to devote more time on the latter.  For example, the Democracy Defender Director has re-trained the team of canvassers to address H.B. 2492's DPOC requirement and to ensure that applicants have the appropriate documentation to register.  Currently, the Democracy Defender Director is creating an online petition for the community to sign to show their opposition to H.B. 2492 and H.B. 2243.  This new outreach project will also help educate naturalized citizens who fear for their voting rights about H.B. 2492 and H.B. 2243.

109.    Plaintiff anticipates continuing to devote time and resources to monitoring how H.B. 2492 and H.B. 2243 are implemented.  Because these laws have caused and will continue to cause a direct injury by lowering voter registration, Plaintiff will seek to counteract this by diverting resources to help educate and assist voters about the new requirements.  To do so, it will be required to expend resources updating training materials for its canvassers and youth fellows, re-training its canvassers, and creating and distributing materials to explain the complex requirements of H.B. 2492 and H.B. 2243.  For example, training materials must be revised to reflect that one's birthplace is now required for a registration form to be complete, and they must now explain the nuances of what driver's licenses and state IDs are sufficient to register.  Moreover, while canvassing, canvassers will need to spend additional time to assuage fears and counteract the chilling effect created by these laws.  Such efforts will continue to occur for future elections and beyond for as long as these laws' requirements are in effect.

110.    Plaintiff will be forced to divert resources from its other civic engagement programs, such as voter registration, mobilization, and education activities, and instead

focus resources on ensuring that voters obtain proper licenses and other documentation/citizenship updates. For example, Plaintiff currently funds Island Liaison, Inc. ("Island Liaison"), which is a nonprofit committed to the mission of serving as a resource for educational and cultural enrichment as well as health and government services locally to the Pacific Islander community in Arizona. As part of providing accessibility assistance to government services, Island Liaison helps Pacific Islanders obtain DPOC from government agencies. However, as a result of H.B. 2492 and H.B. 2243's DPOC requirement, this program will need to be expanded to help Asian Americans, Native Hawaiians, and naturalized communities. To enable the expansion, Plaintiff will be forced to allocate more of its funding to Island Liaison, and in doing so, will not be able to use its limited resources to fund other critical activities it otherwise would champion.

111. Plaintiff currently uses Arizona's state voter registration form to register voters, and if a naturalized citizen seeking to register lacks DPOC at the time of registration, then they are registered to vote in federal elections. After H.B. 2492 becomes effective though, naturalized citizens seeking to register using the state form without DPOC will not be registered for any elections at all. And under H.B. 2243, they may be subsequently cancelled from the voter rolls if they cannot provide DPOC. This means that Plaintiff will need to develop new materials and educate voters to ensure that they are in fact registered and remain registered. For example, Plaintiff plans to create "Know Your Rights" cards and develop educational resources to ensure that applicants know what they need to satisfy the DPOC requirement. Creating these new materials, educating already-registered voters and those who will register, and assisting voters in these situations will require Plaintiff to, at minimum, reallocate its staff and volunteer time. Moreover, to reach the AANHPI community, these materials will need to be translated into various languages—a costly expense Plaintiff will incur.

112. Additionally, Plaintiff will need to inform community members of H.B. 2492's and H.B. 2243's investigation and prosecution provisions. It will also need to

- 37 -

divert resources to counteract the chilling effect that such procedures will create and have on voters.  This is especially so because Plaintiff's community includes naturalized citizens whose information in the databases listed in A.R.S. § 16-143(B) and A.R.S. § 16-165 is not likely to reflect their current citizenship status.  To educate the community and combat the resulting chilling effect of these laws, Plaintiff will need to develop new materials and translate them into various languages.  Plaintiff will thus continue to suffer injury as a direct result of H.B. 2492 and H.B. 2243.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Undue Burden on the Right to Vote
in Violation of the First and Fourteenth Amendments to the U.S. Constitution)**

113.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

114.    Voting is a fundamental right subject to the protections of the Fourteenth Amendment.  Similarly, Plaintiff's rights to engage in its core activities, including civic engagement and voter registration, mobilization, and education, are protected by the First Amendment.

115.    Laws related to voting regulations that place burdens on these rights are subject to the sliding scale *Anderson*/*Burdick* balancing test.  *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).  The more severe the burden, the more compelling the state's interest must be.  On one side, regulations imposing a lesser burden may be justified by demonstrating important regulatory interests.  On the other side, regulations imposing severe burdens are subject to strict scrutiny.  Regulations may also fall in the middle where they are serious enough to require an assessment of whether alternative methods would advance the purported governmental interests.

116.    By enforcing compliance with Sections 1, 3, 4, 5, and 7 of H.B. 2492 (together and individually), which include the birthplace, DPOC, and DPOR

- 38 -

requirements to register to vote, Defendants impose severe burdens on Plaintiff's First Amendment rights.  Defendants' pretextual justifications do not survive strict scrutiny or even rational basis review.

117.    By enforcing compliance with Sections 1, 3, 4, 5, and 7 of H.B. 2492 (together and individually), which include the birthplace, DPOC, and DPOR requirements to register to vote, Defendants impose severe burdens on the right to vote for Arizonans, and in particular for AANHPIs, naturalized citizens, and other voters of color.  Defendants' pretextual justifications do not survive strict scrutiny or even rational basis review.

118.    By enforcing compliance with Section 2 of H.B. 2243, which requires that voters provide additional information and documentation to prove U.S. citizenship, Defendants impose severe burdens on the right to vote for Arizonans, and in particular for AANHPIs, naturalized citizens, and other voters of color.  Defendants' pretextual justifications do not survive strict scrutiny or even rational basis review.

### SECOND CLAIM FOR RELIEF

**(Arbitrary and Disparate Treatment of Voter Registration Applicants Using the State Form in Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution)**

119.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

120.    The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.  It requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburn Living Ctr.*, 473 U.S. 432, 439 (1985).

121.    The right to vote is "a fundamental political right . . . preservative of all rights." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("[T]he right to vote is too precious, too fundamental to be so burdened or conditioned.").  "[O]nce the franchise is granted to the electorate, lines may not be drawn

- 39 -

which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment. That is to say, the right of suffrage is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress, acting pursuant to its constitutional powers, has imposed." *Harper*, 383 U.S. at 665.

122. By treating voters who register with the Federal Form differently from voters who register with the state form, Sections 1, 3, 4, 5, and 7 of H.B. 2492 and Defendants' enforcement of those sections impermissibly subject state form applicants to disparate treatment by rejecting their applications completely, rather than registering them to vote in congressional and/or federal elections.  Defendants' pretextual justifications do not survive strict scrutiny or even rational basis review.

123. By treating voters who register with the Federal Form differently from voters who register with the state form, Sections 1, 3, 4, 5, and 7 of H.B. 2492 and Defendants' enforcement of those sections impermissibly subject state form applicants to disparate treatment by requiring additional information on the state form, including requiring an applicant's place of birth.  Because Arizona law expressly does not use this information to verify state form applicants' citizenship, it does not advance any proffered or possible State interest.  Defendants' pretextual justifications do not survive strict scrutiny or even rational basis review.

124. Accordingly, Plaintiff is entitled to a declaration that Sections 1, 3, 4, 5, and 7 of H.B. 2492 are unconstitutional and an order permanently enjoining their enforcement.

## THIRD CLAIM FOR RELIEF

**(National Origin Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution)**

125. Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

126. The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

- 40 -

U.S. Const. amend. XIV, § 1.  The Equal Protection Clause is violated when the government treats a person disparately as compared to similarly situated persons where the disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.

127.    Laws that classify based on national origin are inherently suspect and subject to strict scrutiny.  Where a law does not facially classify by a suspect class, an Equal Protection claim alleging disparate treatment that targets a suspect class is analyzed under the discriminatory intent test.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

128.    By classifying and subjecting naturalized U.S. citizens to disfavored treatment through the imposition of burdensome voting registration requirements (i.e., the DPOC and birth place requirements), Sections 1, 3, 4, 5, and 7 of H.B. 2492 and Defendants' enforcement of those sections violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Moreover, because the voters most likely to lack DPOC include AANHPIs, naturalized citizens, and other voters of color, Sections 1, 3, 4, 5, and 7 of H.B. 2492 discriminate against those citizens.

129.    By subjecting naturalized U.S. citizens to disfavored treatment through the imposition of burdensome voting registration requirements (i.e., the DPOC requirement), Section 2 of H.B. 2243 and Defendants' enforcement of that section violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Moreover, because the voters most likely to lack DPOC include AANHPIs, naturalized citizens, and other voters of color, Section 2 of H.B. 2243 discriminates against those citizens.

130.    By requiring county recorders to only consult the SAVE database when the county recorder has reason to believe a voter is not a citizen, or when a voter has not provided DPOC, H.B. 2243 impermissibly targets voters by national origin for disparate treatment in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

131.    As alleged above, H.B. 2492 and H.B. 2243 were enacted with discriminatory intent and the intent to suppress the voting rights of AANHPIs, naturalized citizens, and/or other voters of color.

132.    Accordingly, Plaintiff is entitled to a declaration that Sections 1, 3, 4, 5, and 7 of H.B. 2492 are unconstitutional and an order permanently enjoining their enforcement.

133.    Accordingly, Plaintiff is entitled to a declaration that Section 2 of H.B. 2243 is unconstitutional and an order permanently enjoining its enforcement.

## FOURTH CLAIM FOR RELIEF

### (Violation of Procedural Due Process Rights under the Fourteenth Amendment to the U.S. Constitution)

134.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

135.    The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

136.    Voting is a fundamental right subject to the protections of the Fourteenth Amendment. Furthermore, because Arizona voters have been able to vote in presidential elections and Arizona has afforded its voters the ability to vote by mail, these aspects are subject to due process guarantees as well and voters cannot be deprived of them without adequate procedures. Laws related to voting regulations that place burdens on these rights are subject to the sliding scale *Anderson/Burdick* balancing test. Defendants' pretextual justifications for H.B. 2492 and H.B. 2243 do not survive strict scrutiny or even rational basis review.

137.    By stripping already-registered voters who have not provided DPOC of their eligibility to vote in presidential elections and to use early ballots by mail without providing notice or an opportunity to contest or cure, Section 5 of H.B. 2492 and Defendants' enforcement of that section violate voters' procedural due process rights.

138.    By cancelling a voter's registration without notice or an opportunity to contest or cure when a county recorder receives and confirms information that the person registered is not a United States citizen, Section 8 of H.B. 2492 and Defendants' enforcement of that section violate voters' procedural due process rights.

139.    By rejecting a voter's registration application upon determination that the applicant is not a citizen and forwarding the application to the county attorney and attorney general for investigation without allowing the applicant an opportunity to contest or cure such a determination, Section 4 of H.B. 2492 and Defendants' enforcement of that section violate voters' procedural due process rights.

140.    Accordingly, Plaintiff is entitled to a declaration that Sections 4, 5, and 8 of H.B. 2492 are unconstitutional and an order permanently enjoining their enforcement.

141.    By cancelling a voter's registration without an adequate opportunity to contest or cure when a county recorder obtains information that the person registered is not a United States citizen, Section 2 of H.B. 2243 and Defendants' enforcement of that section violate voters' procedural due process rights.

142.    Accordingly, Plaintiff is entitled to a declaration that Section 2 of H.B. 2243 is unconstitutional and an order permanently enjoining its enforcement.

**FIFTH CLAIM FOR RELIEF**

**(Race Discrimination in Violation of the Fourteenth & Fifteenth Amendment to the U.S. Constitution)**

143.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

144.    Section 1 of the Fourteenth Amendment to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

- 43 -

145.    The Fifteenth Amendment to the United States Constitution provides that the "right of citizens of the United States to vote shall not be denied or abridged by … any State on account of race, color or previous condition of servitude."   The Fifteenth Amendment is "comprehensive in reach," and applies to "any election in which public issues are decided or public officials selected."  *Rice v. Cayetano*, 528 U.S. 495, 512, 523 (2000).   "The [Fifteenth] Amendment bans racial discrimination in voting by both state and nation.  It thus establishes a national policy . . . not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local."  *Terry v. Adams*, 345 U.S. 461, 469–70 (1953).

146.    Both the Fourteenth and Fifteenth Amendment prohibit intentional racial discrimination by state actors.   Discrimination may be established by proof that the defendants used race as a motivating factor in their decisions.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

147.    As alleged above, H.B. 2492 and H.B. 2243 were enacted with discriminatory intent and the intent to suppress the voting rights of AANHPIs, naturalized citizens from those communities, and other voters of color.

148.    By requiring that voters provide additional information and documentation to meet the birthplace requirement and prove U.S. citizenship and residency, and removing voters from the rolls if such information is not provided or is questioned, Sections 1, 3, 4, 5, 7, and 8 of H.B. 2492 and Defendants' enforcement of those sections intentionally discriminate against AANHPIs, naturalized citizens from those communities, and other voters of color, in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution.

149.    Accordingly, Plaintiff is entitled to a declaration that Sections 1, 3, 4, 5, 7, and 8 of H.B. 2492 are unconstitutional and an order permanently enjoining their enforcement.

150.    By requiring that voters provide additional information and documentation to prove U.S. citizenship, and removing voters from the rolls if such information is not

- 44 -

provided or is questioned, Section 2 of H.B. 2243 and Defendants' enforcement of that section intentionally discriminate against AANHPIs, naturalized citizens from those communities, and other voters of color, in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution.

151.    Accordingly, Plaintiff is entitled to a declaration that Section 2 of H.B. 2243 is unconstitutional and an order permanently enjoining its enforcement.

**SIXTH CLAIM FOR RELIEF**

**(Denial of Right to Vote Based on Immaterial Omission on Voter Registration Form in Violation of the Civil Rights Act, 52 U.S.C. § 10101)**

152.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

153.    The Materiality Provision of the Civil Rights Act of 1964 prohibits individuals "acting under color of law" from denying anyone the right "to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).

154.    H.B. 2492 violates Subsection (a)(2)(B) of Section 10101 of the Civil Rights Act by requiring registrants to provide their place of birth, which is not material to determine whether a registrant is qualified to vote.

155.    Accordingly, Plaintiff is entitled to a declaration that Defendants' implementation of Section 4 of H.B. 2492 violates Plaintiff's rights under 52 U.S.C. § 10101(a)(2)(B) and an order permanently enjoining its enforcement.

**SEVENTH CLAIM FOR RELIEF**

**(Violation of the National Voter Registration Act of 1993)**

156.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

- 45 -

COMPLAINT

157.   On July 22, 2022, Plaintiff provided written notice of the NVRA violations created by H.B. 2492 and H.B. 2243 and described in this Complaint (*See* Appendix 1).

158.   Defendants have already been notified of the NVRA violations created by H.B. 2492 described in this Complaint by other persons who, for purposes of 52 U.S.C. § 20510's notice provisions, are similarly situated to Plaintiff.  No additional notice to Defendants is required to effectuate the purpose of 52 U.S.C. § 20510 because, on information and belief, Defendants have not and will not take any ameliorative actions to comply with the NVRA.  NVRA violations as a result of H.B. 2243 if implemented in any way prior to November 8, 2022 are subject to 20-day notice under 52 U.S.C. § 20510 as they are within 120 days of a federal election.  Despite believing that no further notice under the NVRA is required for H.B. 2492, Plaintiff will seek to amend and/or supplement this Complaint upon the expiration of the respective notice periods under the NVRA for H.B. 2492 and H.B. 2243 to re-allege these claims.

159.   Section 5 of the NVRA requires that (most) states register voters "simultaneously" when they apply for a state driver's license or ID.  52 U.S.C. § 20504. In doing so, a state "may not require any information that duplicates information required on the driver's license portion of the form" and "may require only the minimum amount of information necessary to prevent duplicate voter registrations[] and enable State election officials to assess the eligibility of the applicant . . . ."  52 U.S.C. § 20504(c)(2). Moreover, Section 5 of the NVRA requires that state officials provide applicants with a statement setting forth each eligibility requirement to register to vote and requires applicants to attest under penalty of perjury to meeting such eligibility requirements.  *See* 52 U.S.C. § 20504(c)(2)(C).

160.   Section 6 of the NVRA requires states to "accept and use" the Federal Form.  52 U.S.C. § 20505(a)(1).  The Federal Form requires that an applicant attest under penalty of perjury that they meet the voter eligibility requirements of the applicant's state. 52 U.S.C. § 20508(b)(2).

- 46 -

161. Section 8 of the NVRA requires that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office" be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1). The statute's uniformity requirement is violated where a voter-roll maintenance program singles out one group of voters for different treatment. The statute's nondiscrimination requirement is violated when a voter-roll maintenance program targets specified classes of people.

162. Section 8 of the NVRA also limits the reasons that a state or political subdivision may remove a registered voter from the voter registration rolls. 52 U.S.C. § 20507(a)(3)-(4). Specifically, a voter can be removed at the voter's request, by reason of criminal conviction or mental incapacity, by the voter's death, or by a change in the residence of the voter. *Id.* The statute also establishes that, before any voter is removed, they must be given notice, in writing, and can be removed only if they fail both to respond to the notice and to vote in "2 or more consecutive general elections for Federal office." 52 U.S.C. § 20507(b)(2), (d).

163. Section 8 of the NVRA also requires states to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A).

164. Defendants' implementation of Section 2 of H.B. 2492 violates Section 5 of the NVRA, which prohibits states from collecting information that is duplicative of the driver's license application and only allows for the collection of information necessary to assess eligibility or to prevent voter roll duplications.

165. Defendants' implementation of Sections 1, 3, 4, 5, and 7 of H.B. 2492 violates Section 6 of the NVRA, which requires the State of Arizona to accept and use the mail voter registration application form prescribed by the U.S. Election Assistance

Commission under 52 U.S.C. § 20508(a)(2) for the registration of voters in elections for Federal office.

166.    Defendants' implementation of Sections 4 and 5 of H.B. 2492 violates Section 8 of the NVRA, which requires uniformity and nondiscrimination in any voter-roll maintenance program and requires that voters only be removed from voter rolls at the voter's request, by reason of criminal conviction or mental incapacity, by the voter's death, or by a change in the residence of the voter.

167.    Accordingly, Plaintiff is entitled to a declaration that Defendants' implementation of Sections 1, 3, 4, 5, and 7 of H.B. 2492 violates Plaintiff's rights under the NVRA and an order permanently enjoining their enforcement.

168.    Defendants' implementation of Section 2 of H.B. 2243 violates Section 6 of the NVRA, which requires the State of Arizona to accept and use the mail voter registration application form prescribed by the U.S. Election Assistance Commission under 52 U.S.C. § 20508(a)(2) for the registration of voters in elections for Federal office.

169.    Defendants' implementation of Section 2 of H.B. 2243 violates Section 8 of the NVRA, which requires uniformity and nondiscrimination in any voter-roll maintenance program and requires that voters only be removed from voter rolls at the voter's request, by reason of criminal conviction or mental incapacity, by the voter's death, or by a change in the residence of the voter.

170.    Defendants' implementation of Section 8 of H.B. 2492 violates Section 8 of the NVRA, which requires uniformity and nondiscrimination in any voter-roll maintenance program and requires that voters only be removed from voter rolls at the voter's request, by reason of criminal conviction or mental incapacity, by the voter's death, or by a change in the residence of the voter.

171.    H.B. 2243 violates Section 8 of the NVRA by systematically removing voters from voter rolls within 90 days of a federal election.  As discussed above, Section 2 of H.B. 2243 requires county recorders to cancel an individual's voter registration if

- 48 -

they obtain and confirm information that the individual is not a U.S. citizen and that individual does not provide DPOC within 35 days.  County recorders are to obtain such information each month from, *inter alia*, the Secretary of State's comparison of registered voters to the driver license database, the comparison of properly registered voters who the county recorder "believes" are not U.S. citizens to the SAVE database, and the comparison between properly registered voters who do not have DPOC on file to the myriad of other government databases.  If such voters are matched to records indicating that they may not be U.S. citizens, then H.B. 2243 requires county recorders to send such voters a cancellation notice and cancel their registration if DPOC is not provided within 35 days.  H.B. 2243 requires such voter roll maintenance each month without exception.

172.  Defendants' implementation of Section 2 of H.B. 2243 violates Section 8 of the NVRA, which requires that any program to systematically remove the names of allegedly ineligible voters from official lists of eligible voters be completed not later than 90 days prior to a primary or general election for Federal office.

173.  Accordingly, Plaintiff is entitled to a declaration that Defendants' implementation of Section 2 of H.B. 2243 violates Plaintiff's rights under the NVRA and an order permanently enjoining its enforcement.

174.  Likewise, Plaintiff is entitled to a declaration that Defendants' implementation of Section 8 of H.B. 2492 violates Plaintiff's rights under the NVRA and an order permanently enjoining its enforcement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

i.    Issue a declaration that Sections 1, 3, 4, 5, 7, and 8 of H.B. 2492 and Section 2 of H.B. 2243 are unconstitutional, illegal, and of no force or effect;

ii.   Enter an order enjoining Defendants and their agents and successors in office from implementing Sections 1, 3, 4, 5, 7, and 8 or any subpart thereof of H.B. 2492 and Section 2 or any subpart thereof of H.B. 2243;

- 49 -

iii.    Enter an order requiring Defendants to take all steps necessary, including the adoption of the appropriate administrative policies or rules, to make the voter registration form prescribed by the Elections Assistance Commission available and to register those voter registration applicants who complete and submit the mail voter registration form prescribed by the Elections Assistance Commission;

iv.    Enter an order requiring Defendants to immediately add to the voter registration rolls those voter registration applicants who previously submitted to any County Recorder a completed voter registration application and whose application was rejected for failure to provide the applicants' date and place of birth, proof of residency, and documentary proof of citizenship as required by Sections 1, 3, 4, 5, and 7 of H.B 2492;

v.    Enter an order requiring Defendants to immediately add to the voter registration rolls those voter registration files that were removed from the rolls entirely, removed from the presidential election rolls, and removed from the ability to use mail-in ballots as required by Sections 1, 3, 4, 5, 7, and 8 of H.B 2492 and Section 2 of H.B. 2243;

vi.    Enter an order requiring Defendants to publicize effectively the remedial plans and programs ordered by the Court to ensure widespread dissemination to Arizona residents, among others, especially those who, at the time of the Court's order, may have been denied the opportunity to register to vote or were removed from voter rolls in Arizona for failure to provide the applicant's date and place of birth, proof of residency, and documentary proof of citizenship as required by Sections 1, 3, 4, 5, and 7 of H.B. 2492 and Section 2 of H.B. 2243;

vii.    Award Plaintiff's attorneys' fees and costs incurred in this action under 42 U.S.C. § 1988 and 52 U.S.C. §§ 10310(e) and 20510;

viii.    Grant such other and further relief as may be deemed just and proper; and

- 50 -

ix.    Maintain jurisdiction over this action for such period of time as may be appropriate to ensure the Defendants' compliance with relief ordered by this Court.

Dated: August 16, 2022

Respectfully submitted,

/s/  Amit Makker

Sadik Huseny
Amit Makker
LATHAM & WATKINS LLP

Niyati Shah
Terry Ao Minnis
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC

Andrew M. Federhar
SPENCER FANE

*Attorneys for Plaintiff*

- 51 -

COMPLAINT