# Exhibit 15

ELECTIONS IMMIGRATION LAW & GOVERNMENT

# Voting advocates fear new law could disenfranchise some naturalized citizens

BY: **RACHEL LEINGANG/VOTEBEAT** - JULY 14, 2022 8:15 AM




Gov. Doug Ducey speaks during a rally for President Donald Trump at the International Air Response facility on Oct. 19, 2018, in Mesa. Photo by Ralph Freso | Getty Images

One of the most significant election bills this legislative session is provoking an outcry from voting advocates who say it could disenfranchise naturalized citizens and other voters by canceling their registrations. It was quietly signed into law by Gov. Doug Ducey earlier this month, even though the governor had previously vetoed a similar bill.

At least one group told Votebeat they intend to challenge the new law in court.

This article was originally published by Votebeat, a nonprofit news organization covering local election administration and voting access.

Ducey signed House Bill 2243 last week after previously vetoing a substantially similar bill in late May, House Bill 2617. Both bills call on county recorders to compare voter rolls to other databases and sources, like driver's licenses in other states, death records, and jury questionnaires.

In a letter explaining his veto of the original legislation, Ducey pointed to a provision of the bill that required recorders to cancel voter registrations if they received information that the voter wasn't a qualified elector. He said that provision was vague and could result in "bad actors" falsely asserting someone wasn't qualified to vote in Arizona.

Voting rights groups, too, said HB 2617 could lead to people submitting lists of voters they contended weren't qualified based on any number of likely discriminatory factors, requiring a recorder to investigate and potentially remove voters.

But Ducey said he largely agreed with the bill's other provisions, setting the stage for lawmakers to tweak the bill to try to get Ducey's approval.

That's exactly what happened.

GET THE MORNING HEADLINES DELIVERED TO YOUR INBOX SUBSCRIBE

The new version says recorders must "obtain," rather than "receive and confirm," information that indicates someone isn't eligible to vote. That change partly addresses the issue, said Jon Sherman, the litigation director for the Fair Elections Center, because it leaves discretion to the administrators to proactively investigate ineligible voters rather than forcing them to act on outside tips.

A spokesman for Ducey said he signed the second bill because the changes addressed his concerns about due process.

Voter advocates feel differently. They point to a remaining provision directing recorders with "reason to believe" a voter isn't a citizen to check whether the person is in the Systematic Alien Verification for Entitlements, a federal database most often used by agencies to verify immigration status for the purposes of receiving benefits.

The law "could be easily manipulated by vigilantes who are using racist attacks against people in our voter database," said Alex Gulotta, the Arizona director of All Voting Is Local.

The database could be inaccurate or out of date, and federal officials have in the past said it isn't meant to be used this way. Voting advocates say relying on it could violate state and federal law.

"I think they were just very focused on the third-party false accusation problem, which has been reduced but not eliminated, but they haven't focused at all on the discrimination problem," Sherman said.

Multiple groups, including the Arizona Association of Counties, wrote letters to Ducey asking him to veto HB 2243 and pointing out concerns over the "reason to believe" provision.

"Page 6, lines 7-8 uses the phrase 'who the county recorder has reason to believe' – upon what is this based? Is it up to each Recorder to decide?" wrote Jennifer Marson, the executive director of the Arizona Association of Counties.

Sherman said the new law will most affect naturalized citizens who are registered to vote in Arizona. And while a person would get notice and an opportunity to submit information within 90 days before getting removed from the rolls, that presumes that the person is still at the same address, isn't traveling, and is able to quickly confirm citizenship, he said.

"This provision is an open invitation to discriminate on the basis of race, ethnicity, dress, English proficiency or lack thereof. It allows any county recorder to act on their mere suspicions or bias and queue someone up for extra unwarranted scrutiny, even in the absence of any concrete information that they're, in fact, not a United States citizen. And it's illegal for that reason," Sherman said.

Liz Avore, the vice president of law and policy at the Voting Rights Lab, said the law could also affect people who get misidentified because they share a name with others, despite their citizenship status, because the law doesn't lay out detailed criteria for how to match people correctly.

"It will very likely result in eligible Arizona citizens not being able to cast their ballot. And that's problematic when you have people being deprived of their voice in a democracy," Avore said.

And she pointed out another provision in the law that could lead to eligible voters getting removed from the rolls: It requires the Arizona secretary of state to send monthly reports to recorders comparing the state's driver's license database to the voter registration database and identify if people changed their addresses or are not U.S. citizens.

That provision requires use of information that could be outdated – people who were not citizens when they got their licenses may have become citizens afterward, she said. (In Arizona, driver's licenses don't expire for decades.) She pointed to a botched 2019 Texas plan to use license data for citizenship purposes, which identified many actual citizens who naturalized after getting a license, ultimately leading to a lawsuit and the resignation of that state's secretary of state.

## Why did Ducey sign?

Despite those concerns, Ducey's spokesman, C.J. Karamargin, said the new bill addressed the problem Ducey had with the previous bill.

"What we asked for in the veto letter is what we wanted to see, and it was added," Karamargin said.

The governor's office didn't respond to further questions about voting advocates' concerns over the bill.

The bill also had considerable support on the right. Proponents of the previous bill had urged Ducey to sign it, saying it helped ensure election integrity and provided more "trust and confidence" in the process. A coalition of conservative groups that wrote to Ducey said the bill would have put processes in place that regularly removed people who became ineligible for various reasons, including moving, death, or felony convictions. They also said the bill included safeguards and enough notice to make sure people didn't get removed erroneously.

After the veto, backers didn't give up. Arizona Sen. Warren Petersen, a Republican, noted on the Senate floor in late June that an amendment to HB 2243 – previously a bill that simply called for voter registrations to be canceled if a person moved to another state – addressed Ducey's problems by adding more notice requirements but that it was "otherwise identical" to the previous bill.

Rep. Joseph Chaplik, who sponsored HB 2617, said on Twitter that he "worked every angle" to get his bill's provisions signed into law as part of HB 2243. Describing HB 2617 in a committee hearing earlier this year, Chaplik said the bill essentially created a "maintenance program" to make sure ballots go only to qualified voters. (Chaplik didn't respond to requests for comment.)

## SAVE isn't a catch-all

In a letter urging Ducey to veto HB 2243, Secure Democracy USA said the language change "somewhat reduces" the potential for abuse, but the remaining "reason to believe" provision still obligates county recorders to act on suspicions of people who could claim someone isn't a citizen by requiring them to search for that voter in the SAVE database.

And, the election policy advocacy group notes, SAVE is not considered a definitive source of citizenship: It doesn't contain U.S.-born citizens, for instance, and may not contain all naturalized citizens or children who become citizens based on their parents' naturalization , unless they file certain forms.

"Pursuant to this new legislation, one eligible, registered Arizona voter could cause another eligible, registered Arizona voter to be subjected to an inaccurate citizenship verification process that may well result in their removal from the rolls or, at a minimum, force them to needlessly provide proof of citizenship once again," Secure Democracy USA's Senior Director of Advocacy Charley Olena wrote.

Gulotta, of All Voting Is Local, said the SAVE database is "woefully out of date" and not intended to be used to identify citizenship for voter registration purposes. There is not a national database of all U.S. citizens, Sherman said.

SAVE's outdated records could erroneously show a person as a noncitizen even if they have since been naturalized, critics said, or produce false matches of people with the same names and birthdates.

Using SAVE to clean voter rolls isn't a new idea. In 2013, for example, Florida tried something similar to the new Arizona law after first trying to find noncitizens using driver's license data, which resulted in tens of thousands of eligible voters caught in the dragnet. Kris Kobach, the former Kansas secretary of state and one-time vice chairman of President Trump's quickly disbanded voter fraud commission, told the Washington Times in 2017 that the commission's work would include comparing voter rolls to SAVE.

In previous years, the Department of Homeland Security and the Justice Department have warned that SAVE was not designed for voter registration searches and isn't a complete accounting of citizens.

Another problem, the Voting Rights Lab's Avore noted, is officials need an identification number related to immigration for a person to look them up in the database, not just a name or birthdate. A county recorder would not have that information, she said.

"I don't think that the election officials are going to have the ability to actually use the database well," Avore said.

## Is the bill illegal?

Opponents of the bill contend that it's illegal – for several different reasons. And they'll be suing.

Sherman, of the Fair Elections Center, said his organization will be adding legal claims against HB 2243 in an ongoing lawsuit against another Arizona bill, HB 2492, a proof-of-citizenship law for voting that has drawn multiple lawsuits, including one from the U.S. Justice Department.

Multiple voting rights advocates said those two bills are this legislative session's most consequential changes to election policy and could cause the most problems for voters.

"The two bills that do real, substantive damage are these two bills. If you look at what changed in Arizona election law that is really going to hurt people going forward, it's these two," Gulotta said.

Sherman said HB 2243 violates the U.S. Constitution and the National Voter Registration Act.

"Even if it's not discriminatory on its face, it doesn't create a racial classification on its face, it is an open invitation, it declares open season for discrimination on the basis of race, ethnicity,

dress, English proficiency, anything else," he said.

Secure Democracy USA also alleged the bill violates federal civil rights laws, specifically the 1964 Civil Rights Act, because it subjects some voters to different verification processes than others (checking some through SAVE but not all).

"This open-ended license for arbitrary and discriminatory treatment of voters will be readily struck down by a federal court and, accordingly, waste taxpayer dollars," Secure Democracy USA wrote.

Additionally, the bill may have been enacted illegally, the counties association contends. In Arizona, the Voter Protection Act prohibits the Legislature from easily amending or repealing voter-approved ballot measures and referendums. They need a three-fourths vote to make any changes to voter-protected laws, and even then, those changes have to "further the purposes" of the voter-approved measure.

In the counties association's letter to Ducey, the group notes that several provisions of a voter-protected part of state statutes are now in conflict with the changes to law from HB 2243. (Those statutes became voter-protected because of a 2004 ballot proposition that required photo ID to vote and proof of U.S. citizenship to register to vote, in addition to limiting public benefits to citizens.) The bill itself didn't change the voter-protected statutes in question, but it created conflicting directives to recorders and essentially "forces County Recorders to violate voter protected statutes," Marson wrote.

And the Legislature did not get a three-fourths majority when passing the bill; it passed on party lines in both chambers. Because there was a major amendment to HB 2243 late in the process, much of the bill did not go through committee votes or the rules committee hearings that would indicate whether it was legal.

"If signed, this bill is an illegal enactment," Marson wrote, "because the bill passed with only a simple majority in both chambers."

SUPPORT NEWS YOU TRUST.

DONATE

REPUBLISH

*Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our web site. Please see our republishing guidelines for use of photos and graphics.*



## RACHEL LEINGANG/VOTEBEAT

Rachel Leingang has covered government, politics and higher education in Arizona since 2015, first at the Arizona Capitol Times, then The Arizona Republic and the Arizona Agenda.

MORE FROM AUTHOR

## RELATED NEWS



**Lawmakers add pilots for 'smart' drop boxes, special ballots...**

BY **RACHEL LEINGANG/VOTEBEAT**

June 24, 2022




**GOP poll watcher training casts unfounded suspicion on...**

BY **JEN FIFIELD/VOTEBEAT**

June 27, 2022

INSIGHTFUL. INVESTIGATIVE. INDEPENDENT.

DEMOCRACY TOOLKIT

AZM

Amplifying the voices of Arizonans whose stories are unheard; shining a light on the relationships between people, power and policy; and holding public officials to account.

DEIJ Policy | Ethics Policy | Privacy Policy

Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our web site.

© Arizona Mirror, 2022

# Exhibit 16

PHOENIX New Times

*advertisement*




**ELECTIONS**

# 'Extreme' Arizona Elections Bills Inching Closer to Law

**KATYA SCHWENK | MARCH 30, 2022 | 6:00AM**





The Arizona State Capitol. **Sean Holstege**

Several bills that could drastically change Arizona elections — restricting voting and removing thousands of voters from rolls — are slowly making their way toward Governor Doug Ducey's desk.

Over the course of this year's legislative session, Arizona lawmakers have flooded both Republican-controlled chambers with election proposals. After the furor around the 2020 election "audit" in Maricopa County, these bills are popular among a conservative electorate still fixated on election security.

Voting rights advocates have been sounding the alarm. Many of the most radical election-related bills have failed to pass or have stalled in committee. But others appear to have momentum, including one bill that could force tens of thousands to re-register to vote, which now sits on Ducey's desk.

Advocates warn that these bills, if they become law, could harm voting rights in the state and, in some cases, have wide-ranging impact on elections.

## RELATED STORIES

**Show Me the Money, Wendy Rogers. Most of Her Campaign Money Comes From Beyond Arizona**
**Political Stunt to Carve up Maricopa County Stalls**
**Arizona Republicans Seek to Stop Early Voting with Supreme Court Lawsuit**

Sponsored Content - Golf is Hard at East Lake Golf Club

menu

“It’s a mess,” said Alex Gulotta, an attorney and the Arizona director of All Voting Is Local, a national group that advocates for voting rights. “We’re seeing a bunch of policies that are basically predicated on the same lies and conspiracy theories that got us to the sham election review in the first place.”

Low-income communities and communities of color would be disproportionately harmed by many of these, he said. When states pass additional documentation requirements for voter registration — like showing a photo ID — the elderly, poor, and minorities often struggle to meet that standard, **research has shown**.

Liz Avore, the vice president of law and policy at Voting Rights Lab, a nonpartisan group that tracks state legislation on voting across the country, said that Arizona is a key battleground for these issues.

Nationally, Avore said, lawmakers have focused on bills related to election administration. In Arizona, however, lawmakers have not given up on attempts to crack down on voters.

“Arizona is a bit of an outlier,” Avore said. “They are still introducing and moving bills that impact election administration and restrict election administration — but also voter access.”

In Arizona, the Voting Rights Lab tracker has highlighted 52 bills introduced this year that have the potential to restrict voter access or hamper election administration. That tops all other states currently being tracked by the organization — Georgia comes in second with 38 such bills, and Virginia is third with 37.

This tracker only includes states that convened for a normal legislative session this year, so certain states — including Texas — are excluded from the count.

In Arizona, here are five key election-related bills that have voting rights advocates worried — and are the closest to becoming law:

**House Bill 2492: Requires proof of citizenship for voting; those who do not provide it will be investigated.**

This bill, sponsored by Republican State Representative Jake Hoffman, who represents Queen Creek and Gilbert, is awaiting Ducey's signature after passing both the House and the Senate on party-line votes.

It's the first elections bill to be considered by the governor and has prompted an outcry from voting rights advocates.

The bill would require all voters to provide proof of citizenship and residence when registering to vote in most cases — and make it a felony offense if any election official registered a voter without such documentation.

According to state law, Arizona voters must already prove they are citizens in state elections. But that law does not extend to federal elections. And it is not always enforced.

Under HB 2492, in cases where a voter registered with a form provided by the federal government, avoiding Arizona's proof of citizenship requirement, election officials would now be required to investigate the citizenship of each voter. They would have to use "all available resources" to do so.

If an official fails to investigate, he or she could also be charged with a class six felony, the least serious designation.

The Arizona Attorney General would also be directed to investigate anyone who did not provide documentary proof of citizenship.

"This is actually a trend that we have seen this year," Avore said of the bill. "We've seen nine states that have introduced this legislation related to citizenship requirement. It's kind of remarkable, because these policies have been consistently found to be unconstitutional."

In 2020, a federal appeals court struck down a **similar Kansas law**, which required voters to show a passport or birth certificate to prove their citizenship when registering. The court found that the measure placed a burden on voting that outweighed any concerns about voter fraud.

But, Avore said, that ruling didn't stop states from trying their own hand at such legislation. A similar law in Mississippi has now passed both chambers and also appears destined for the governor's desk.

Gulotta emphasized that if HB 2492 is implemented in Arizona, it could lead to tens of thousands of voters who have not provided proof of citizenship being kicked off the voter rolls, given provisions that prevent voters from participating in elections unless they have provided citizenship documents. "Every legal analyst I've talked to thinks they have to re-register," he said.

Interest groups in support of the bill deny that, and some independent analysts say the bill is **too vague to be sure**. They say it's not clear if the requirement would retroactively apply to voters who registered decades ago, before proof of citizenship was required to obtain a driver's license, and thus for voter registration.

Hoffman, on his Telegram channel, called the legislation the "most important election integrity bill of the 2022 legislative session." Arizona, he said, "cannot allow potentially tens of thousands of noncitizens to vote in our elections." Years of research

on the topic shows that, contrary to such claims, **noncitizen voting is extremely rare**.

A spokesperson for Ducey did not return questions from *Phoenix New Times* regarding HB 2492 or other bills in this story.

**House Bill 2617: New requirements for monitoring voter rolls, investigating citizenship status.**

This bill, authored by Republican State Representative Joseph Chaplik, would create new, onerous requirements for the Arizona Secretary of State and county recorders to investigate and purge their voter rolls. Chaplik represents Scottsdale and Fountain Hills.

County recorders would have to monitor drivers' licenses issued in other states and address changes monthly. If the county sees a voter change address outside the county or gets an out-of-state driver's license, authorities must cancel the registration within 90 days and notify the voter.

Furthermore, county recorders must proactively monitor federal vital records databases, along with other government databases to affirm the citizenship status of all registered voters.

“In general, if we have requirements to make sure that we’re keeping our lists up to date, that’s a good thing,” Gulotta said. But this bill goes far beyond that, he said. There were not enough cross-checks in place to make sure a voter was not wrongly removed from the rolls and forced to re-register — potentially disenfranchising voters without cause.

Maintenance of voter rolls is required by federal law in order to ensure such records are accurate. But the frequency — and extent — of voter roll purges is **often the subject of debate**. In 2018, a **report** by the Brennan Center, a nonpartisan policy research institute, called stricter purge requirements a "growing threat" to elections. It was common, researchers found, for states to use faulty data, and for eligible voters to

be wrongfully removed from rolls.

Gulotta raised similar concerns about House Bill 2617. “The fact that someone has moved shouldn’t just kick you off the rolls,” he said.

This bill passed the House and now is working its way through committees in the Senate.

**House Bill 2780: Publishes the name and address of each voter online.**

Conceived by Republican State Representative John Kavanagh — with help, **he claims**, from audit liaison and former lawmaker Ken Bennett — HB 2780 would require county recorders to publish the names, addresses, and voting methods of each voter online after an election.

Kavanagh is a Republican representing the northeast stretches of metro Phoenix, including Scottsdale and Fountain Hills, like Chaplik. He has said the bill will bring “a little bit of sunshine” to the voter rolls, promoting trust in elections.

Ten days before an election, the bill says, county recorders must publish a list of every active and inactive voter on their voter rolls on their website. Social security numbers and birthdates of voters would be redacted, but addresses and names would remain. After the election, a list of each person who voted, as well as their method for voting, would be published.

Furthermore, images of every ballot cast in the election would be published online. No identifying information would be provided that could link ballots to voters.

Gulotta said this bill could put voters at risk, given that it could make their place of birth public, along with their names and addresses. This could invite targeting based on nationality, he said.

He also said publishing ballot images could lead to additional misinformation — instead of more transparency, as intended. “We’re making every person with a

computer the cyber ninjas," he said.

The general public, Gulotta explained, would not be able to replicate election results just by looking at ballot images. There are specific processes, for instance, that election workers use when a ballot is unclear or has stray marks.

“In the aim of more transparency, we’re going to put ballot images out there where people won’t be able to actually duplicate the results,” he said.

This bill has passed the House, 31-26, and the Senate Government Committee.

**House Bill 2289: Ends early voting; requires ballots to be hand-counted.**

Earlier in the session, Republican State Representative John Fillmore proposed ending all early voting in the state of Arizona and requiring all ballots to be counted by hand — within just 24 hours of Election Day.

This law was quickly quashed in the House. Speaker Russell "Rusty" Bowers sent it to a dozen committees, where it languished.

But Republican State Senator Kelly Townsend allowed Fillmore to introduce a strike-everything amendment in the Senate. This let him attach his proposal to a separate piece of legislation — without a House vote.

Now, the bill has passed out of committee and could see a Senate-wide vote.

House Bill 2289 would end all early voting in the state, outright. It would also require a hand count of ballots — instead of machine tabulation — and election workers would have to deliver those results within just 24 hours.

“It’s a pretty extreme piece of legislation,” said Avore. Not only did the bill seem infeasible, it is also an “unusual proposal,” she said.

Unlike many other states, Arizona has provided early voting for decades. In 1991, the state allowed any registered voter to vote by mail. In the years since, the state has introduced several measures to expand access to early voting. Now, most Arizona voters **are on the early voting list**.

"Persons with disabilities, persons who are working class, who may not be able to go vote on Election Day, rely on early voting and mail-in voting to participate in our democracy," said Darrell Hill, policy director at the Arizona branch of the American Civil Liberties Union. "[The policy is] really tragic and wrong."

Early voting is wildly popular in Arizona. In the 2020 election, nearly 90 percent of Arizona voters cast early ballots, at one of the highest rates in the country.

And, elsewhere in the country, states appear more open to the practice. "Almost all the action that we're seeing on early voting is expanding it," Avore said. This includes red states, like Oklahoma and Kentucky, that have seen similar pushes from lawmakers to restrict election administration or tighten election security.

Now that the bill has a second life in the Senate, it will just need to clear a vote in that chamber, then be ratified by the House. So far, it has passed the Senate government committee in a 4-3 party-line vote.

### House Bill 2602: Ends emergency voting in most cases

Under State Representative Shawnna Bolick's proposed legislation — which passed the Senate Rules Committee on Monday — most all emergency voting in the state of Arizona would be banned.

Some counties use emergency voting provisions to set up voting centers on the days directly preceding the election, allowing greater access for voters who are unavailable on the day of the election. Voters who use these centers have to attest they were not available to vote on Election Day, due to their situation.

But this law would prohibit any emergency voting save for times of war, natural disaster, or unrest that "substantially impaired" voters in "large numbers."

The bill would also allow groups to electioneer and canvas at some polling sites — which is normally prohibited — and limit the ability of counties to restrict such activity.

Whether HB 2602 — or other bills that have been moving through Senate committees — will make it to Ducey's desk remains to be seen.

And a good number of lawmakers' more extreme election bills have either stalled in committee or failed outright.

Multiple bills that created new misdemeanor or felony crimes have failed in the Senate. They included SB 1457, a bill by Republican State Senator Sonny Borrelli that made it a misdemeanor for an election official to allow tabulation equipment to be connected to the internet, and SB 1570, a Townsend bill that created new misdemeanors for election workers who violate new ballot security requirements.

"We saw this really emerge as a trend last year, and it's picking up steam this year as well," Avore said. Activities that were standard practice — like sending out absentee ballots to people who did not request one — could now result in jail time.

"It's really treating the entire election system as if it's a crime scene," Avore said.

Still, as Gulotta noted, the session is not yet over. Many of these failed proposals could return in last-ditch efforts by lawmakers.

"It could be stuck today and end up in a striker tomorrow," he said.

**KEEP PHOENIX NEW TIMES FREE...** Since we started *Phoenix New Times*, it has been defined as the free, independent voice of Phoenix, and we'd like to keep it that way. With local media under siege, it's more important than ever for us to rally support behind funding our local journalism. You can help by participating in our "I Support" program, allowing us to keep offering readers access to our incisive coverage of local news, food and culture with no paywalls.

Make a one-time donation today for as little as $1.

**CONTACT:** Katya Schwenk
**FOLLOW:** Twitter: @ktyschwnk

## TRENDING NEWS

- Abe Hamadeh Wants to be Arizona's Top Cop. As a Teen, He Bragged About Voter Fraud
- Four Eye-Popping Moments from Arizona GOP Senate Debate
- Joe Arpaio is Four Times a Loser

DON'T MISS OUT
SIGN UP for the latest news, free stuff and more!

# Exhibit 17

DAILY
INDEPENDENT
(/)

Select a newspaper

MAIN MENU

ARIZONA LEGISLATURE

# Scottsdale lawmaker calls election bill veto 'shocking'

'I worked directly with the gov’s office on the Senate amendment language for the bill.'



(/uploads/original/20220529-130905-053022 Gov vetoes voter DQ proposal 2.jpg)

FILE PHOTO

**HB 2617 was sponsored by Rep. Joseph Chaplik, R-Scottsdale, shown here in a campaign photo with his family.Gov. Doug Ducey vetoed the bill late Friday. Chaplik who called it "a simple, common-sense election integrity bill to help clean up the voter-roll maintenance."**

Posted Sunday, May 29, 2022 1:17 pm



**By Howard Fischer (/browse.html?byline=Howard%20Fischer)**
**Mail (mailto:azcapmedia@gmail.com) | Twitter: @azcapmedia (https://twitter.com/azcapmedia)**

PHOENIX — Friday, Gov. Doug Ducey vetoed legislation which would have required county election officials to cancel the registration of anyone they determine is not qualified to vote.

The move, the first of the governor this session, came amid concerns from county officials that what was in HB 2617 could lead to mischief as it would allow individuals to make unsubstantiated claims that some people on the voter registration rolls should be removed. Jennifer Marson, executive director of the Arizona Association of Counties, said that, in turn, would trigger automatic investigations.

Marson, in a letter Friday to Ducey, also pointed out what she said were illegal provisions in the measure.

The governor, in his veto message, said he agrees.

"The implementation of this provision is vague and lacks any guidance for how a county recorder would confirm such a determination," Ducey wrote.

"Our lawfully registered voters deserve to know that their right to vote will not be disturbed without sufficient due process," he continued. "This provision leaves our election system vulnerable to bad actors who could seek to falsely allege a voter is not a qualified elector".

HB 2617 was sponsored by Rep. Joseph Chaplik, R-Scottsdale, who called it "a simple, common-sense election integrity bill to help clean up the voter-roll maintenance."

"It should be going on already," he told colleagues. "We have to pass this to obviously have the county do their work."

But it also is being pushed by the business-oriented Arizona Free Enterprise Club, the same group that worked to convince the Arizona Supreme Court to block voters from having a say on a $1.9 billion tax cut where the majority of the proceeds would have gone to the wealthiest. The organization also is behind a ballot measure to add additional requirements on those who want to vote by mail.

"The first step in election integrity is ensuring clean and current voter rolls," said Greg Blackie who lobbies for the organization. And that, he said, requires not just ensuring that people are legally qualified to vote but also "regular maintenance to ensure that people who are no longer qualified, whether due to death, felony conviction, residency status or for other reasons are regularly removed."

In a written statement, Chaplik called the veto "shocking."

"I worked directly with the gov's office on the Senate amendment language for the bill," he said.

But gubernatorial press aide C.J. Karamargin said the lawmaker knows the reasons for the veto.

Some of what was in HB 2317 was fairly straightforward, like saying that people should be deleted from Arizona voting lists when they get a driver's license in another state.

Another provision required court officials to forward to recorders a list of people who ask to be excused from jury duty because they are not citizens.

Marson, however, told the governor that it's not that simple.

"County recorder's offices are not designed to be investigative bodies," she wrote to Ducey. "Yet this bill allows anyone, without any evidence, to simply give a list of names of those suspected to be improperly registered to the county. And the county must take a variety of steps to confirm if the person should be registered."

In fact, she said, one provision even allows for verbal complaints, with nothing more.



(https://yourvalleybanners.creativecirclemedia.com/www/delivery/ck.php?oaparams=2__bannerid=1433__zoneid=12__cb=34a3ae83d9__oadest=https%3A%2F%2Fconsumers4qualitycare.org%2Farizona%2F)

“A person could call in or submit claims anonymously,” Marson said. “Counties would have no mechanism to track or halt bad actors who use this new law to report, without any evidence, anyone they believe to be suspicious.”

She said there are other problems. It would have required county records, on a monthly basis, to compare a list of registered voters who they have “reason to believe are not United States citizen with records maintained by the United States Citizenship and Immigration Services.”

“Upon what is that based?” Marson asked about what would give recorders that reason to believe. “It is up to each recorder to decide?”

And then there was the provision that required county recorders to determine if a person actually lived where he or she said. The vagueness of that clearly bothered Ducey.

“There are certain aspects of being a qualified elector that are objectively quantifiable, such as age and citizenship status,” he wrote. “But the determination of residency can be a fact-specific inquiry. The subjectivity of this provision, as well as a lack of guardrails against false claims, included in HB 2617, leaves voter registration susceptible to being canceled based on fiction rather than fact.”

Marson also said the questions of illegal registration are the purview of county and state prosecutors, including an Election Integrity Unit within the Attorney General’s Office, saying any of those “would be a more appropriate entity to determine if voter fraud is occurring.”

There were things in Chaplik’s bill that the governor said he liked.

“For example, requiring the Department of Transportation to notify the secretary of state when a registered voter receives an out-of-state license is a step forward in maintaining accurate voter rolls,” Ducey wrote.

“Moreover, the process outlined in the bill that describes how counties are notified when a prospective juror is not a U.S. citizen also provides tools to make sure only qualified electors are participating in Arizona elections,” he continued. And the governor indicated he would sign such a bill into law containing that measure.

Chaplik, in explaining the measure, said nothing in HB 2317 would automatically remove anyone from the voter registration rolls. Instead, it would have required county recorders to send a notice to who appear to not be legally registered telling them their registration would be canceled in 90 days unless they provide “satisfactory evidence” of qualification.


**Howard Fischer**

**@azcapmedia (https://twitter.com/azcapmedia)**

**@azcapmedia (https://twitter.com/azcapmedia)**

**Mr. Fischer, a longtime award-winning Arizona journalist, is founder and operator of Capitol Media Services.**

**Subscribers make this story possible.**

**Support the journalists of Independent Newsmedia (https://yourvalley.net/subscribe/?lcid=305404).**

## Keywords

Chaplik, Ducey, voter registraion, voter disqualification, county auditors, voter rolls, Arizona legislature

# Comments

2 COMMENTS ON THIS ITEM PLEASE LOG IN TO COMMENT BY CLICKING HERE (/LOGIN.HTML?REFERER=%2FSTORIES%2FGOVERNOR-VETOES-ELECTIONS-BILL-SPONSORED-BY-SCOTTSDALE-GOP-LAWMAKER%2C305404)

### jason.alexander

What has Joe Chaplik accomplished in 2 years, other than make a name as an election denier? He certainly hasn't helped our schools, or helped keep our kids safe. He hasn't helped our economy, or led us through COVID. Most of the bills he's sponsored have lost. What has he actually accomplished?

SUNDAY, MAY 29 REPORT THIS (/REPORT_ITEM.HTML?SUB_ID=305404&COMMENT_ID=188&REFERRING_URL=%2FSTORIES%2FGOVERNOR-VETOES-ELECTIONS-BILL-SPONSORED-BY-SCOTTSDALE-GOP-LAWMAKER%2C305404)

### Navlac

Way to go Ducey. He was always a RINO now we know. Glad he is going to be gone. So, I guess we can forget about fair elections come November, perhaps the new Governor will sign some common sense election integrity legislation before 2024 so maybe we can have Trump back where he belongs. AZ is not a blue state it is red through and through.

WEDNESDAY, JUNE 1 REPORT THIS (/REPORT_ITEM.HTML?SUB_ID=305404&COMMENT_ID=189&REFERRING_URL=%2FSTORIES%2FGOVERNOR-VETOES-ELECTIONS-BILL-SPONSORED-BY-SCOTTSDALE-GOP-LAWMAKER%2C305404)

**OTHER ITEMS THAT MAY INTEREST YOU**

**Phoenix Zoo's 'gentle giant' Pete dies at 20 (/stories/phoenix-zoos-gentle-giant-pete-dies-at-20,322915)**

**Jail term nears for Arizona ‘ballot harvester' as lawyer seeks delay (/stories/prison-term-nears-for-arizona-ballot-harvester,322900)**

**Board, commission members sought by city of Scottsdale (/stories/board-commission-members-sought-by-city-of-scottsdale,322897)**

**Super Bowl countdown begins at Phoenix Sky Harbor (/stories/super-bowl-lvii-countdown-begins-at-phoenix-sky-harbor,322852)**

**MOST POPULAR STORIES IN DAILY INDEPENDENT**

**Candidate withdraws from Scottsdale Unified governing board election (/stories/candidate-withdraws-from-scottsdale-unified-governing-board-election,322708)**

**Black-owned investment bank supports Scottsdale diversity summit (/stories/blaylock-van-supports-scottsdale-diversity-summit,322557)**

**Boys and Girls Club in need of West Valley volunteers (/stories/boys-and-girls-club-in-need-of-west-valley-volunteers,322747)**

**Hopi teens see need for skateboarding park, make it happen (/stories/hopi-teens-see-need-for-skateboarding-park-make-it-happen,322682)**



(https://yourvalleybanners.creativecirclemedia.com/www/delivery/ck.php?
_cb=2cf7993e25__oadest=https%3A%2F%2Fconsumers4qualitycare.org%2Farizona



(https://yourvalleybanners.creativecirclemedia.com/www/delivery/ck.php?
_cb=13ebbbb492__oadest=https%3A%2F%2Fconsumers4qualitycare.org%2Farizona



(https://yourvalleybanners.creativecirclemedia.com/www/delivery/ck.php?
oaparams=2__bannerid=1388__zoneid=218__cb=8bbcb4e523__oadest=https%3A%2F%2Fwww.yourvalley.net%2Fwestvalleyfav

**FREE NEWSLETTER**

# Register for our free newsletter

DON'T MISS A BEAT: Simply submit your e-mail address below, click on the opt-in email link and watch your inbox for news from the Daily Independent at YourValley.net. Thank you for reading!

## Daily Independent at YourValley.net

Sign up for the latest news from around the Phoenix area delivered Monday through Friday.

Email Required

SUBSCRIBE




(https://yourvalleybanners.creativecirclemedia.com/www/delivery/ck.php?oaparams=2__bannerid=1367__zoneid=1__cb=3d0f57d880__oadest=https%3A%2F%2F72sold.com%3Futm_source%3Diniusa%

**MOST RECENT**

## Andretti effort to join F1 the most vocal of many inquiries (/stories/andretti-effort-to-join-f1-the-most-vocal-of-many-inquiries,322930)

The CEO of Formula One says the series has multiple inquiries from potential team owners who have taken a more behind-the-scenes approach than Michael Andretti. Stefano Domenicali says Andretti has ...

## Woods, McIlroy behind tech-infused golf league in TV venture (/stories/woods-mcilroy-behind-tech-infused-golf-league-in-tv-venture,322931)

## October lineup set for downtown Glendale music series (/stories/october-lineup-set-for-downtown-glendale-music-series,322926)

## Scottsdale approves police pay increases to stay competitive (/stories/scottsdale-approves-police-pay-increases-to-stay-competitive,322916)

## Cosmetics giant Sephora settles customer data privacy suit (/stories/cosmetics-giant-sephora-settles-customer-data-privacy-suit,322929)

**DAILY INDEPENDENT**

**Tweets from @AzNewsmedia**

Daily Independent Retweeted

**Melissa Rosequist**
@mrosequist_ · Aug 23

Kavanagh defends police videotaping law as news groups file suit #AZNEWSMEDIA
yourvalley.net/scottsdale-ind...

Facebook (https://www.facebook.com/YourValley.net/)

*Celebrating & Connecting*
*Our Communities*

YourValley.net (/)
623-972-6101
17220 N Boswell Blvd
Suite 230E

Sun City AZ 85373

Email: azdelivery@iniusa.org (mailto:azdelivery@iniusa.org)

**OUR SERVICES**

Advertising (/advertising/)
Find Your Local Newspaper (/racks-and-dealers/)
Our History (/our-history/)
Public Notices (http://www.publicnoticeads.com/AZ/)
About Us (/about/index.html)
Start a print subscription to the Daily Independent (/start_a_print_subscription_to_the_daily_independent/index.html)
Print With Us (/valley_newspapers/)
Contact Us (/contact-us/index.html)
Our Journalists (/our-journalists/)
Privacy Policy (/privacy-policy/)
Work for Us (/stories/join-our-teams,73431)
Our Vision & Values (/stories/our-vision-and-values,86397)
Start a digital subscription to YourValley.net (/subscribe-today/)

**OUR COMMUNITIES**

Anthem (/stories/anthem,73440)
Buckeye (/stories/buckeye,73441)
El Mirage (/stories/el-mirage,73442)
Gilbert (/stories/gilbert,73443)
Gold Canyon (/stories/gold-canyon,73444)
Litchfield Park (/stories/litchfield-park,73446)
Peoria (/stories/peoria,73417)
Scottsdale (/stories/scottsdale,73419)
Sun City West (/stories/sun-city-west,73421)
Town of Paradise Valley (/stories/town-of-paradise-valley,73416)
Tempe (/stories/tempe,208255)
Apache Junction (/stories/apache-junction,73414)
Chandler (/stories/chandler,322928)
Florence (/stories/florence,195634)
Glendale (/stories/glendale,73415)
Goodyear (/stories/goodyear,73445)
Mesa (/stories/mesa,73447)
Queen Creek (/stories/queen-creek,73418)
Sun City (/stories/sun-city,73420)
Surprise (/stories/surprise,73423)
Youngtown (/stories/youngtown,73448)

© COPYRIGHT 2022 INDEPENDENT NEWSMEDIA INC.

POWERED BY CREATIVE CIRCLE MEDIA SOLUTIONS (HTTP://CREATIVECIRCLEMEDIA.COM)

# Exhibit 18

# STATE OF ARIZONA
# OFFICE OF THE GOVERNOR

DOUGLAS A. DUCEY
GOVERNOR

EXECUTIVE OFFICE

May 27, 2022

The Honorable Rusty Bowers
Speaker of the House
Arizona State House of Representatives
1700 W. Washington
Phoenix, AZ 85007

Re: House Bill 2617 (voter registration; cancellations; causes)

Dear Speaker Bowers,

Today I vetoed H.B. 2617. Arizona has long been — and will remain — a national leader in election integrity. Our approach is grounded in the foundational principle that we should encourage voters to participate and make it difficult for anyone to cheat. H.B. 2617 falls short of meeting this objective and should not become law in its current form.

Eliminating fraudulent voting practices is a key tenet of election integrity, and for good reason. If a ballot is cast illegally, it has the net effect of disenfranchising a lawful Arizona voter. It is equally important that our laws include safeguards to protect the vote of any Arizonan who is eligible and lawfully registered. In this regard, H.B. 2617, while well intentioned, does not include these necessary safeguards.

H.B. 2617 requires a county recorder to cancel the voter registration of a voter if the recorder receives information that provides the basis for determining that the person is not a qualified elector. The implementation of this provision is vague and lacks any guidance for how a county recorder would confirm such a determination. Our lawfully registered voters deserve to know that their right to vote will not be disturbed without sufficient due process. This provision leaves our election system vulnerable to bad actors who could seek to falsely allege a voter is not a qualified elector.

There are certain aspects of being a *qualified elector* that are objectively quantifiable and identifiable, such as age and citizenship status; but, the determination of *residency* can be a fact specific inquiry. The subjectivity of this provision, as well as a lack of guardrails against false claims, included in H.B. 2617 leaves voter registration susceptible to being canceled based on fiction rather than fact.

To be clear, it is currently and will remain illegal to vote in an Arizona election as a non-Arizona resident. To that end, there are provisions contained in H.B. 2617 that would strengthen a county recorder's ability

to make an objective determination to initiate the process of removing a person from the voter rolls because they are not qualified to vote in Arizona.

For example, requiring the Department of Transportation to notify the Secretary of State when a registered voter receives an out-of-state license is a step forward in maintaining accurate voter rolls. For that reason, the state *should* be notifying counties when a registered voter has received an out-of-state license and the county should move the voter to the inactive voting list after the voter receives a notice from the county.

Moreover, the process outlined in the bill that describes how counties are notified when a prospective juror is not a U.S. citizen also provides tools to make sure only qualified electors are participating in Arizona elections. That procedure should be codified in statute.

Additionally, the Secretary of State should be providing monthly reports to the county recorders of persons who are registered to vote in that county and who have changed residence addresses or are no longer a U.S. citizen. Further, to the extent practicable, recorders should be completing monthly comparisons to the databases that are delineated in the bill. Finally, a quarterly report of the number of deaths reported to the Secretary of State by the Department of Health Services and the number of voter registration cancellation notices issued by the Secretary as a result of those reports should be going to the Legislature, as H.B. 2617 would require.

Working with our partners in the Legislature, we have created a strong track record on election integrity. We have advanced more than 20 bills since the start of last year that, taken together, demonstrate our unwavering commitment to strengthening the system by which Arizonans exercise their rights and responsibilities as citizens in our representative democracy. I look forward to working with the sponsor and I am hopeful the aspects of the bill outlined above will be returned to my desk this session.

Sincerely,

Douglas A. Ducey
Governor
State of Arizona

cc: The Honorable Karen Fann
The Honorable Joseph Chaplik
The Honorable Katie Hobbs

# Exhibit 19

Explore

Settings

## Thread

**Arizona Free Enterprise Club**
@azfec

🚨 Official response re: Governor @DougDucey's veto of #HB2617

Unfortunately, Governor Ducey today vetoed HB 2617, critical election integrity legislation that would have ensured Arizona's voter rolls contain only eligible citizens. 1/5

9:02 PM · May 27, 2022 · Twitter Web App

**100** Retweets **20** Quote Tweets **163** Likes

**Arizona Free Enterprise Club** @azfec · May 27
Replying to @azfec
Contrary to what is stated in the veto letter, #HB2617 provides ample safeguards to ensure eligible voters do not have their registrations improperly cancelled. 2/5

1 15 52

**Arizona Free Enterprise Club** @azfec · May 27
In fact, the bill stipulates that counties must confirm that the voter is ineligible, then requires the county to send a notice to the voter. It is only after the voter fails to respond to the notice within 90 days that the registration would be cancelled. 3/5

2 16 47

**Arizona Free Enterprise Club** @azfec · May 27
A broad coalition of local and national election integrity leaders signed onto a letter urging Governor Ducey to sign HB2617, and explained in great detail the need for the enhanced voter roll maintenance requirements and the safeguards contained in the measure. 4/5




1 19 49

**Arizona Free Enterprise Club** @azfec · May 27
We want to thank Representative @JosephChaplik for sponsoring and championing this important bill, and the Republicans in the House and Senate who passed it. /end

1 14 70

Search Twitter

**New to Twitter?**
Sign up now to get your own pers

Continue with G

Continue with

Create account with pho

By signing up, you agree to the Te Privacy Policy, including Cookie U

**Relevant people**

**Arizona Free Ente**
@azfec
The Arizona Free E free market policy a organization dedica your freedoms and prosperous.

**Doug Ducey**
@DougDucey
Governor of Arizona

**What's happening**

US national news · LIVE
**The DOJ submits a redacte affidavit used in search of Trump's estate**

Inverse · 20 minutes ago
**Why NASA's Artemis Moon Mission Must Prove Itself E We Can Support It**

Vox · Yesterday
**Biden's big new student loa forgiveness plan, explained**

Politics · Trending
**Ben Shapiro**
5,292 Tweets

Politics · Trending
**Ashley Biden**
9,437 Tweets

Show more

Terms of Service Privacy Policy
Accessibility Ads info More ···
© 2022 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.
Log in S

# Exhibit 20

June 22, 2022 floor session of the Arizona Senate, available at

https://www.azleg.gov/videoplayer/?eventID=2022061052&startStreamAt=2847

The referenced section of the meeting can be found starting at approximately 48 minutes and 5 seconds into the video.

# Exhibit 21

COMMITTEE ON HOUSE ADMINISTRATION
CHAIRPERSON ZOE LOFGREN (D-CALIF.)

SUBCOMMITTEE ON ELECTIONS | 117TH CONGRESS

REPORT ON

# Voting in America: Ensuring Free and Fair Access to the Ballot

PREPARED BY CHAIR G. K. BUTTERFIELD (D-N.C.)
July 2021

# TABLE OF CONTENTS


## ACKNOWLEDGEMENTS

## EXECUTIVE SUMMARY
Committee on House Administration and Subcommittee on Elections ............................... 3

## CHAPTER ONE
*Introduction and the History of Discrimination in Voting*

America's Long History of Discriminating in Voting ....................................................... 10
A Constitutional Right to Vote ....................................................................................... 12
The Voting Rights Act, Precedent, and *Shelby County v. Holder* ...................................... 12
The Subcommittee on Elections Investigation of Current Discrimination in Voting ......... 19

## CHAPTER TWO
*Discriminatory Practices in Voting: An Overview*

Overview ........................................................................................................................ 23

## CHAPTER THREE
*Voter List Maintenance Practices and the Purging of Eligible Voters*

Background .................................................................................................................... 28
The Disproportionate and Discriminatory Burden
and Impact of List Maintenance Practices on
Minority Voters ............................................................................................................. 30

## CHAPTER FOUR
*Voter Identification and Documentary Proof-of-Citizenship Requirements*

Background .................................................................................................................... 43
The Disproportionate and Discriminatory Burden and Impact on Minority Voters
of Voter ID and Documentary Proof-of-Citizenship Laws ............................................... 46
Additional Evidence of Discriminatory Purpose ............................................................. 55

## CHAPTER FIVE
*Access to Multi-Lingual Voting Materials and Assistance*

Background .................................................................................................................... 61
The Disproportionate and Discriminatory Burden and Impact of Lack of Access to
Multi-Lingual Voting Materials and Support ................................................................... 64

## CHAPTER SIX

*Polling Place Closures, Consolidations, Relocations, and Long Wait Times at the Polls*

Background ........ 74
The Disproportionate and Discriminatory Burden and Impact of Polling Place Closures, Consolidations, and Relocations, Wait Times, and Lack of Resources on Minority Voters ........ 76

## CHAPTER SEVEN

*Restricting Opportunities to Vote*

Background ........ 89
Cutbacks and Restrictions on Opportunities to Vote and the Discriminatory and Disproportionate Burden and Impact on Minority Voters ........ 91

## CHAPTER EIGHT

*Changes to Methods of Election, Jurisdictional Boundaries, and Redistricting*

Background ........ 106
The Disproportionate and Discriminatory Burden and Impact on Minority Voters of Changes to Methods of Election, Jurisdictional Boundaries, and Redistricting ........ 107

**CONCLUSION** **121**

HAVA further requires that states implement, consistent with NVRA, systems "of file maintenance that make[] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," under which "registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote."[151]

When done improperly, voter list maintenance and voter purges disenfranchise otherwise eligible voters, use unreliable practices and data that disproportionately sweep in, and ultimately disenfranchise minority voters, often occurring too close to an election for a voter to correct the error if registration deadlines have passed.[152] Practices of voter purging have raised serious concerns in recent years.

## THE DISPROPORTIONATE AND DISCRIMINATORY BURDEN AND IMPACT OF LIST MAINTENANCE PRACTICES ON MINORITY VOTERS

Evidence received by the Subcommittee demonstrates that misconceived voter list maintenance efforts have erroneously sought to remove hundreds of thousands of properly registered voters and, in doing so, disproportionately burdened minority voters.

Following the *Shelby County* decision, several states, including those previously covered by Section 5 preclearance, have removed millions of registered voters from their voter rolls. As Michael Waldman, President of the Brennan Center for Justice, stated in his testimony before the Subcommittee, "abusive purges can remove duly registered citizens, often without their knowledge."[153] Mr. Waldman further testified that, "purges have surged in states once subject to federal oversight under the VRA[154]… states once covered by Section 5 saw purges at a 40 percent higher rate than the rest of the country."[155]

The Brennan Center reports that more than 17 million voters were removed from the rolls nationwide between 2016 and 2018.[156] In testimony during the 116th Congress, Mr. Waldman noted that the purge rate outpaced growth in voter registration (18 percent) or population (6 percent) and that the Brennan Center had calculated that two million fewer voters would have been purged between 2012 and 2016 if jurisdictions previously covered by Section 5 of the Voting Rights Act had purged their voter rolls at the same rate as other non-covered

151 *Id.* § 20183(a)(4)(A).

152 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 2.

153 *Voting in America: A National Perspective on the Right to Vote, Methods of Election, Jurisdictional Boundaries, and Redistricting*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Michael Waldman at 3.

154 *Id. citing* Jonathan Brater *et al.*, *Purges: A Growing Threat to the Right to Vote,* Brennan Center for Justice (July 20, 2018) at 3-5, https://www.brennancenter.org/publication/purges-growing-threat-right-vote.

155 *Id.* Kevin Morris, *Purge Rates Remain High*, Brennan Center for Justice (Aug. 21, 2019), https://www.brennancenter.org/our-work/analysis-opinion/voter-purge-rates-remain-high-analysis-finds.

156 *Id.*

jurisdictions.[157] Kevin Morris, Researcher with the Brennan Center, stated in his testimony before the Subcommittee that:

> Put differently, this means that the end of the preclearance condition did not result in a one-time 'catch-up' of voter list maintenance, but rather ushered in a new era in which the voter list maintenance practices of formerly covered jurisdictions were substantially more aggressive than other demographically-similar jurisdictions that were not covered under the VRA. …Simply put, *Shelby County* allowed and effected increased voter purges in counties with demonstrated histories of racially discriminatory voting rules.[158]

In several recent cases, states were found to have improperly sought to remove properly registered voters. For example, after the State of Wisconsin identified 341,855 registrants as potentially subject to removal on the basis of having moved, thousands of individuals showed up to vote in the following election at their address of registration, indicating that Wisconsin had improperly flagged such registrants as likely movers.[159] Joshua Kaul, Attorney General for the State of Wisconsin testified that, of the voters initially listed on the "movers report," over 6,000 voters responded to the postcards sent out to the potential "movers" and therefore kept their registration active, however, many more were erroneously deactivated and left off the poll book even though they had not moved.[160] Attorney General Kaul further testified that, during the 2018 Spring Primary, Wisconsin Elections Commission staff reported that, "while available data from the DMV implied many had moved, some of the voters, in fact, had not moved," and that "[o]verall, 12,133 [voters] were proactively reactivated by staff or were stopped from being deactivated due to these data discrepancies."[161] A study of Wisconsin's process found that at least four percent of the registrants who were identified as potential movers and who did not respond to a subsequent postcard cast a ballot at their address of registration, with minority registrants twice as likely as white registrants to do so.[162]

The State of Arkansas moved to purge nearly 8,000 voters from the rolls on grounds that they were ineligible to vote due to a felony conviction—in Arkansas, those who have been convicted of a felony lose their right to vote until their sentence is completed or they are pardoned.[163] In actuality, however, the list included a high percentage of voters who were indeed eligible and, in fact, some had never been convicted of a felony or had had their voting rights restored.[164]

---

157 *Voting Rights and Election Administration in America*: Hearing Before the Subcomm. on Elections, 116th Cong. (2019), written testimony of Michael Waldman at 3.

158 *Voting in America: The Potential for Polling Place Quality and Restrictions on Opportunities to Vote to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Kevin Morris at 8.

159 Gregory Huber *et al.*, *The racial burden of voter list maintenance errors: Evidence from Wisconsin's supplemental poll movers poll books*, 7 Sci. Adv. 3 (Feb. 17, 2021).

160 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Josh Kaul at 1-2.

161 *Id.*

162 Gregory Huber *et al.*, *The racial burden of voter list maintenance errors: Evidence from Wisconsin's supplemental poll movers poll books*, 7 Sci. Adv. 3 (Feb. 17, 2021).

163 Jonathan Brater, *et al.*, *Purges: A Growing Threat to the Right to Vote*, Brennan Center for Justice (2018) at 5, https://www.brennancenter.org/sites/default/files/2019-08/Report_Purges_Growing_Threat.pdf.

164 *Id.*

Thomas Saenz of MALDEF noted in his testimony before the Subcommittee that, "MALDEF and others also had to challenge an attempt to purge thousands of naturalized Texans, who were targeted through Motor Vehicles data that the state knew were outdated and would not reflect recent naturalizations."[165] Texas erroneously tried to remove tens of thousands of voters on grounds that they were non-citizens. Evidence subsequently showed that virtually all the registrants targeted by the effort were, in fact, citizens eligible to vote.[166]

Additionally, an analysis conducted by a non-partisan group found that, of the more than 300,000 registrants Georgia purged in 2019 for having changed residence, 63.3 percent still lived at the residence identified on the voter registration.[167] The analysis found the Georgia erroneously purged nearly 200,000 voters from its rolls.[168]

In many cases, the percentage of voters from racial or language minority groups subject to removal under these recent, large-scale, and often errant, voter roll purge efforts exceeded such groups' representation in the overall population. For example, in 2012 the State of Florida created a list of 182,000 registrants potentially subject to purge on the grounds that the registrants were non-citizens. The percentage of registrants included in the list that were Hispanic (61 percent) substantially exceeded the percentage of Hispanics in Florida's overall population (16 percent).[169] Litigation in the case of *Mi Familia Vota Education Fund v. Detzner* showed that this change should have been submitted for preclearance as a statewide change impacting formerly covered counties in Florida under Section 5.[170] NAACP LDF's *Democracy Diminished* report noted that a 2018 report found that since 2016, Florida has purged more than seven percent of voters.[171]

Likewise, mailers initiating the Wisconsin voter purge effort were disproportionately sent to counties with disproportionately large Black and Latino populations.[172] According to Demos,

165 *Voting in America: A National Perspective on the Right to Vote, Methods of Election, Jurisdictional Boundaries, and Redistricting*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021); written testimony of Thomas A. Saenz at 3.

166 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 8-10.

167 Palast Investigative Fund, *Georgia Voter Roll Purge Errors* (Sept. 1, 2020) at 10-11, https://www.acluga.org/sites/default/files/georgia_voter_roll_purge_errors_report.pdf; *see also ACLU of Georgia Releases the Palast Investigative Fund Report: The State Likely Removed Nearly 200,000 Citizens From the Voter Rolls Who Never Moved*, ACLU Georgia (Sept. 2, 2020), https://www.aclu.org/press-releases/aclu-georgia-releases-palast-investigative-fund-report-state-likely-removed-nearly.

168 *Id.*

169 U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States, 2018 Statutory Report* (Sept. 2018) at 147-48.

> The vast majority of voters on Florida's 2012 purge list were people of color. The data in a federal complaint alleging Section 2 violations (based on Florida voter registration data) showed that 87 percent were voters of color: 61 percent were Hispanic (whereas 14 percent of all registered voters in Florida were Hispanic); 16 percent were Black (whereas 14 percent of all registered voters were Black); 16 percent were White (whereas 70 percent of registered voters were White); and 5 percent were Asian American (whereas only 2 percent of registered voters were Asian).

170 *Id.* (citing *Mi Familia Vota Educ. Fund v. Detzner,* 891 F. Supp. 2d 1326, 1332-34 (M.D. Fla. 2012), https://www.clearinghouse.net/chDocs/public/VR-FL-0168-0008.pdf; *see also Allen,* 393 U.S. at 565, 567 (1969) (recognizing that Congress intended to give the VRA the "broadest possible scope" and that Section 5 reaches "subtle, as well as obvious" state laws that have the effect of or intent to disenfranchise minority voters); *Presley v. Etowah Cty. Comm'n,* 502 U.S. 491, 501 (1992) (reaffirming *Allen* and stating that "all changes in voting must be precleared" and that the "sphere" of Section 5 includes "all changes to rules governing voting").

171 *Democracy Diminished: State and Local Threats to Voting Post-Shelby County, Alabama v. Holder*, NAACP Legal Defense and Educational Fund, Inc. (as of Nov. 13, 2020) at 18.

172 Shruti Banerjee & Stuart Naifeh, *How the Wisconsin Voter Purge Targets Black Voters*, Demos (Dec. 20, 2019), https://www.demos.org/blog/how-wisconsin-voter-purge-targets-black-voters.

while the Black voting population comprises only 5.7 percent of Wisconsin's total electorate, "the highest concentrations of 2019 ERIC mailers were sent to areas that are home to the largest Black voting population in Wisconsin."[173] Demos reported that over one-third of the mailers sent to voters on the 2019 ERIC list went to the two counties where the vast majority of Wisconsin's Black voters reside—Milwaukee and Dane—two counties that are home to three quarters of Wisconsin's Black voters.[174]

A 2016 analysis of an Ohio removal effort found that the effort disproportionately removed voters in in-town African American neighborhoods relative to predominantly white suburbs—"in predominantly African American neighborhoods around Cincinnati, 10 percent of registered voters had been removed due to inactivity in 2012, compared to just 4 percent in the suburban Indian Hill."[175] And a purge of registrants in Brooklyn, New York, removed 14 percent of voters in Hispanic-majority districts compared to 9 percent of voters in other districts.[176]

Several approaches states have taken to culling voter rolls have been shown to disproportionately remove properly registered minority voters. To begin, a number of states, including Florida, Georgia, Iowa, Minnesota, Tennessee, and Texas, have sought to remove registrants on the basis that they were non-citizens, often using state and federal databases that can contain inaccurate information.[177] To identify non-citizen registrants, for example, Florida used its Department of Motor Vehicles ("DMV") and the federal Systematic Alien Verification for Entitlements ("SAVE") databases and sought to match citizenship information in those databases with its voting rolls.

As explained in the Subcommittee's prior report, the SAVE database is used at times to verify immigration status when an individual interacts with a state—however, SAVE does not include a comprehensive and definitive listing of U.S. citizens and states have been cautioned against using it to check eligibility.[178] Drivers' license databases have also proven to be inaccurate for verifying voter registration lists.[179]

According to the U.S. Commission on Civil Rights' ("USCCR") 2018 report, the list of 182,000 registrants was created by comparing the voting rolls to drivers' license databases, "which is an extremely faulty method as drivers' license databases do not reflect citizenship," and was then cut back to approximately 2,600.[180] Because, among other reasons, DMV

173 *Id.*

174 *Id.*

175 Andy Sullivan & Grant Smith, *Use it or lose it: Occasional Ohio voters may be shut out in November*, Reuters (June 2, 2016), https://www.reuters.com/article/us-usa-votingrightsohio-insight/use-it-or-lose-it-occasional-ohio-voters-may-be-shut-outin-november-idUSKCN0YO19D; *see also* Subcomm. on Elections, *Report on Voting Rights and Election Administration in the United States of America,* 116th Cong. (2019) at 42-43.

176 Jonathan Brater *et al.*, *Purges: A Growing Threat to the Right to Vote*, Brennan Center for Justice (2018) at 6, https://www.brennancenter.org/sites/default/files/2019-08/Report_Purges_Growing_Threat.pdf.

177 *Id.* at 9.

178 Subcomm. on Elections, *Report on Voting Rights and Election Administration in the United States of America*, 116th Cong. (2019) at 46; *see also Voting Rights and Election Administration in America*: Hearing Before the Subcomm. on Elections, 116th Cong. (2019), written testimony of Michael Waldman at 4; written testimony of Dale Ho at. 8-9.

179 *Id.*, Dale Ho at 12.

180 U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States, 2018 Statutory Report* (Sept. 2018) at 147.

records and SAVE databases are not generally updated to remove subsequently naturalized individuals, Florida's reliance on those databases to identify voters subject to being purged erroneously identified numerous registrants as non-citizens, the vast majority of whom were Latino, Hispanic, or Black. For example, of the 1,572 individuals that were notified by Miami-Dade County that they were potentially subject to purge as identified non-citizens, 98 percent of the respondents (549 out of 562) provided evidence that they were citizens and eligible to vote.[181]

Similarly, Texas used DMV records to try to identify non-citizens to remove from its voting rolls.[182] Texas officials initially claimed that the DMV matching effort identified 95,000 non-citizens as registered to vote (58,000 of whom had voted in the previous election).[183] However, because the DMV data did not account for subsequently naturalized citizens, the effort erroneously flagged thousands of individuals who were lawfully registered to vote. In Harris County, Texas, alone, approximately 60 percent of the voters flagged for removal produced evidence confirming their citizenship and entitlement to vote.[184]

An audit of a sample of the remaining registrants identified by the DMV database matching effort as "non-citizens" yielded no non-citizens.[185] Because over 87 percent of Texas' naturalized citizens are Black, Latino, or Asian,[186] these falsely identified non-citizens were overwhelmingly minority voters. Sonja Diaz, Founding Executive Director of the Latino Policy and Politics Initiative at the University of California, Los Angeles ("UCLA LPPI") notes in her testimony that, "[t]he disingenuous targeting of naturalized voters was not unique to Texas, but also found in 16 states where inaccurate immigration data identified and purged rightfully registered Latino voters."[187]

The NAACP Legal Defense Fund's report *Democracy Diminished* noted an additional example of attempts to wrongfully or inaccurately purge voters from the voting rolls, such as in Alabama when, in 2012, parties entered into a partial consent agreement to resolve issues under Section 5 of the VRA and blocked the City of Evergreen from continuing to implement an un-precleared discriminatory voter purge based on utility records that omitted eligible voters from a voter registration list, "including nearly half of the Conecuh County registered voters who reside in districts heavily populated by Black people."[188]

Additionally, several states have relied, or tried to rely, on multi-state databases—Interstate Voter Registration Crosscheck ("Crosscheck") and Electronic Registration Information Center

181 Compl., *Arcia v. Detzner*, 1:12-cv-22282 ¶ 39 (S.D. Fla. June 19, 2012).

182 *Secretary Whitley Issues Advisory on Voter Registration List Maintenance Activity* (Jan. 25, 2019), https://www.sos.texas.gov/about/newsreleases/2019/012519.shtml.

183 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 8-10.

184 *Voting Rights and Election Administration in America:* Hearing Before the Subcomm. on Elections, 116th Cong. (2019), written testimony of Dale Ho at 17.

185 *Id.*

186 *Id.*

187 *Voting in America: Ensuring Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sonja Diaz at 24.

188 *Democracy Diminished: State and Local Threats to Voting Post-Shelby County, Alabama v. Holder*, NAACP Legal Defense and Educational Fund, Inc. (as of Nov. 13, 2020) at 13.

("ERIC")—to identify registrants who allegedly moved to a different state, and therefore were allegedly subject to removal.

Crosscheck, a joint venture of as many as 29 states, was created by former Kansas Secretary of State Kris Kobach to identify voters registered in more than one state.[189] The Crosscheck program sought to do so by comparing voter registration lists from participating states and flagging all records that have the same first and last name, and date of birth.

Quantitative studies have shown that Crosscheck is an unreliable basis for identifying voters registered in multiple jurisdictions because of the small number of data points it uses to identify "duplicate" registrations—many people share the same first and last name and the same birthday.[190] In other words, "a substantial share of the pairings returned to states by Crosscheck [as duplicate registrations] represented cases in which two different registrants shared the same first name, last name, and date of birth instead of the same person being registered in to vote in two different states."[191]

The states which used Crosscheck to identify duplicate registrants should have known this—Crosscheck's, "user manual specifically states that 'a significant number of apparent double votes are false positives and not double votes.'"[192] The accuracy of Crosscheck was also undermined by its use of unreliable registration dates and other data entry errors.[193] Sophia Lin Lakin, Deputy Director of the Voting Rights Project at the American Civil Liberties Union ("ACLU") notes in her testimony that:

> A study by a team of researchers at Stanford, Harvard, the University of Pennsylvania, and Microsoft found that using Crosscheck to purge the voter rolls in one state, "could impede approximately 300 legitimate votes for each double vote prevented." In other words, the system incorrectly flags people as potential double voters ("matches") more than 99% of the time because of false positives resulting from poor matching protocols.[194]

Crosscheck's high error rate and heavy reliance on first and last names to identify duplicate registrants increases the likelihood that properly registered minority voters are subject to removal proceedings at a higher rate than properly registered white voters. As Ms. Lakin explained to the Subcommittee:

---

189 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Dr. Marc Meredith at 3.

190 Sharad Goel, *et al.*, *One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections*, 114 Am. Pol. Sci. Rev. 456 (2020) (finding that "one of Crosscheck's proposed purging strategies would eliminate about 300 registrations used to cast a seemingly legitimate vote for every one registration used to cast a double vote"); *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Dr. Marc Meredith at 3.

191 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Dr. Marc Meredith at 4.

192 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 4.

193 *Id.* at 5; Jonathan Brater *et al.*, *Purges: A Growing Threat to the Right to Vote*, Brennan Center for Justice (2018) at 8, https://www.brennancenter.org/sites/default/files/2019-08/Report_Purges_Growing_Threat.pdf.

194 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 4.

> Among some minority populations, first-name naming conventions are more commonly used, and many individuals born around the same historical periods are given the same name. Many often share the same or similar last names. Latinx voters, for example, are more likely than white voters to have one of the most common 100 surnames in the country. Indeed, existing studies show that incorrect matches using such a methodology are disproportionately concentrated among minority voters. Crosscheck flagged one in six Latinx Americans, one in seven Asian Americans, and one in nine African Americans as potential double registrants.[195]

Several states have aggressively sought to purge voters using data they knew or should have known would errantly lead to the removal of properly registered voters. For example, an election official in Kansas—the State that created and managed Crosscheck—contemporaneously admitted that most of the "duplicate" registrations identified by Crosscheck were not the result of fraud, but instead reflected data entry errors, writing in an email disclosed in litigation that, "[i]n the majority of cases of apparent double votes, in the end they do not turn out to be real double votes due to poll worker errors, mis-assignment of voter history, voters signing the wrong lines in poll books, etc."[196]

Other states participating in Crosscheck were also aware of its high error rate. A 2013 report by the Virginia State Board of Elections, for example, found that, after conducting "quality control for verifying . . . data matches . . . only 57,000 of the 308,579" registrations identified by Crosscheck as "duplicates" in fact warranted initiation of cancellation efforts, meaning that Virginia independently determined that Crosscheck's error rate likely exceeded 75 percent.[197]

Likewise, Indiana twice used database records to purge "duplicate" registrants from its voting rolls, and in doing so failed to comply with the NVRA. Indiana's first voter purge effort used data from Crosscheck—which, as explained above, is known to include numerous errors and disproportionately identify minority voters as having moved—to purge voters without providing affected registrants notice of the removal efforts.[198] Empirical evidence presented to the district court revealed that "Indiana's use of Crosscheck data likely triggered list-maintenance against thousands of eligible registrants who continued to reside at their address of registration, but who had the misfortune of sharing the same first name, last name, and date of birth of a registrant in another Crosscheck member state."[199]

The U.S. Court of Appeals for the Seventh Circuit held that Indiana's voter purge program violated the NVRA by removing voters who were suspected of changing residence without

---

195 *Id.*, *citing* Jonathan Brater *et al.*, *Purges: A Growing Threat to the Right to Vote*, Brennan Center for Justice (2018) at 7, https://www.brennancenter.org/sites/default/files/2019-08/Report_Purges_Growing_Threat.pdf.

196 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 5.

197 Virginia State Board of Elections, *Annual Report on Voter List Maintenance Activities* (Jan. 6, 2014), https://www.elections.virginia.gov/media/formswarehouse/maintenance-reports/2013SBEListMaintenancereport.pdf.

198 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 6.

199 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Dr. Marc Meredith at 4.

adhering to the NVRA's notice requirements.[200] Notwithstanding that its previous purge effort had been found to be unlawful, Indiana embarked on a second voter purge effort using a proprietary database that a federal court found was, "functionally identical to Crosscheck."[201] The district court again concluded that the renewed voter roll purge effort violated the NVRA for the same reason—Indiana was seeking to purge voters using database information without adhering to the NVRA's notice-and-waiting procedure.[202]

Crosscheck is no longer a widely used system amongst states because of its abuses and inaccuracies. Ms. Lakin testified that the system has been on hold since a 2019 settlement in a case brought by the ACLU of Kansas, "on behalf of 945 voters whose partial Social Security numbers were exposed by Florida officials through a public records request" and it has not been used since, "a Homeland Security audit discovered security vulnerabilities in 2017."[203] The failures and abuses of Crosscheck demonstrate how list maintenance processes and databases can be abused and lead to erroneous and disproportionate purging of minority voters from the voting rolls.

ERIC is another voter list maintenance tool which is used by 30 states and the District of Columbia to maintain their voter rolls.[204] Whereas Crosscheck used just two datapoints to identify "duplicate" registrations, ERIC uses more information to identify duplicates, including DMV information and Postal Service change of address data.[205] The 31 jurisdictions participating in ERIC have agreed to send postcards to registrants flagged by ERIC as duplicates to confirm their registrations, the first step in removing such registrants from voting rolls.

Though ERIC is generally viewed as more reliable than Crosscheck, it too has room for improvement and can disproportionately impact minority voters. As first noted above, a 2021 study of Wisconsin registrants flagged by ERIC as potentially subject to removal based on a change of address found that approximately four percent of the voters flagged as having moved subsequently voted at their address of registration, meaning that for every 29 registrations ERIC identified as having moved, at least "one registrant continued to reside at their address of registration and used that address to cast a ballot" in the next election.[206]

Notably, the study found that registrants who were Black and Hispanic were significantly more likely to be falsely identified by ERIC as having moved than White registrants, meaning that, "the lower bound on the false mover error rate is more than 100% larger for minorities than for whites."[207] In other words, the study found that ERIC erroneously identified Black and Hispanic voters as subject to removal at twice the rate at which it erroneously identified White

200 *Common Cause Indiana v. Lawson*, 937 F.3d 944, 958-59 (7th Cir. 2019).
201 *Common Cause Indiana v. Lawson*, 481 F. Supp. 3d at 807.
202 *Ind. State Conf. NAACP v. Lawson*, 481 F. Supp. 3d 826, 840 (S.D. Ind. 2020).
203 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 4.
204 Gregory Huber *et al.*, *The racial burden of voter list maintenance errors: Evidence from Wisconsin's supplemental poll movers poll books*, 7 Sci. Adv. 3 (Feb. 17, 2021).
205 *Id.* at 2-3.
206 *Id.* at 5.
207 *Id.*

voters as subject to removal. The authors identified minority registrants' disproportionate likelihood of living in a multi-unit or larger household dwellings (and, therefore, a likely relatively more frequent rate of change of residence within a single jurisdiction) as likely causes for their erroneous identification as subject to purge.[208]

Summarizing the literature on the use of databases to identify duplicate registrants, Dr. Marc Meredith of the University of Pennsylvania—who has published papers analyzing both Crosscheck and ERIC—testified that research "demonstrates that minority registrants are more likely than White registrants to be incorrectly identified as no longer eligible to vote at their address of registration."[209] Given that the majority of states use databases like Crosscheck and ERIC to identify voters for removal, the discriminatory burdens imposed by use of the databases extend throughout much of the United States.

Ms. Lakin also provided testimony to the Subcommittee on the dangers of "mass voter challenges." According to her testimony, state "challenger laws"—laws that allow private citizens to challenge the eligibility of prospective voters on or before Election Day—have also been used to remove voters from the rolls *en masse*.[210] These laws have been used to target voters along race, class, and disability lines.[211] As Ms. Lakin explains, "[m]ass challenges are tantamount to a systemic purge, but can be exploited to avoid federal rules governing purge programs, such as the prohibition of systemic removals of voter registrations within 90 days of a federal general election" and can deprive or attempt to deprive thousands of their voting rights.[212]

Furthermore, a 2020 report published by the Native American Rights Fund ("NARF"), *Obstacles at Every Turn: Barriers to Political Participation Faced by Native American Voters*, highlighted the impact voter purges have on Native American voters. The NARF report details how the non-traditional addresses many Native voters have, or failure to accept a P.O. Box and an applicant's drawing on the voter registration form, can result in them being purged from the voter rolls.[213] Under the NVRA, election officials cannot deny a voter's registration or purge an existing application because the applicant uses a non-traditional address or must be identified by landmarks or geographic features.[214]

Additionally, failing to provide language assistance and information about voter purges in the covered Native language, as provided for under Section 203 of the VRA, can negatively impact Native language speaking voters.[215] Wrongful purges can impact Native voters for many subsequent elections. According to NARF's report:

208 *Id.* at 4.

209 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Dr. Marc Meredith at 1.

210 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 13.

211 *Id.* at 13-14.

212 *Id.*

213 Tucker *et al.*, *Obstacles at Every Turn: Barriers to Political Participation Faced by Native American Voters*, Native American Rights Fund (2020), at 83-84.

214 *Id.*

215 *Id.*

> Once purged, many Native voters will not vote again in non-Tribal elections. Effectively, a voter purge can result in permanent disenfranchisement. Far too often, that is precisely what election officials intend to accomplish in Indian Country.[216]

The various processes by which voters are removed from the rolls can be and is abused, resulting in numerous cases in which otherwise eligible voters were erroneously removed from the voting rolls. The data gather by the Subcommittee illustrates the disproportionate and discriminatory impact borne by minority voters.

This record also demonstrates minority voters face a significant risk of being disproportionately burdened through voter roll purges which are attributable to discriminatory intent. The facts and circumstances surrounding several state and local voter list maintenance efforts and voter purges demonstrate that there is a high risk that the demonstrated, disproportionate burdens on minority voters of such efforts are a product of discriminatory intent.

First, the "historical background" of many of these widespread voter purge efforts raises concerns about intentional discrimination.[217] Several analyses have found that jurisdictions previously covered by Section 5 of the VRA—states that had a history of engaging in intentional discrimination against minority voters—removed voters from their rolls at a faster rate than jurisdictions that had not been previously covered by Section 5. As noted in the discussion above, the Brennan Center found that jurisdictions previously covered by Section 5 would have removed two million fewer voters during the 2012 to 2016 period had they removed registrants at the same rate as jurisdictions not previously subject to preclearance; they removed voters at a significantly higher rate than previously non-covered jurisdictions.[218]

Similarly, a 2020 nationwide study by two researchers at Columbia University's Barnard College found post-*Shelby County* increases in purge rates of between 1.5 and 4.5 points in jurisdictions formerly covered by Section 5 compared to jurisdictions that had never been covered.[219] In several of these previously covered states, the rate at which voters cast provisional ballots increased after the voter purges, suggesting that voters were improperly purged.[220]

The Subcommittee further found that several state efforts to remove alleged "non-citizens" from their voting rolls involved statements made by elected officials revealing of discriminatory intent. When Texas errantly used DMV records to identify "non-citizen" registrants, the Attorney General of Texas sent the following tweet:

216 *Id.*

217 *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

218 *Voting Rights and Election Administration in America*: Hearing Before the Subcomm. on Elections, 116th Cong. (2019), written testimony of Michael Waldman at 3.

219 Catalina Feder & Michael G. Miller, *Voter Purges After* Shelby: *Part of Special Symposium on Election Sciences*, 6 Am. Pol. Res. 687 (June 1, 2020), https://journals.sagepub.com/doi/abs/10.1177/1532673X20916426.

220 Jonathan Brater *et al.*, *Purges: A Growing Threat to the Right to Vote*, Brennan Center for Justice (2018) at 5, https://www.brennancenter.org/sites/default/files/2019-08/Report_Purges_Growing_Threat.pdf.

> VOTER FRAUD ALERT: The @Txsecofstate discovered approximately 95,000 individuals identified by DPS as non-U.S. citizens have a matching voting registration record in TX, appr 58,000 of whom have voted in TX elections. Any illegal vote deprives Americans of their voice.[221]

The Texas Governor then issued a statement supporting "prosecution where appropriate" of "this illegal vote [sic] registration."[222] As noted above, these inflammatory allegations proved to be entirely false. Kristen Clarke, then-Executive Director of the Lawyers' Committee, testified before the Subcommittee in 2019 that, "the list was based on DMV data that the state knew was flawed and would necessarily sweep in thousands of citizens who completed the naturalization process after lawfully applying for a Texas drivers' license."[223] Ms. Diaz testified that litigation work "led Texas officials to admit to knowing the discriminatory impact of their citizenship review on naturalized citizens."[224] A federal court described the state officials' communications regarding the non-citizen purge effort as "threatening" and "exemplif[ying] the power of government to strike fear and anxiety and to intimidate the least powerful among us."[225]

Florida's misconceived use of the SAVE database to identify "non-citizen" registrants involved similarly troubling evidence of discriminatory intent. The U.S. Department of Homeland Security expressly advised Florida officials that the SAVE database was not a reliable tool to verify citizenship.[226] The State was similarly warned in a letter from the Justice Department.[227] Despite these warnings, Florida nevertheless moved forward with its effort to remove alleged non-citizens using SAVE data—an effort that, as explained above, disproportionately targeted minority voters. The State was ultimately ordered to discontinue its purge based on the use of SAVE data following litigation.[228]

Additionally, many of these voter purges—such as the errant and unlawful purges in Florida, Georgia, and Texas—occurred in states that were previously covered jurisdictions under the VRA and had longstanding histories of racially polarized voting, which courts recognize provides Republican-controlled state legislatures with an incentive to engage in election administration practices that disproportionately burden minority voters likely to support

221 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 8.

222 *Id.* at 9.

223 *Voting Rights and Election Administration in America*: Hearing Before the Subcomm. on Elections, 116th Cong. (2019), written testimony of Kristen Clarke at 8.

224 *Voting in America: Ensuring Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sonja Diaz at 25.

225 Order Denying Mot. To Dismiss at 1, 4, *Tex. League of United Latin Am. Citizens v. Whitley*, No. 5:19-cv-00074 (W.D. Tex Feb. 27, 2019), ECF No. 61.

226 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 12.

227 U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States, 2018 Statutory Report* (Sept. 2018) at 148; *see* U.S. Dep't of Justice, Letter from Thomas E. Perez, Assist. Att'y Gen., U.S. Dep't of Justice, to Hon. Ken Detzner, Florida Secretary of State (June 11, 2012), https://assets.documentcloud.org/documents/805150/us-dep-ofjustice-save-letter-1.pdf.

228 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 12-13.

non-Republican candidates.[229] For example, between 2016 and 2018, Georgia purged more than 10 percent of its voters.[230]

In the context of mass voter challenges, a 2016 case in North Carolina is illustrative of the way in which voter purges based off challenges can be used to discriminate against and suppress minority voters. As detailed in Ms. Lakin's testimony, in the months and weeks before the November 2016 elections, boards of election in three North Carolina counties canceled thousands of voter registrations, "based solely on challengers' evidence that mail sent to those addresses had been returned as undeliverable."[231] Voters were not provided notice, and in one of the counties, "voters who were purged were disproportionately African American."[232]

In a court hearing on the case, the federal district judge stated that she was "horrified" by the "insane" process by which voters could be removed from the rolls without their knowledge, and went on to say that the mass challenges at issue, "sound[ed] like something that was put together in 1901."[233] As noted previously, the federal court recognized that these challenges are essentially systematic voter purges and thus require the same protections, and ultimately barred the state from removing voters based on these challenges unless the voters is given notice and a waiting period and unless the removals comply with the NVRA's mandate of 90 days before federal elections.[234]

As also noted above, the voter purge efforts in Florida and Texas were intended to combat registration and voting by non-citizens, yet each state's alleged evidence of non-citizen registration and voting proved wholly unsupported when subjected to even minimal scrutiny.[235] The Texas actions, which largely targeted Latino voters, followed an election year wherein Latino voters doubled their turnout.[236]

Since the 2020 election, several states have enacted new laws, along partisan lines, designed to purge voters more aggressively from their rolls. These new laws are justified by no more than unsupported claims of fraud or irregularities in the 2020 election. Iowa enacted a new "use-it-or-lose-it" voting list maintenance law requiring that the Iowa Secretary of State move all registrants who did not vote in the most recent general election to "inactive" status—the first step toward removing the registrant from the state's rolls.[237] Among those moved to "inactive"

229 *Perez v. Abbott*, 253 F. Supp. 3d 864, 946 (W.D. Tex. 2017); *see also Georgia State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018).

230 *Voting Rights and Election Administration in Georgia*: Hearing Before the Subcomm. on Elections, 116th Cong. (2019), written testimony of Gilda Daniels at 5.

> "Between 2016 – 2018, Georgia purged more than 10 percent of its voters, nearly 670,000 registrations were cancelled in 2017 alone."

231 *Id.* at 14.

232 *Id.*

233 *Id.*, *citing* Mark Joseph Stern, *North Carolina is Engaging in "Insane" Jim Crow-Style Voter Suppression, Says Federal Judge*, Slate (Nov. 3, 2016), https://slate.com/news-and-politics/2016/11/federal-judge-slams-north-carolina-voter-purge.html.

234 *Id.*, *citing N.C. State Conf. of NAACP*, 2018 WL 3748172, at 2.

235 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. On Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 8-13.

236 *Voting in America: Ensuring Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sonja Diaz at 24.

237 Iowa S.F. 413.

status were hundreds of 17-year-olds who were eligible to register but not yet eligible to vote in the 2020 general election.[238]

Arizona and Florida enacted laws making it easier to remove voters from the states' vote-by-mail registration lists.[239] And Georgia's new voting law, which imposes a variety of restrictions on voting, authorizes any individual Georgia citizen to file an unlimited number of challenges to the eligibility of particular voters.[240]

## CONCLUSION

The evidence before the Subcommittee leads to a clear conclusion—voter list maintenance and voter purge processes can be, and are, wielded in a discriminatory manner and have a disproportionate impact on minority voters. Additionally, as will be discussed later in this report, erroneously removing voters from the rolls does not affect only the individual voter, but can have rippling consequences at the polling place, increasing wait times that also disproportionately impact minority voters.

As Ms. Lakin of the ACLU stated in her testimony, "the integrity of our voter rolls—and thus our democratic process itself—are threatened by overly aggressive practices that wrongfully purge legitimate voters from the rolls—often disproportionately voters of color, voters with disabilities, and other historically disenfranchised voters."[241] Also, tellingly, because the claimed justifications for the purge efforts have often been found to be unsupported or pretextual, the evidence illustrates that this disproportionate impact can be the product of discriminatory intent. As such, the methods by which states maintain their voter rolls and remove voters from active voter lists deserves a heightened level of scrutiny and protection for voters.

238 Ryan J. Foley, *Iowa moves 294,000 registered voters to 'inactive' status*, ABC News (Apr. 26, 2021), https://abcnews.go.com/Politics/wireStory/iowa-moves-294000-registered-voters-inactive-status-77323150.

239 Ariz. S.B. 1485; Fl. S.B. 90.

240 Ga. S.B. 202, *see also Important Facts About LDF's Lawsuit Challenging Georgia's Voter Suppression Law*, NAACP Legal Defense and Educational Fund, Inc., https://www.naacpldf.org/naacp-publications/ldf-blog/important-facts-about-ldfs-lawsuit-challenging-georgias-voter-suppression-bill/.

241 *Voting in America: The Potential for Voter List Purges to Interfere with Free and Fair Access to the Ballot*: Hearing Before the Subcomm. on Elections, 117th Cong. (2021), written testimony of Sophia Lin Lakin at 18.

HTTPS://CHA.HOUSE.GOV/

# Exhibit 22

About Us

- Our Process
- Our Staff
- Who pays for Politifact?
- Advertise with Us
- Suggest a Fact-check
- Corrections and Updates

Donate

**Follow us**

The Facts Newsletter

Enter your email

Sign up

What are you looking for?




[League of Women Voters of Florida]
stated on October 10, 2013 in a statement:
The U.S. Department of Homeland Security warned that the SAVE "database is not a foolproof means of verifying (citizenship on) the voter rolls."

true 


- Elections
- Florida
-  League of Women Voters of Florida

×



By Amy Sherman October 30, 2013

# Homeland Security warned that the SAVE database is not foolproof way to verify the voter rolls, LWV says

Florida led an effort to remove noncitizens from the voter rolls last year that faced widespread criticism from county election officials. So Secretary of State Ken Detzner hit the road in October to make amends and unveil a revamped process for round two.

During his stop in deep-blue Broward County, Detzner -- an appointee of Republican Gov. Rick Scott -- faced a new heap of criticism. Voting rights activists peppered him with questions about the program Florida will use to purge noncitizen voters, called Systematic Alien Verification for Entitlements, or SAVE.

"Using the federal SAVE Program to conduct this ‘cleaning’ of the voter rolls is like taking a chihuahua on a hunting expedition -- it is an inappropriate tool for this application," said League of Women Voters President Deirdre Macnab in an Oct. 10 statement, the day after the meeting. "The U.S. Department of Homeland Security has already warned that this database is not a foolproof means of verifying the voter rolls."

The League of Women Voters filed an amicus brief in a lawsuit currently before the U.S. District 11th circuit challenging the state Division of Elections’ use of the SAVE program.

Some of Macnab’s statement is a matter of opinion -- as fact-checkers we won’t weigh in on whether using SAVE is appropriate to search for noncitizens on voter rolls. But we decided to check if the Department of Homeland Security warned that SAVE "is not a foolproof means of verifying the voter rolls."

**Florida’s controversial noncitizen voter purge**

First, here’s a brief recap of the state’s effort to ferret out noncitizens on the voter rolls before the November 2012 presidential election: Florida started with a list of about 180,000 potential noncitizens and whittled it down to about 2,600 names that later turned into 198. The list was rife with errors -- it even flagged a Brooklyn-born World War II veteran. (The best data PolitiFact Florida could nail down from the state was that there were about 85 noncitizens actually removed as of Aug. 1, 2012.)

The first round was based on driver's license data, which was a poor method to identify current noncitizens, because it isn’t updated when someone later obtains citizenship. After a battle with federal officials, Florida gained access to the SAVE program in August 2012. But by then, many county election supervisors were fed up with the timing and process and it was scrapped.

Detzner hasn’t indicated when he will start the next round. But unlike last year, the state plans to review the data before sending an electronic file to supervisors with supporting documentation. This time, county election supervisors have the option of accessing SAVE themselves.

**SAVE database**

Implemented in 1987, SAVE wasn’t originally intended as a way to clean up voter rolls. SAVE is a Web service used by government agencies to verify immigration status in order to determine if someone is eligible for benefits including Medicaid, housing loans and unemployment. The Department of Homeland Security and U.S. Citizenship and Immigration Service administer SAVE. During the past couple of years, several states including Florida sought to use SAVE to verify voter rolls.

We asked the League of Women Voters for the source of their claim that the department warned that SAVE is "not a foolproof means of verifying the voter rolls."

**Featured Fact-check**

×




true
By Amy Sherman • August 1, 2022

The League pointed to a *New York Times* article about Detzner's tour which stated, "In the 2012 agreement with Florida which allowed the state to use the information, the Department of Homeland Security said that the database was not a foolproof way of verifying citizenship."

That agreement between the department and the state Division of Elections doesn't use the literal word "foolproof." But that's the essence of a Homeland Security fact sheet the state forwarded to us that explains some caveats about using SAVE to verify a voter's eligibility:

"Because the SAVE program cannot confirm your citizenship status based upon information provided by the agency, you must be given an opportunity by the voter registration agency to provide the correct documentation or correct your records with USCIS and/or appeal the denial of your voter registration. Please note there are a number of reasons why the SAVE program may not be able to verify your citizenship, e.g., the SAVE program can only verify naturalized or derived citizens, to the extent

"SAVE relies on DHS records, which do not include a comprehensive and definitive listing of U.S. citizens..." stated a letter from the U.S. Justice Department to Detzner in July 2012.

For example, if someone has recently participated in a naturalization ceremony and that information isn't yet loaded into SAVE, then it could be possible for an elections supervisor to obtain outdated information on a voter.

"The information in the database is only as good as the information inputted into the database," Christopher Bentley, a spokesman for USCIS, told PolitiFact Florida.

When Florida's state elections director Maria Matthews talked about the SAVE database during a meeting in Sarasota County, she said "Is it foolproof? No, obviously it's not," according to the *Sarasota Herald-Tribune*.

While state elections officials have said SAVE isn't perfect, Detzner has said: "This is the best database we have to deal with."

Currently, there are four states with signed DHS agreements to access the SAVE Program for voter verification services: Florida, Colorado, Iowa and North Carolina -- plus five counties in Arizona. Several additional states have pending applications including Virginia, Oregon and Georgia.

**Our ruling**

The League of Women Voters in Florida said, "The U.S. Department of Homeland Security has already warned that this (SAVE) database is not a foolproof means of verifying the voter rolls."

That warning is essentially what the federal government conveyed in a document that explains SAVE may not be able to show citizenship status for all voters. The document didn't use the literal word "foolproof" but that is the message that the feds tried to communicate to the state. SAVE is intended to show if someone is not a U.S. citizen -- it is not a full database of people who are citizens. A state elections official said that SAVE isn't "foolproof," but the state argues that it is the best available resource.

We rate this claim True.

## Our Sources

U.S. Department of Homeland Security, "The SAVE program: Verification, immigrants and public benefits," 2011

U.S. Citizenship and Immigration Service, SAVE Benefit Category Filter Definitions, Accessed October 2013

U.S. Department of Homeland Security and U.S. Citizenship and Immigration Services and Florida Department of State/Division of Elections, Memorandum of Agreement, Aug. 14, 2012

U.S. Department of Homeland Security and U.S. Citizenship and Immigration Services, Fact sheet, July 23, 2012

U.S. Assistant Attorney General Thomas Perez, Letter to Florida Secretary of State Ken Detzner, June 11, 2012

Immigration Policy Center, "The systematic alien verification for entitlements (SAVE) program: a Fact sheet," Dec. 15, 2011

Federal Register, Rules and Regulations Department of Homeland Security, Aug. 23, 2010

Election Law @Moritz, Arcia vs. Detzner, Oct. 11, 2013

*New York Times*, "Florida Defends new effort to clean up voter rolls," Oct. 10, 2013

*Miami Herald*'s Naked Politics blog, "Detzner: 'I accept responsibility' for non-citizen voter search woes," Oct. 9, 2013

Associated Press, "GOP search for voter fraud turns up little," Sept. 26, 2012

Associated Press, "Colo. voter citizenship checks yield few responses," June 19, 2013

*Sarasota Herald-Tribune*, "'Credible' work to purge rolls," Oct. 9, 2013

*The Capital Times* (Madison, Wisconsin), "Latest election controversy brewing over idea to ferret out non-citizen voters," Dec. 20, 2012

Interview, Elizabeth Pines, Board Director at League of Women Voters of Florida, Oct. 11, 2013

Interview, Baylor Johnson, spokesman ACLU of Florida, Oct. 11, 2013

Interview, Deirdre Macnab, President of the League of Women Voters of Florida, Oct. 11, 2013

Interview, Cynthia Gordy, spokeswoman for the Advancement Project, Oct. 15, 2013

Interview, Christopher Bentley, spokesman for the U.S. Citizenship and Immigration Services, Oct. 15, 2013

Interview, Erik Opsal, spokesman Brennan Center for Justice, Oct. 15, 2013

**Read About Our Process**

The Principles of the Truth-O-Meter

## Browse the Truth-O-Meter

### More by Amy Sherman

slide 4 to 6 of 15

**Homeland Security warned that the SAVE database is not foolproof way to verify the voter rolls, LWV says**

×

# Exhibit 23

Senate Engrossed House Bill

voter registration; state residency; cancellation

State of Arizona
House of Representatives
Fifty-fifth Legislature
Second Regular Session
2022

# CHAPTER 370

# HOUSE BILL 2243

AN ACT

AMENDING SECTION 16-152, ARIZONA REVISED STATUTES; AMENDING SECTION 16-165, ARIZONA REVISED STATUTES, AS AMENDED BY LAWS 2022, CHAPTER 99, SECTION 8; AMENDING SECTION 21-314, ARIZONA REVISED STATUTES; RELATING TO QUALIFICATION AND REGISTRATION OF ELECTORS.

(TEXT OF BILL BEGINS ON NEXT PAGE)

Be it enacted by the Legislature of the State of Arizona:

Section 1. Section 16-152, Arizona Revised Statutes, is amended to read:

16-152. Registration form

A. The form used for the registration of electors shall contain:

1. The date the registrant signed the form.

2. The registrant's given name, middle name, if any, and surname.

3. The complete address of the registrant's actual place of residence, including street name and number, apartment or space number, city or town and zip code, or such description of the location of the residence that it can be readily ascertained or identified.

4. The registrant's complete mailing address, if different from the residence address, including post office address, city or town, zip code or other designation used by the registrant for receiving mail. The form shall also include a line for the registrant's e-mail address (optional to registrant).

5. The registrant's party preference. The two largest political parties that are entitled to continued representation on the ballot shall be listed on the form in the order determined by calculating which party has the highest number of registered voters at the close of registration for the most recent general election for governor, then the second highest. The form shall allow the registrant to circle, check or otherwise mark the party preference and shall include a blank line for other party preference options.

6. The registrant's telephone number, unless unlisted.

7. The registrant's state or country of birth.

8. The registrant's date of birth.

9. The registrant's occupation.

10. The registrant's Indian census number (optional to registrant).

11. The registrant's father's name or mother's maiden name.

12. One of the following identifiers for each registrant:

(a) The Arizona driver license number of the registrant or nonoperating identification license number of the registrant that is issued pursuant to section 28-3165.

(b) If the registrant does not have an Arizona driver license or nonoperating identification license, the last four digits of the registrant's social security number.

(c) If the registrant does not have an Arizona driver license or nonoperating identification license or a social security number and the registrant attests to that, a unique identifying number consisting of the registrant's unique identification number to be assigned by the secretary of state in the statewide electronic voter registration database.

13. A statement as to whether or not the registrant is currently registered in another state, county or precinct, and if so, the name, address, county and state of previous registration.

14. The question to the registrant "Are you a citizen of the United States of America?", appropriate boxes for the registrant to check "yes" or "no" and a statement instructing the registrant not to complete the form if the registrant checked "no".

15. The question to the registrant "Will you be eighteen years of age on or before election day?", appropriate boxes for the registrant to check "yes" or "no" and a statement instructing the registrant not to complete the form if the registrant checked "no".

16. A statement that the registrant has not been convicted of treason or a felony, or if so, that the registrant's civil rights have been restored.

17. A statement that the registrant is a resident of this state and of the county in which the registrant is registering.

18. A statement that executing a false registration is a class 6 felony.

19. The signature of the registrant.

20. If the registrant is unable to sign the form, a statement that the affidavit was completed according to the registrant's direction.

21. A statement that if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes.

22. A statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

23. A statement that the applicant shall submit evidence of United States citizenship with the application and that the registrar shall reject the application if no evidence of citizenship is attached.

24. A STATEMENT THAT IF THE REGISTRANT PERMANENTLY MOVES TO ANOTHER STATE AFTER REGISTERING TO VOTE IN THIS STATE, THE REGISTRANT'S VOTER REGISTRATION WILL BE CANCELED.

B. A duplicate voter receipt shall be provided with the form that provides space for the name, street address and city of residence of the applicant, party preference and the date of signing. The voter receipt is evidence of valid registration for the purpose of casting a provisional ballot as prescribed in section 16-584, subsection B.

C. The state voter registration form shall be printed in a form prescribed by the secretary of state.

D. The county recorder may establish procedures to verify whether a registrant has successfully petitioned the court for an injunction against harassment pursuant to section 12-1809 or an order of protection pursuant to section 13-3602 and, if verified, to protect the registrant's residence address, telephone number or voting precinct number, if appropriate, from public disclosure.

E. Subsection A of this section does not apply to registrations received from the department of transportation pursuant to section 16-112.

Sec. 2. Section 16-165, Arizona Revised Statutes, as amended by Laws 2022, chapter 99, section 8, is amended to read:

16-165. Causes for cancellation; report

A. The county recorder shall cancel a registration:

1. At the request of the person registered.

2. When the county recorder ~~knows of the death of~~ IS INFORMED AND CONFIRMS THAT the person registered IS DEAD.

3. If the person has been adjudicated an incapacitated person as defined in section 14-5101.

4. When the person registered has been convicted of a felony, and the judgment of conviction has not been reversed or set aside. The county recorder shall cancel the registration on receipt of notice of a felony conviction from the court or from the secretary of state or when reported by the elector on a signed juror questionnaire that is completed pursuant to section 21-314.

5. On production of a certified copy of a judgment directing a cancellation to be made.

6. Promptly after the election if the person registered has applied for a ballot pursuant to section 16-126.

7. When a person has been on the inactive voter list and has not voted during the time periods prescribed in section 16-166, subsection C.

8. When the county recorder receives written information from the person registered that the person has a change of residence within the county and the person does not complete and return a new registration form within twenty-nine days after the county recorder mails notification of the need to complete and return a new registration form with current information.

9. When the county recorder receives written information from the person registered that the person has a change of address outside the county, INCLUDING WHEN THE COUNTY RECORDER EITHER:

(a) RECEIVES A FORM FROM THE PERSON PURSUANT TO SUBSECTION E OF THIS SECTION ON WHICH THE PERSON HAS CONFIRMED THAT THE PERSON IS NOT A RESIDENT OF THIS STATE.

(b) RECEIVES A SUMMARY REPORT FROM THE JURY COMMISSIONER OR JURY MANAGER PURSUANT TO SECTION 21-314 INDICATING THAT THE PERSON HAS STATED THAT THE PERSON IS NOT A RESIDENT OF THE COUNTY. BEFORE THE COUNTY RECORDER CANCELS A REGISTRATION PURSUANT TO THIS SUBDIVISION, THE COUNTY RECORDER SHALL SEND THE PERSON NOTICE BY FORWARDABLE MAIL AND A POSTAGE PREPAID PREADDRESSED RETURN FORM REQUESTING THE PERSON CONFIRM BY SIGNING UNDER PENALTY OF PERJURY THAT THE PERSON IS A RESIDENT OF THE COUNTY AND IS NOT KNOWINGLY REGISTERED TO VOTE IN ANOTHER COUNTY OR ANOTHER STATE. THE NOTICE SHALL INFORM THE PERSON THAT FAILURE TO RETURN THE FORM WITHIN THIRTY FIVE DAYS WILL RESULT IN THE PERSON'S REGISTRATION BEING

CANCELED. IF THE PERSON FAILS TO RETURN THE NOTICE WITHIN THIRTY FIVE DAYS THE COUNTY RECORDER SHALL CANCEL THE PERSON'S REGISTRATION.

~~10. When the county recorder receives and confirms information that the person registered is not a United States citizen.~~

10. WHEN THE COUNTY RECORDER OBTAINS INFORMATION PURSUANT TO THIS SECTION AND CONFIRMS THAT THE PERSON REGISTERED IS NOT A UNITED STATES CITIZEN, INCLUDING WHEN THE COUNTY RECORDER RECEIVES A SUMMARY REPORT FROM THE JURY COMMISSIONER OR JURY MANAGER PURSUANT TO SECTION 21-314 INDICATING THAT A PERSON WHO IS REGISTERED TO VOTE HAS STATED THAT THE PERSON IS NOT A UNITED STATES CITIZEN. BEFORE THE COUNTY RECORDER CANCELS A REGISTRATION PURSUANT TO THIS PARAGRAPH, THE COUNTY RECORDER SHALL SEND THE PERSON NOTICE BY FORWARDABLE MAIL THAT THE PERSON'S REGISTRATION WILL BE CANCELED IN THIRTY FIVE DAYS UNLESS THE PERSON PROVIDES SATISFACTORY EVIDENCE OF UNITED STATES CITIZENSHIP PURSUANT TO SECTION 16-166. THE NOTICE SHALL INCLUDE A LIST OF DOCUMENTS THE PERSON MAY PROVIDE AND A POSTAGE PREPAID PREADDRESSED RETURN ENVELOPE. IF THE PERSON REGISTERED DOES NOT PROVIDE SATISFACTORY EVIDENCE WITHIN THIRTY FIVE DAYS, THE COUNTY RECORDER SHALL CANCEL THE REGISTRATION AND NOTIFY THE COUNTY ATTORNEY AND ATTORNEY GENERAL FOR POSSIBLE INVESTIGATION.

B. If the county recorder cancels a registration pursuant to subsection A, paragraph 8 of this section, the county recorder shall send the person notice that the registration has been ~~cancelled~~ CANCELED and a registration form with the information described in section 16-131, subsection C attached to the form.

C. When proceedings in the superior court or the United States district court result in a person being declared incapable of taking care of himself and managing his property, and for whom a guardian of the person and estate is appointed, result in such person being committed as an insane person or result in a person being convicted of a felony, the clerk of the superior court in the county in which those proceedings occurred shall file with the secretary of state an official notice of that fact. The secretary of state shall notify the appropriate county recorder and the recorder shall cancel the name of the person on the register. Such notice shall name the person covered, shall give the person's date and place of birth if available, the person's social security number, if available, the person's usual place of residence, the person's address and the date of the notice, and shall be filed with the recorder of the county where the person last resided.

D. Each month the department of health services shall transmit to the secretary of state without charge a record of the death of every resident of the state reported to the department within the preceding month. This record shall include only the name of the decedent, the decedent's date of birth, the decedent's date of death, the decedent's social security number, if available, the decedent's usual legal residence at the time of death and, if available, the decedent's father's name or

mother's maiden name. The secretary of state shall use the record for the sole purpose of canceling the names of deceased persons from the statewide voter registration database. In addition, the department of health services shall annually provide to the secretary of state from the statewide electronic death registration system without charge a record of all deaths of residents of this state that are reported to the department of health services. The records transmitted by the department of health services shall include only the name of the decedent, the decedent's date of birth, the decedent's social security number, if available, the decedent's usual legal residence at the time of death and, if available, the decedent's father's name or mother's maiden name. The secretary of state shall compare the records of deaths with the statewide voter registration database. Public access to the records is prohibited. Use of information from the records for purposes other than those required by this section is prohibited. The name of each deceased person shall promptly be canceled from the statewide voter registration database and the secretary of state shall notify the appropriate county recorder and the recorder shall cancel the name of the person from the register.

E. EACH MONTH THE DEPARTMENT OF TRANSPORTATION SHALL FURNISH TO THE SECRETARY OF STATE WITHOUT CHARGE A LIST OF PERSONS WHO THE DEPARTMENT HAS BEEN NOTIFIED HAVE BEEN ISSUED A DRIVER LICENSE OR THE EQUIVALENT OF AN ARIZONA NONOPERATING IDENTIFICATION LICENSE IN ANOTHER STATE. WITHIN TEN DAYS AFTER RECEIVING THE LIST OF PERSONS FROM THE DEPARTMENT OF TRANSPORTATION, THE SECRETARY OF STATE SHALL PROVIDE TO THE APPROPRIATE COUNTY RECORDER A LIST OF REGISTERED VOTERS IN THAT COUNTY WHO HAVE BEEN ISSUED A DRIVER LICENSE OR THE EQUIVALENT OF AN ARIZONA NONOPERATING IDENTIFICATION LICENSE IN ANOTHER STATE. THE COUNTY RECORDER SHALL PROMPTLY SEND NOTICE BY FORWARDABLE MAIL TO EACH PERSON WHO HAS OBTAINED A DRIVER LICENSE OR THE EQUIVALENT OF AN ARIZONA NONOPERATING IDENTIFICATION LICENSE IN ANOTHER STATE AND A POSTAGE PREPAID PREADDRESSED RETURN FORM REQUESTING THE PERSON CONFIRM BY SIGNING UNDER PENALTY OF PERJURY THAT THE PERSON IS A RESIDENT OF THIS STATE AND IS NOT KNOWINGLY REGISTERED TO VOTE IN ANOTHER STATE OR CONFIRM THAT THE PERSON IS NOT A RESIDENT OF THIS STATE. THE NOTICE SHALL INFORM THE PERSON THAT FAILURE TO RETURN THE FORM WITHIN NINETY DAYS WILL RESULT IN THE PERSON'S REGISTRATION BEING PLACED IN INACTIVE STATUS. IF THE PERSON RETURNS THE FORM WITHIN NINETY DAYS CONFIRMING THAT THE PERSON IS A RESIDENT OF THIS STATE, THE COUNTY RECORDER SHALL MAINTAIN THE REGISTRATION IN ACTIVE STATUS. IF THE PERSON FAILS TO RETURN THE FORM WITHIN NINETY DAYS, THE COUNTY RECORDER SHALL PLACE THE PERSON'S REGISTRATION IN INACTIVE STATUS.

F. EACH MONTH THE SECRETARY OF STATE SHALL COMPARE THE STATEWIDE VOTER REGISTRATION DATABASE TO THE DRIVER LICENSE DATABASE MAINTAINED BY THE DEPARTMENT OF TRANSPORTATION. THE SECRETARY OF STATE SHALL NOTIFY THE APPROPRIATE COUNTY RECORDER IF A PERSON WHO IS REGISTERED TO VOTE IN THAT

COUNTY HAS CHANGED THE PERSON'S RESIDENCE ADDRESS OR IS NOT A UNITED STATES CITIZEN.

G. TO THE EXTENT PRACTICABLE, EACH MONTH THE COUNTY RECORDER SHALL COMPARE THE COUNTY'S VOTER REGISTRATION DATABASE TO THE SOCIAL SECURITY ADMINISTRATION DATABASE.

H. TO THE EXTENT PRACTICABLE, EACH MONTH THE COUNTY RECORDER SHALL COMPARE PERSONS WHO ARE REGISTERED TO VOTE IN THAT COUNTY AND WHO THE COUNTY RECORDER HAS REASON TO BELIEVE ARE NOT UNITED STATES CITIZENS AND PERSONS WHO ARE REGISTERED TO VOTE WITHOUT SATISFACTORY EVIDENCE OF CITIZENSHIP AS PRESCRIBED BY SECTION 16-166 WITH THE SYSTEMATIC ALIEN VERIFICATION FOR ENTITLEMENTS PROGRAM MAINTAINED BY THE UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES TO VERIFY THE CITIZENSHIP STATUS OF THE PERSONS REGISTERED.

I. FOR PERSONS WHO ARE REGISTERED TO VOTE WITHOUT SATISFACTORY EVIDENCE OF CITIZENSHIP AS PRESCRIBED IN SECTION 16-166, THE COUNTY RECORDER SHALL COMPARE THE ELECTRONIC VERIFICATION OF VITAL EVENTS SYSTEM MAINTAINED BY A NATIONAL ASSOCIATION FOR PUBLIC HEALTH STATISTICS AND INFORMATION SYSTEMS, IF ACCESSIBLE, WITH THE INFORMATION ON THE PERSON'S VOTER REGISTRATION FILE.

J. TO THE EXTENT PRACTICABLE, THE COUNTY RECORDER SHALL REVIEW RELEVANT CITY, TOWN, COUNTY, STATE AND FEDERAL DATABASES TO WHICH THE COUNTY RECORDER HAS ACCESS TO CONFIRM INFORMATION OBTAINED THAT REQUIRES CANCELLATION OF REGISTRATIONS PURSUANT TO THIS SECTION.

K. AFTER CANCELING A REGISTRATION PURSUANT TO THIS SECTION, THE COUNTY RECORDER SHALL SEND A NOTICE BY FORWARDABLE MAIL INFORMING THE PERSON THAT THE PERSON'S REGISTRATION HAS BEEN CANCELED, THE REASON FOR CANCELLATION, THE QUALIFICATIONS OF ELECTORS PURSUANT TO SECTION 16-101 AND INSTRUCTIONS ON REGISTERING TO VOTE IF THE PERSON IS QUALIFIED.

L. THE SECRETARY OF STATE SHALL REPORT THE FOLLOWING INFORMATION TO THE LEGISLATURE AT THE END OF EACH QUARTER:

1. THE NUMBER OF DEATHS REPORTED TO THE SECRETARY OF STATE BY THE DEPARTMENT OF HEALTH SERVICES, THE NUMBER OF VOTER REGISTRATION CANCELLATION NOTICES ISSUED BY THE SECRETARY OF STATE TO THE COUNTY RECORDERS AS A RESULT OF THOSE REPORTS AND THE NUMBER OF REGISTRATIONS CANCELED AS A RESULT OF THOSE NOTICES.

2. THE NUMBER OF PERSONS REPORTED TO THE SECRETARY OF STATE WHO HAVE BEEN ISSUED A DRIVER LICENSE OR THE EQUIVALENT OF AN ARIZONA NONOPERATING IDENTIFICATION LICENSE IN ANOTHER STATE, THE NUMBER OF NOTICES SENT PURSUANT TO SUBSECTION E OF THIS SECTION AND THE NUMBER OF VOTER REGISTRATIONS THAT HAVE BEEN PLACED IN INACTIVE STATUS AND THE NUMBER OF VOTER REGISTRATIONS THAT HAVE BEEN CANCELED AS A RESULT OF THOSE NOTICES.

3. THE NUMBER OF PERSONS WHO HAVE STATED ON A JURY QUESTIONNAIRE THAT THE PERSON IS NOT A UNITED STATES CITIZEN, THE NUMBER OF NOTICES SENT PURSUANT TO SUBSECTION A, PARAGRAPH 10 OF THIS SECTION AND THE NUMBER OF REGISTRATIONS THAT HAVE BEEN CANCELED AS A RESULT OF THOSE NOTICES.

4. THE NUMBER OF PERSONS WHO HAVE STATED ON A JURY QUESTIONNAIRE THAT THE PERSON IS NOT A RESIDENT OF THE COUNTY, THE NUMBER OF NOTICES SENT PURSUANT TO SUBSECTION A, PARAGRAPH 9, SUBDIVISION (b) OF THIS SECTION AND THE NUMBER OF REGISTRATIONS THAT HAVE BEEN CANCELED AS A RESULT OF THOSE NOTICES.

5. THE NUMBER OF REGISTRATIONS ON THE INACTIVE VOTER LIST THAT HAVE BEEN CANCELED PURSUANT TO SUBSECTION A, PARAGRAPH 7 OF THIS SECTION.

Sec. 3. Section 21-314, Arizona Revised Statutes, is amended to read:

21-314. Juror questionnaire

A. The jury commissioner or jury manager shall use a questionnaire to determine whether a person is qualified to serve or has valid grounds to be excused or postponed from service. The jury commissioner or jury manager may require additional information from the person to make this determination. The jury commissioner or jury manager may determine juror qualifications, excuses and postponements at the same time.

B. THE JUROR QUESTIONNAIRE SHALL INFORM THE PERSON THAT DISQUALIFICATION FROM JURY DUTY AS A RESULT OF RESPONDING TO THE QUESTIONNAIRE THAT THE PERSON IS NOT A RESIDENT OR IS NOT A UNITED STATES CITIZEN WILL RESULT IN THE PERSON'S VOTER REGISTRATION BEING CANCELED.

~~B.~~ C. The jury commissioner or jury manager may destroy the fully answered questionnaire ninety days after the commissioner or manager receives it.

~~C.~~ D. The juror questionnaire may be included in the same mailing as the summons to attend the court as a juror or the questionnaire may be mailed before the summons.

~~D.~~ E. The jury commissioner or jury manager may investigate the accuracy of the answers to the questionnaire and may call on law enforcement agencies and the county attorney for assistance in an investigation.

F. THE JURY COMMISSIONER OR JURY MANAGER SHALL FORWARD TO THE SECRETARY OF STATE AND THE COUNTY RECORDER A SUMMARY REPORT DERIVED FROM JURY QUESTIONNAIRE DATA THAT CONTAINS INFORMATION THAT INDICATES THAT A PERSON IS NOT A UNITED STATES CITIZEN OR DOES NOT RESIDE IN THE COUNTY. THE REPORT SHALL ONLY CONTAIN THE INFORMATION THAT IS NECESSARY FOR THE COUNTY RECORDER TO ACCURATELY IDENTIFY THE PERSON IN THE VOTER REGISTRATION DATABASE.

APPROVED BY THE GOVERNOR JULY 6, 2022.
FILED IN THE OFFICE OF THE SECRETARY OF STATE JULY 6, 2022.

# Exhibit 24

**Makker, Amit (Bay Area)**

| | |
|---|---|
| **From:** | Bo Dul <bo@statesuniteddemocracy.org> |
| **Sent:** | Friday, August 19, 2022 2:32 PM |
| **To:** | Makker, Amit (Bay Area); agaona@cblawyers.com; kyost@cblawyers.com; rdesai@cblawyers.com; Christine Bass |
| **Cc:** | nshah@advancingjustice-aajc.org; efarmer@advancingjustice-aajc.org; tminnis@advancingjustice-aajc.org; #C-M AZ HB 2492 - LW TEAM |
| **Subject:** | Re: AZ AANHPI for Equity Coalition v. Hobbs et al., No. 2:22-cv-1381-DLR (D. Ariz.) |

Amit –

Because H.B. 2243 does not have a delayed effective date, it is subject to the General Effective Date of September 24, 2022. However, the Secretary's position is that Section 2 of H.B. 2243 is not operative until January 1, 2023 because it amends A.R.S. § 16-165 "as amended by" H.B. 2492, which does not go into effect by its own terms until that date. Because H.B. 2243 makes amendments to A.R.S. 16-165 on top of the amendments enacted by H.B. 2492, it is not possible to reverse engineer what the changes would be if the H.B. 2492 changes are not in effect. The Secretary thus believes it is not possible for her office or the counties to operationalize H.B. 2243's amendments to A.R.S. 16-165 until H.B. 2492 is in effect.

The Secretary's office has discussed and shared this position with the counties on a coordinating call, but has not yet transmitted any guidance in writing.

Best,

Bo

**Bo Dul (she/her) | Senior Counsel**
States United Democracy Center
480.253.9651 | @statesunited
bo@statesuniteddemocracy.org

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

---

**From:** Amit.Makker@lw.com <Amit.Makker@lw.com>
**Date:** Thursday, August 18, 2022 at 7:35 PM
**To:** agaona@cblawyers.com <agaona@cblawyers.com>, kyost@cblawyers.com <kyost@cblawyers.com>, rdesai@cblawyers.com <rdesai@cblawyers.com>, Bo Dul <bo@statesuniteddemocracy.org>, Christine Bass <Christinebass@statesuniteddemocracy.org>
**Cc:** nshah@advancingjustice-aajc.org <nshah@advancingjustice-aajc.org>, efarmer@advancingjustice-aajc.org <efarmer@advancingjustice-aajc.org>, tminnis@advancingjustice-aajc.org <tminnis@advancingjustice-aajc.org>, AZHB2492.LWTEAM@lw.com <AZHB2492.LWTEAM@lw.com>
**Subject:** AZ AANHPI for Equity Coalition v. Hobbs et al., No. 2:22-cv-1381-DLR (D. Ariz.)

Counsel-
Attached is a copy of our complaint, which we understand has been formally served.

As indicated in paragraph 20 of our complaint, three county recorders have told us in writing that they understand H.B. 2243 would go into effect on September 24, 2022 and that they would follow the law. Since we filed our complaint, two more county recorders have stated the same.

As you know, H.B. 2243 contains various language regarding the Arizona county recorders, and the positions of the county recorders on what they intend (and feel compelled) to do, come September, will ultimately dictate how we proceed regarding H.B. 2243 in our case. Accordingly, we ask that, via response to this email, you let us know (1) the Secretary of State's position on the effective date of H.B. 2243, and (2) whether the Secretary of State has issued any statement or directive to the county recorders regarding the effective date of H.B. 2243. We also ask that, if the Secretary of State has issued any such statements or directives, (3) you let us know exactly what was said and in what format (or, of course, forward us the correspondence in question). This will allow us to confirm with *all* defendants their position on H.B. 2243 and determine our next steps.

Thank you very much for your time. As always, we are available to get on a call to discuss at any time.

Best regards,

**Amit Makker**

**LATHAM & WATKINS LLP**
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
Direct Dial: +1.415.395.8034
Email: amit.makker@lw.com
https://www.lw.com

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

# Exhibit 25

TABLE OF SECTIONS AFFECTED

A.R.S. SECTIONS AMENDED, ADDED, TRANSFERRED OR REPEALED

In this table:

1. Brackets to the right of section numbers reflect multiple activities.
2. "A" means amended, "N" means added, "T" means transferred and renumbered, "#" means renumbered and "R" means repealed.
3. "G" means general effective date (the ninety-first day after final adjournment of the session), "E" means effective through enactment of a valid emergency clause or provision of appropriations for the support and maintenance of departments of the state and of state institutions, "COND" means conditionally enacted (check the chapter for the terms of the condition), "(RET)" means retroactive (check the chapter for the specific date), "(P108)" means enacted pursuant to Const. of Az. art. IX, sec. 22, and "(P105)" means enacted pursuant to Const. of Az. art. IV, pt. 1, sec. 1.

| Section | | Chapter Number | Section of the Bill | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 1-321 | } | 244 | 1 | N | G |
| 1-321 | } Renumbered as 1-322 | 304 | 1 | N | G |
| 1-602 | | 200 | 1 | A | G |
| 1-611 | | 184 | 1 | N | G |
| 3-109.03 | | 292 | 1 | N | E (6/13/22) |
| 3-2003 | | 59 | 1 | A | G |
| 3-2009 | | 59 | 2 | A | G |
| 3-2086 | | 59 | 3 | A | G |
| 3-3614 | | 32 | 1 | A | E (3/23/22) |
| 4-203.03 | | 282 | 1 | A | G |
| 4-205.04 | | 282 | 2 | A | G |
| 4-205.08 | | 282 | 3 | A | G |
| 4-207 | | 282 | 4 | A | G |
| 4-207.03 | | 282 | 5 | N | G |
| 4-209 | | 282 | 6 | A | G |
| 4-210 | } | 59 | 4 | A | G |
| 4-210 | } | 282 | 7 | A | G |
| 4-215 | | 282 | 8 | N | G |
| 4-243 | | 282 | 9 | A | G |
| 4-243.03 | | 282 | 10 | A | G |
| 4-244 | } | 146 | 1 | A | G |
| 4-244 | } | 282 | 11 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 4-246 | | 146 | 2 | A | G |
| 5-108 | | 59 | 5 | A | G |
| 5-404 | | 59 | 6 | A | G |
| 5-559 | | 31 | 1 | A | G |
| 5-562 | | 59 | 7 | A | G |
| 5-1209 | | 59 | 8 | A | G |
| 5-1211 | | 306 | 1 | A | G |
| 5-1212 | | 306 | 2 | A | G |
| 5-1304 | | 59 | 9 | A | G |
| 5-1306 | | 59 | 10 | A | G |
| 5-1318 | } (L21, ch 405, sec 3) | 306 | 3 | R | G |
| 5-1318 | } (L21, ch 234, sec 4) | 306 | 4 | A | G |
| 5-1401 | | 364 | 1 | N | G |
| 5-1402 | | 364 | 1 | N | G |
| 5-1403 | | 364 | 1 | N | G |
| 5-1404 | | 364 | 1 | N | G |
| 5-1405 | | 364 | 1 | N | G |
| 5-1406 | | 364 | 1 | N | G |
| 5-1407 | | 364 | 1 | N | G |
| 5-1408 | | 364 | 1 | N | G |
| 5-1409 | | 364 | 1 | N | G |
| 5-1431 | | 364 | 1 | N | G |
| 5-1432 | | 364 | 1 | N | G |
| 5-1433 | | 364 | 1 | N | G |
| 5-1434 | | 364 | 1 | N | G |
| 5-1461 | | 364 | 1 | N | G |
| 5-1462 | | 364 | 1 | N | G |
| 5-1463 | | 364 | 1 | N | G |
| 5-1464 | | 364 | 1 | N | G |
| 5-1465 | | 364 | 1 | N | G |
| 5-1466 | | 364 | 1 | N | G |
| 5-1467 | | 364 | 1 | N | G |
| 5-1468 | | 364 | 1 | N | G |
| 5-1469 | | 364 | 1 | N | G |
| 5-1470 | | 364 | 1 | N | G |
| 5-1471 | | 364 | 1 | N | G |
| 5-1472 | | 364 | 1 | N | G |
| 5-1473 | | 364 | 1 | N | G |
| 5-1474 | | 364 | 1 | N | G |
| 5-1475 | | 364 | 1 | N | G |
| 5-1476 | | 364 | 1 | N | G |
| 5-1477 | | 364 | 1 | N | G |
| 6-117 | | 45 | 1 | N | G |
| 6-123.01 | | 236 | 1 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 6-126 | | 236 | 2 | A | G |
| 6-147 | | 59 | 11 | A | G |
| 6-204 | | 59 | 12 | A | G |
| 6-326 | | 59 | 13 | A | G |
| 6-330 | | 176 | 1 | A | G |
| 6-603 | | 59 | 14 | A | G |
| 6-605 | | 59 | 15 | A | G |
| 6-606 | | 45 | 2 | A | G |
| 6-707 | | 59 | 16 | A | G |
| 6-714 | | 45 | 3 | A | G |
| 6-817 | | 59 | 17 | A | G |
| 6-857 | | 59 | 18 | A | G |
| 6-863 | | 59 | 19 | A | G |
| 6-901 | | 172 | 1 | A | G |
| 6-902.01 | | 172 | 2 | N | G |
| 6-903 | } | 45 | 4 | A | G |
| 6-903 | } | 59 | 20 | A | G |
| 6-903 | } | 172 | 3 | A | G |
| 6-905 | | 59 | 21 | A | G |
| 6-912 | | 59 | 22 | A | G |
| 6-941 | | 172 | 4 | A | G |
| 6-943 | } | 45 | 5 | A | G |
| 6-943 | } | 59 | 23 | A | G |
| 6-945 | | 59 | 24 | A | G |
| 6-971 | | 172 | 5 | A | G |
| 6-974 | | 59 | 25 | A | G |
| 6-976 | | 172 | 6 | A | G |
| 6-977 | | 45 | 6 | A | G |
| 6-982 | | 59 | 26 | A | G |
| 6-991.02 | | 45 | 7 | A | G |
| 6-991.05 | | 59 | 27 | A | G |
| 6-1107 | | 59 | 28 | A | G |
| 6-1201 | } | 236 | 3 | R | G |
| 6-1201 | } | 236 | 4 | N | G |
| 6-1202 | } | 236 | 3 | R | G |
| 6-1202 | } | 236 | 4 | N | G |
| 6-1203 | } | 236 | 3 | R | G |
| 6-1203 | } | 236 | 4 | N | G |
| 6-1204 | } | 236 | 3 | R | G |
| 6-1204 | } | 236 | 4 | N | G |
| 6-1205 | } | 236 | 3 | R | G |
| 6-1205 | } | 236 | 4 | N | G |
| 6-1205.01 | | 236 | 3 | R | G |
| 6-1206 | } | 236 | 3 | R | G |
| 6-1206 | } | 236 | 4 | N | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 6-1207 | } | 236 | 3 | R | G |
| 6-1207 | } | 236 | 4 | N | G |
| 6-1208 | } | 236 | 3 | R | G |
| 6-1208 | } | 236 | 4 | N | G |
| 6-1209 | } | 59 | 29 | A | G |
| 6-1209 | } | 236 | 3 | R | G |
| 6-1209 | } | 236 | 4 | N | G |
| 6-1210 | } | 236 | 3 | R | G |
| 6-1210 | } | 236 | 4 | N | G |
| 6-1211 | } | 236 | 3 | R | G |
| 6-1211 | } | 236 | 4 | N | G |
| 6-1212 | } | 236 | 3 | R | G |
| 6-1212 | } | 236 | 4 | N | G |
| 6-1213 | } | 236 | 3 | R | G |
| 6-1213 | } | 236 | 4 | N | G |
| 6-1214 | } | 236 | 3 | R | G |
| 6-1214 | } | 236 | 4 | N | G |
| 6-1215 | } | 236 | 3 | R | G |
| 6-1215 | } | 236 | 4 | N | G |
| 6-1216 | } | 59 | 30 | A | G |
| 6-1216 | } | 236 | 3 | R | G |
| 6-1216 | } | 236 | 4 | N | G |
| 6-1217 | } | 236 | 3 | R | G |
| 6-1217 | } | 236 | 4 | N | G |
| 6-1218 | } | 236 | 3 | R | G |
| 6-1218 | } | 236 | 4 | N | G |
| 6-1219 | | 236 | 4 | N | G |
| 6-1220 | | 236 | 4 | N | G |
| 6-1221 | | 236 | 4 | N | G |
| 6-1222 | | 236 | 4 | N | G |
| 6-1223 | | 236 | 4 | N | G |
| 6-1224 | | 236 | 4 | N | G |
| 6-1225 | | 236 | 4 | N | G |
| 6-1226 | | 236 | 4 | N | G |
| 6-1227 | | 236 | 4 | N | G |
| 6-1228 | | 236 | 4 | N | G |
| 6-1229 | | 236 | 4 | N | G |
| 6-1230 | | 236 | 4 | N | G |
| 6-1231 | | 236 | 4 | N | G |
| 6-1232 | | 236 | 4 | N | G |
| 6-1233 | | 236 | 4 | N | G |
| 6-1234 | | 236 | 4 | N | G |
| 6-1241 | } (to 6-1242) | 236 | 5 | # | G |
| 6-1241 | } | 236 | 6 | N | G |
| 6-1242 | } (to 6-1243) | 236 | 5 | # | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 6-1242 | } (from 6-1241) | 236 | 5 | # | G |
| 6-1242 | } | 236 | 7 | A | G |
| 6-1243 | (from 6-1242) | 236 | 5 | # | G |
| 6-1305 | | 236 | 8 | A | G |
| 6-1306 | | 236 | 9 | R | G |
| 6-1404 | | 59 | 31 | A | G |
| 8-115 | | 5 | 1 | A | G |
| 8-201 | | 26 | 1 | A | G |
| 8-202 | } (L21, ch 222, sec 1 & ch 240, sec 1) | 112 | 2 | A | G (RET) |
| 8-202 | } (L21, ch 435, sec 1) | 112 | 3 | R | G (RET) |
| 8-221 | } | 5 | 2 | A | G |
| 8-221 | } | 6 | 1 | A | G |
| 8-237 | | 5 | 3 | A | G |
| 8-246 | | 6 | 2 | A | G |
| 8-272 | | 122 | 1 | A | G |
| 8-303 | | 375 | 1 | A | G |
| 8-305 | | 6 | 3 | A | G |
| 8-322 | | 6 | 4 | A | G |
| 8-349 | | 6 | 5 | A | G |
| 8-350 | | 6 | 6 | A | G |
| 8-351 | | 6 | 7 | A | G |
| 8-352 | | 6 | 8 | A | G |
| 8-353 | | 6 | 9 | A | G |
| 8-354 | | 6 | 10 | A | G |
| 8-355 | | 6 | 11 | A | G |
| 8-356 | | 6 | 12 | R | G |
| 8-455 | | 275 | 1 | A | G |
| 8-456 | | 195 | 1 | A | G |
| 8-509 | | 85 | 1 | A | G |
| 8-514.03 | } (L18, ch 110, sec 2) | 85 | 2 | A | G |
| 8-514.03 | } (L18, ch 153, sec 3) | 85 | 3 | R | G |
| 8-521 | | 316 | 1 | A | G |
| 8-525 | | 5 | 4 | A | G |
| 8-530.03 | | 30 | 1 | N | G |
| 8-535 | | 5 | 5 | A | G |
| 8-537 | | 30 | 2 | A | G |
| 8-817 | | 195 | 2 | A | G |
| 8-822 | | 195 | 3 | A | G |
| 8-830 | | 44 | 1 | R | G |
| 8-842 | | 30 | 3 | A | G |
| 8-871 | | 5 | 6 | A | G |
| 8-872 | } | 5 | 7 | A | G |
| 8-872 | } | 30 | 4 | A | G |
| 8-921 | | 115 | 1 | N | G |
| 9-101 | | 108 | 1 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 9-101.01 | | 108 | 2 | A | G |
| 9-461.06 | | 166 | 1 | A | G |
| 9-462.09 | | 132 | 1 | N | G |
| 9-471 | | 215 | 1 | A | G |
| 9-495 | | 114 | 1 | A | G |
| 9-500.39 | | 343 | 1 | A | G |
| 9-500.48 | | 207 | 1 | N | G |
| 9-520 | | 191 | 1 | R | G |
| 9-571 | | 133 | 1 | A | G |
| 9-810.01 | | 22 | 1 | N | G |
| 9-1401 | | 212 | 1 | A | G |
| 9-1418 | | 212 | 2 | A | G |
| 9-1451 | | 293 | 1 | A | G |
| 10-2057 | | 191 | 2 | A | G |
| 10-2081 | | 191 | 3 | A | G |
| 10-2127 | | 191 | 4 | A | G |
| 10-2152 | | 96 | 1 | N | G |
| 11-251 | | 164 | 1 | A | G |
| 11-269.17 | | 343 | 2 | A | G |
| 11-441 | | 374 | 1 | A | G |
| 11-445 | | 278 | 1 | A | G |
| 11-452 | | 27 | 1 | R | G |
| 11-475 | | 9 | 1 | A | G |
| 11-480 | | 9 | 2 | A | G |
| 11-591 | | 82 | 1 | A | G |
| 11-594 | } | 82 | 2 | A | G |
| 11-594 | } | 257 | 1 | A | G |
| 11-599 | | 257 | 2 | A | G |
| 11-820.02 | } | 132 | 2 | N | G |
| 11-820.02 | } Renumbered as 11-820.03 | 182 | 1 | N | G |
| 11-861 | | 22 | 2 | A | G |
| 11-1013 | | 207 | 2 | A | G |
| 11-1014 | | 207 | 3 | A | G |
| 11-1021 | | 207 | 4 | A | G |
| 11-1025 | | 243 | 1 | A | G |
| 11-1029 | | 207 | 5 | A | G |
| 11-1901 | | 212 | 3 | A | G |
| 11-1918 | | 212 | 4 | A | G |
| 11-1951 | | 293 | 2 | A | G |
| 12-102.04 | | 322 | 1 | N | G (RET) |
| 12-115 | | 310 | 1 | A | G |
| 12-120 | | 310 | 2 | A | G |
| 12-120.02 | | 310 | 3 | A | G |
| 12-137 | | 283 | 1 | N | G |
| 12-301 | | 97 | 1 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 12-348 | | 265 | 1 | A | G |
| 12-353 | | 226 | 1 | N | G |
| 12-741 | | 118 | 1 | N | G |
| 12-751 | } | 267 | 1 | R | G |
| 12-751 | } (from 12-752) | 267 | 2 | # | G |
| 12-751 | } | 267 | 2 | A | G |
| 12-752 | (to 12-751) | 267 | 2 | # | G |
| 12-783 | | 188 | 1 | N | G |
| 12-820.03 | | 239 | 1 | A | G |
| 12-1809 | | 278 | 2 | A | G |
| 12-2101 | | 267 | 3 | A | G |
| 12-3252 | | 161 | 1 | A | G |
| 13-105 | | 383 | 1 | A | G |
| 13-705 | } | 197 | 1 | A | G |
| 13-705 | } | 245 | 1 | A | G |
| 13-712 | | 352 | 1 | A | 1/1/24 |
| 13-719 | | 278 | 3 | N | G |
| 13-806 | | 9 | 3 | A | G |
| 13-901 | | 278 | 4 | A | G |
| 13-906 | | 199 | 1 | A | G |
| 13-907 | | 199 | 2 | A | G |
| 13-908 | | 199 | 3 | A | G |
| 13-910 | | 199 | 4 | A | G |
| 13-1204 | } | 8 | 1 | A | G |
| 13-1204 | } | 190 | 1 | A | G |
| 13-1213 | | 260 | 1 | A | G |
| 13-1215 | | 202 | 1 | N | G |
| 13-1216 | | 202 | 1 | N | G |
| 13-1308 | | 197 | 2 | A | G |
| 13-1414 | | 117 | 1 | A | G |
| 13-1425 | | 65 | 1 | A | G |
| 13-1428 | | 197 | 3 | A | G |
| 13-1804 | | 254 | 1 | A | G |
| 13-1904 | | 348 | 1 | A | G |
| 13-2301 | | 160 | 1 | A | G |
| 13-2317 | | 236 | 10 | A | G |
| 13-2323 | | 197 | 4 | A | G |
| 13-2413 | | 262 | 1 | N | G |
| 13-2910 | | 107 | 1 | A | G |
| 13-2910.12 | | 138 | 1 | N | E (4/14/22) |
| 13-2921 | | 291 | 1 | A | G |
| 13-2921.01 | | 291 | 2 | A | G |
| 13-3112 | | 344 | 1 | A | G |
| 13-3205 | | 197 | 5 | A | G |
| 13-3207 | | 197 | 6 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 13-3302 | | 4 | 1 | A | G |
| 13-3401 | | 371 | 1 | A | G |
| 13-3409 | | 245 | 2 | A | G |
| 13-3415 | } (L21, ch 222, sec 5) | 112 | 4 | A | G (RET) |
| 13-3415 | } (L21, ch 372, sec 1) | 112 | 5 | R | G (RET) |
| 13-3554 | | 197 | 7 | A | G |
| 13-3560 | } | 197 | 8 | A | G |
| 13-3560 | } | 245 | 3 | A | G |
| 13-3602 | | 167 | 1 | A | G |
| 13-3624 | | 167 | 2 | A | G |
| 13-3625 | | 197 | 9 | A | G |
| 13-3728 | | 225 | 1 | A | E (5/9/22) |
| 13-3732 | | 376 | 1 | N | G |
| 13-3967 | | 6 | 13 | A | G |
| 13-4304 | | 131 | 1 | A | G |
| 13-4309 | | 131 | 2 | A | G |
| 13-4434 | | 100 | 1 | A | G |
| 13-4501 | | 352 | 2 | A | 1/1/24 |
| 13-4508 | | 352 | 3 | A | 1/1/24 |
| 13-4509 | | 352 | 4 | A | 1/1/24 |
| 13-4515 | | 352 | 5 | A | 1/1/24 |
| 13-4517 | } | 158 | 1 | A | G |
| 13-4517 | } | 352 | 6 | A | 1/1/24 |
| 13-4521 | | 352 | 7 | N | 1/1/24 |
| 15-102 | } | 200 | 2 | A | G |
| 15-102 | } | 205 | 1 | A | G |
| 15-117 | | 200 | 3 | A | G |
| 15-120.02 | } | 106 | 1 | N | G |
| 15-120.02 | } Renumbered as 15-120.03 | 380 | 1 | N | G |
| 15-143 | | 200 | 4 | N | G |
| 15-160.02 | | 210 | 1 | N | G |
| 15-182 | | 123 | 1 | A | G |
| 15-183 | | 201 | 1 | A | G |
| 15-184 | | 237 | 1 | A | G |
| 15-185 | | 317 | 1 | A | G |
| 15-187 | | 145 | 1 | A | G |
| 15-189.07 | | 205 | 2 | N | G |
| 15-203 | | 244 | 2 | A | G |
| 15-211 | | 120 | 1 | A | G |
| 15-213 | | 31 | 2 | A | G |
| 15-216 | | 44 | 1 | R | G |
| 15-217 | | 317 | 2 | N | G |
| 15-217.01 | | 317 | 2 | N | G |
| 15-217.02 | | 317 | 2 | N | G |
| 15-217.03 | | 317 | 2 | N | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 15-240 | | 353 | 1 | N | 7/1/23 |
| 15-244.01 | | 20 | 1 | A | G |
| 15-249 | | 44 | 2 | A | G |
| 15-249.01 | | 44 | 3 | R | G |
| 15-249.17 | | 317 | 3 | N | G |
| 15-249.18 | | 317 | 3 | N | G |
| 15-341 | } | 8 | 2 | A | G |
| 15-341 | } | 237 | 2 | A | G |
| 15-383 | | 290 | 1 | A | G |
| 15-393 | } (L21, ch 252, sec 1 & ch 404, sec 14) | 136 | 1 | A | G (RET) |
| 15-393 | } (L21, ch 252, sec 1 & ch 416, sec 2) | 136 | 2 | R | G (RET) |
| 15-393 | } (L22, ch 136, sec 1) | 317 | 4 | A | G |
| 15-393.01 | | 136 | 3 | A | G |
| 15-398 | | 198 | 1 | N | G |
| 15-448 | (L20, ch 14, sec 2) | 285 | 1 | A | 7/1/23 |
| 15-501.01 | } | 120 | 2 | A | G |
| 15-501.01 | } | 337 | 1 | A | G |
| 15-506 | | 119 | 1 | A | G |
| 15-533 | | 337 | 3 | A | G |
| 15-552 | } | 44 | 4 | A | G |
| 15-552 | } | 44 | 5 | R | 7/1/30 |
| 15-553 | | 337 | 4 | A | G |
| 15-554 | | 337 | 5 | N | G |
| 15-701 | | 120 | 3 | A | G |
| 15-701.01 | } | 60 | 1 | A | G |
| 15-701.01 | } | 303 | 1 | A | G |
| 15-710.02 | | 244 | 3 | N | G |
| 15-718 | | 303 | 2 | N | G |
| 15-720.01 | | 44 | 6 | R | G |
| 15-721 | | 205 | 3 | A | G |
| 15-722 | | 205 | 4 | A | G |
| 15-746 | | 290 | 2 | A | G |
| 15-796 | | 123 | 3 | A | G |
| 15-797 | | 123 | 4 | A | G |
| 15-824 | | 285 | 2 | A | 7/1/23 |
| 15-825 | | 355 | 1 | A | G |
| 15-825.01 | | 355 | 2 | A | G |
| 15-891 | | 44 | 6 | R | G |
| 15-891.01 | | 44 | 6 | R | G |
| 15-891.02 | | 44 | 6 | R | G |
| 15-891.03 | | 44 | 6 | R | G |
| 15-891.04 | | 44 | 6 | R | G |
| 15-891.05 | | 44 | 6 | R | G |
| 15-891.06 | | 44 | 6 | R | G |
| 15-901 | | 317 | 5 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 15-901.08 | | 123 | 5 | A | G |
| 15-910 | } | 285 | 3 | A | 7/1/23 |
| 15-910 | } | 317 | 6 | A | G |
| 15-913.01 | | 317 | 7 | A | G |
| 15-914.01 | | 192 | 1 | A | G |
| 15-922 | | 290 | 3 | A | G |
| 15-923 | | 347 | 1 | A | G |
| 15-925 | | 290 | 4 | N | G |
| 15-943 | | 317 | 8 | A | G |
| 15-943.01 | | 285 | 4 | A | 7/1/23 |
| 15-945 | } | 290 | 5 | A | G |
| 15-945 | } | 317 | 9 | A | G |
| 15-947 | | 285 | 5 | A | 7/1/23 |
| 15-951 | } | 168 | 1 | A | G |
| 15-951 | } (L22, ch 168, sec 1) | 168 | 2 | A | 7/1/23 |
| 15-951 | } | 285 | 6 | A | G |
| 15-951 | } (L22, ch 285, sec 6) | 285 | 7 | R | 7/1/23 |
| 15-952 | | 317 | 10 | R | G |
| 15-953 | | 317 | 11 | A | G |
| 15-961 | } | 285 | 8 | A | 7/1/23 |
| 15-961 | } | 317 | 12 | A | G |
| 15-971 | } | 285 | 9 | A | 7/1/23 |
| 15-971 | } | 317 | 13 | A | G |
| 15-972 | } | 300 | 1 | A | G |
| 15-972 | } | 341 | 1 | A | COND |
| 15-974 | | 285 | 10 | A | 7/1/23 |
| 15-992 | | 285 | 11 | A | 7/1/23 |
| 15-994 | | 317 | 14 | R | G |
| 15-1042 | | 44 | 7 | A | G |
| 15-1306 | | 155 | 1 | A | G |
| 15-1342 | | 155 | 2 | A | G |
| 15-1371 | | 317 | 15 | A | G |
| 15-1372 | | 317 | 16 | A | G |
| 15-1469 | | 315 | 1 | A | G |
| 15-1647 | } | 152 | 1 | R | E (4/18/22) |
| 15-1647 | } | 152 | 2 | N | E (4/18/22) |
| 15-1650.06 | | 315 | 2 | N | G |
| 15-1657 | | 21 | 1 | N | G (RET) |
| 15-1702 | | 21 | 3 | N | G (RET) |
| 15-1703 | | 21 | 3 | N | G (RET) |
| 15-1704 | | 21 | 3 | N | G (RET) |
| 15-1781 | | 21 | 4 | R | G (RET) |
| 15-1781.01 | | 21 | 4 | R | G (RET) |
| 15-1782 | | 21 | 4 | R | G (RET) |
| 15-1783 | | 21 | 4 | R | G (RET) |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 15-1784 | | 21 | 4 | R | G (RET) |
| 15-1802 | | 10 | 1 | A | E (3/18/22) |
| 15-1808 | | 144 | 1 | A | G |
| 15-1809 | | 315 | 3 | N | G |
| 15-1811 | | 273 | 1 | N | G |
| 15-1841 | | 21 | 4 | R | G (RET) |
| 15-1851 | | 21 | 4 | R | G (RET) |
| 15-1851.01 | | 21 | 4 | R | G (RET) |
| 15-1852 | | 21 | 4 | R | G (RET) |
| 15-1853 | | 21 | 4 | R | G (RET) |
| 15-1856 | | 21 | 4 | R | G (RET) |
| 15-1898 | | 330 | 1 | A | G |
| 15-1901 | | 44 | 8 | A | G |
| 15-2301 | | 202 | 2 | A | G |
| 15-2401 | } | 44 | 9 | A | G |
| 15-2401 | } | 388 | 1 | A | G (RET) |
| 15-2401.01 | | 388 | 2 | N | G (RET) |
| 15-2402 | | 388 | 3 | A | G (RET) |
| 15-2403 | | 388 | 4 | A | G (RET) |
| 15-2405 | | 317 | 17 | N | G |
| 16-101 | | 99 | 1 | A | 1/1/23* |
| 16-112 | | 99 | 2 | A | 1/1/23* |
| 16-121 | | 99 | 3 | A | 1/1/23* |
| 16-121.01 | | 99 | 4 | A | 1/1/23* |
| 16-123 | } | 99 | 5 | N | 1/1/23* |
| 16-123 | } Renumbered as 16-128 | 251 | 1 | N | G |
| 16-127 | } | 99 | 5 | N | 1/1/23* |
| 16-127 | } (L22, ch 99, sec 5) | 174 | 1 | A | 1/1/23 |
| 16-132 | } | 276 | 1 | R | G |
| 16-132 | } | 276 | 2 | N | G |
| 16-134 | | 99 | 6 | A | 1/1/23* |
| 16-135 | | 277 | 1 | A | G |
| 16-143 | } | 99 | 7 | N | 1/1/23* |
| 16-143 | } Renumbered as 16-144 | 252 | 1 | N | G |
| 16-143 | } Renumbered as 16-145 | 259 | 1 | N | G |
| 16-152 | | 370 | 1 | A | G |
| 16-153 | | 277 | 2 | A | G |
| 16-165 | } | 99 | 8 | A | 1/1/23* |
| 16-165 | } | 270 | 1 | A | G |
| 16-165 | } (L22, ch 99, sec 8) | 370 | 2 | A | G |
| 16-166 | | 277 | 3 | A | G |
| 16-205 | | 277 | 4 | A | G |

* L22, ch 174, sec 4

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 16-226 | | 277 | 5 | A | G |
| 16-227 | | 277 | 6 | A | G |
| 16-228 | | 277 | 7 | A | G |
| 16-301 | | 349 | 1 | A | COND |
| 16-322 | | 3 | 1 | A | E (3/3/22) |
| 16-341 | | 349 | 2 | A | COND |
| 16-403 | | 277 | 8 | A | G |
| 16-411 | } | 271 | 1 | A | G |
| 16-411 | } | 277 | 9 | A | G |
| 16-412 | | 277 | 10 | A | G |
| 16-442.01 | | 174 | 2 | A | G |
| 16-541 | | 174 | 3 | A | G |
| 16-544 | } | 270 | 2 | A | G |
| 16-544 | } | 277 | 11 | A | G |
| 16-550 | } | 271 | 2 | A | G |
| 16-550 | } | 358 | 1 | A | 1/1/24 |
| 16-551 | | 232 | 1 | A | G |
| 16-563 | | 271 | 3 | A | G |
| 16-579 | | 277 | 12 | A | G |
| 16-579.01 | | 271 | 4 | N | G |
| 16-579.02 | | 271 | 4 | N | G |
| 16-661 | | 230 | 1 | A | G |
| 16-927 | | 196 | 1 | A | G |
| 16-1016 | | 270 | 3 | A | G |
| 17-274 | | 322 | 2 | N | G |
| 17-275 | | 322 | 2 | N | G |
| 17-302.01 | | 223 | 1 | N | G |
| 17-332 | | 276 | 3 | A | G |
| 17-333 | | 335 | 1 | A | G |
| 18-104 | | 50 | 1 | A | G |
| 18-105 | | 50 | 2 | R | G |
| 18-121 | | 50 | 3 | A | G |
| 18-401 | | 307 | 1 | A | G |
| 18-552 | | 81 | 1 | A | G |
| 20-110 | | 89 | 1 | N | G |
| 20-167 | | 342 | 1 | A | G |
| 20-239 | | 342 | 2 | A | G |
| 20-361 | | 59 | 32 | A | G |
| 20-381 | | 342 | 3 | A | G |
| 20-411 | | 59 | 33 | A | G |
| 20-411.01 | | 59 | 34 | A | G |
| 20-463.02 | | 147 | 1 | N | G |
| 20-464 | | 157 | 1 | A | G |
| 20-485.12 | | 59 | 35 | A | G |
| 20-486.01 | | 59 | 36 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 20-841.13 | | 219 | 1 | N | G |
| 20-1004 | | 59 | 37 | A | G |
| 20-1054 | | 59 | 38 | A | G |
| 20-1057.19 | | 219 | 2 | N | G |
| 20-1095.03 | | 59 | 39 | A | G |
| 20-1096.04 | | 59 | 40 | A | G |
| 20-1133 | | 342 | 4 | A | G |
| 20-1376.10 | | 219 | 3 | N | G |
| 20-1379 | | 342 | 5 | A | G |
| 20-1382 | | 342 | 6 | A | G |
| 20-1406.10 | | 219 | 4 | N | G |
| 20-1510 | | 243 | 2 | N | G |
| 20-1583 | | 342 | 7 | A | G |
| 20-2310 | | 342 | 8 | A | G |
| 20-3341 | | 288 | 1 | N | G |
| 20-3342 | | 288 | 1 | N | G |
| 20-3343 | | 288 | 1 | N | G |
| 21-102 | } (L21, ch 160, sec 1) | 112 | 6 | A | G (RET) |
| 21-102 | } (L21, ch 206, sec 1) | 112 | 7 | R | G (RET) |
| 21-222 | | 310 | 4 | A | G |
| 21-314 | | 370 | 3 | A | G |
| 22-117 | | 310 | 5 | A | G |
| 22-261 | | 267 | 4 | A | G |
| 22-281 | | 97 | 2 | A | G |
| 23-211 | | 44 | 10 | A | G |
| 23-215 | | 44 | 11 | R | G |
| 23-391 | | 238 | 1 | A | G |
| 23-414 | | 368 | 1 | A | G |
| 23-418 | | 368 | 2 | A | G |
| 23-771 | | 360 | 1 | A | G |
| 23-908 | } | 56 | 1 | A | E (3/24/22) |
| 23-908 | } | 368 | 3 | A | G |
| 23-963.01 | | 368 | 4 | A | G |
| 23-1061 | | 162 | 1 | A | G |
| 23-1421 | } | 255 | 1 | R | G |
| 23-1421 | } | 255 | 2 | N | G |
| 23-1431 | | 111 | 1 | N | G |
| 23-1605 | | 130 | 1 | N | G |
| 23-1702 | | 361 | 1 | A | G |
| 23-1703 | | 361 | 2 | A | G |
| 25-311 | | 301 | 1 | A | G |
| 25-312 | | 301 | 2 | A | G |
| 25-313 | | 301 | 3 | A | G |
| 25-314 | | 301 | 4 | A | G |
| 25-314.01 | | 301 | 5 | N | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 25-315 | | 301 | 6 | A | G |
| 25-316 | } | 301 | 7 | R | G |
| 25-316 | } | 301 | 8 | N | G |
| 25-317 | | 301 | 9 | A | G |
| 25-318 | | 301 | 10 | A | G |
| 25-318.02 | | 53 | 1 | A | G |
| 25-319 | | 301 | 11 | A | G |
| 25-409 | | 113 | 1 | A | G |
| 26-101 | | 151 | 1 | A | G |
| 26-102 | | 151 | 2 | A | G |
| 26-105 | | 183 | 1 | A | G |
| 26-106 | | 311 | 1 | N | G |
| 26-153 | | 151 | 3 | A | G |
| 26-156 | | 151 | 4 | A | G |
| 26-168.01 | | 48 | 1 | N | G |
| 26-174 | | 222 | 1 | A | G |
| 26-175 | | 151 | 5 | A | G |
| 26-179 | | 151 | 6 | A | G |
| 26-180 | | 151 | 7 | A | G |
| 26-181 | | 151 | 8 | A | G |
| 26-303 | } (L21, ch 405, sec 8) | 220 | 1 | R | G |
| 26-303 | } (L21, ch 348, sec 2 & ch 367, sec 1) | 220 | 2 | A | G |
| 26-311 | | 86 | 1 | A | G |
| 28-101 | | 256 | 1 | A | G |
| 28-339 | | 322 | 3 | N | G |
| 28-472 | | 322 | 4 | A | G |
| 28-661 | | 256 | 2 | A | G |
| 28-662 | | 256 | 3 | A | G |
| 28-663 | | 256 | 4 | A | G |
| 28-664 | | 256 | 5 | A | G |
| 28-665 | | 256 | 6 | A | G |
| 28-666 | | 256 | 7 | A | G |
| 28-668 | | 8 | 3 | A | G |
| 28-673 | | 233 | 1 | A | 1/1/23 |
| 28-729 | | 42 | 1 | A | G |
| 28-815 | | 256 | 8 | A | G |
| 28-900 | | 290 | 6 | A | G |
| 28-903 | | 42 | 2 | A | G |
| 28-959.01 | | 8 | 4 | A | G |
| 28-966 | | 256 | 9 | A | G |
| 28-1321 | | 233 | 2 | A | 1/1/23 |
| 28-1385 | | 233 | 3 | A | 1/1/23 |
| 28-1387 | | 383 | 2 | A | G |
| 28-1401 | | 233 | 4 | A | 1/1/23 |
| 28-1402 | | 233 | 5 | A | 1/1/23 |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 28-1442 | | 383 | 3 | A | G |
| 28-1461 | | 233 | 6 | A | 1/1/23 |
| 28-1526 | | 383 | 4 | N | 1/1/23 |
| 28-2091 | | 66 | 1 | A | G |
| 28-2351 | } | 28 | 1 | A | G |
| 28-2351 | } | 29 | 1 | A | G |
| 28-2351 | } | 75 | 1 | A | G |
| 28-2351 | } | 110 | 1 | A | G |
| 28-2351 | } | 127 | 1 | A | G |
| 28-2351 | } | 143 | 1 | A | G |
| 28-2351 | } | 193 | 1 | A | G |
| 28-2351 | } | 248 | 1 | A | G |
| 28-2351 | } | 294 | 1 | A | G |
| 28-2403 | } | 28 | 2 | A | G |
| 28-2403 | } | 29 | 2 | A | G |
| 28-2403 | } | 110 | 2 | A | G |
| 28-2403 | } | 127 | 2 | A | G |
| 28-2403 | } | 143 | 2 | A | G |
| 28-2403 | } | 193 | 2 | A | G |
| 28-2403 | } | 248 | 2 | A | G |
| 28-2403 | } | 294 | 2 | A | G |
| 28-2470.10 | } | 28 | 3 | N | G |
| 28-2470.10 | } Renumbered as 28-2470.11 | 29 | 3 | N | G |
| 28-2470.10 | } Renumbered as 28-2470.12 | 110 | 3 | N | G |
| 28-2470.10 | } Renumbered as 28-2470.13 | 127 | 3 | N | G |
| 28-2470.10 | } Renumbered as 28-2470.14 | 143 | 3 | N | G |
| 28-2470.10 | } Renumbered as 28-2470.15 | 193 | 3 | N | G |
| 28-2470.10 | } Renumbered as 28-2470.16 | 248 | 3 | N | G |
| 28-2470.10 | } Renumbered as 28-2470.17 | 294 | 3 | N | G |
| 28-2531 | | 58 | 1 | A | G |
| 28-3004 | | 383 | 5 | A | G |
| 28-3053 | } | 290 | 7 | A | G |
| 28-3053 | } | 347 | 2 | A | G |
| 28-3158 | | 264 | 1 | A | G |
| 28-3171 | | 264 | 2 | A | G |
| 28-3225 | | 264 | 3 | A | G |
| 28-3228 | } | 59 | 41 | A | G |
| 28-3228 | } | 290 | 8 | A | G |
| 28-3319 | | 233 | 7 | A | 1/1/23 |
| 28-3413 | | 59 | 42 | A | G |
| 28-3480 | | 264 | 4 | A | G |
| 28-3482 | | 264 | 5 | A | G |
| 28-3512 | | 264 | 6 | A | G |
| 28-4593 | | 58 | 2 | A | G |
| 28-4594 | | 58 | 3 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 28-4841 | | 264 | 7 | A | G |
| 28-5801 | | 264 | 8 | A | G |
| 28-5802 | | 150 | 1 | A | G |
| 28-5805 | | 264 | 9 | A | G |
| 28-6392 | | 264 | 10 | A | G |
| 28-6501 | } | 28 | 4 | A | G |
| 28-6501 | } | 29 | 4 | A | G |
| 28-6501 | } | 110 | 4 | A | G |
| 28-6501 | } | 127 | 4 | A | G |
| 28-6501 | } | 143 | 4 | A | G |
| 28-6501 | } | 193 | 4 | A | G |
| 28-6501 | } | 248 | 4 | A | G |
| 28-6501 | } | 294 | 4 | A | G |
| 28-6924 | | 31 | 3 | A | G |
| 28-6951 | | 322 | 5 | A | G |
| 28-6991 | } | 28 | 5 | A | G |
| 28-6991 | } | 29 | 5 | A | G |
| 28-6991 | } | 110 | 5 | A | G |
| 28-6991 | } | 127 | 5 | A | G |
| 28-6991 | } | 143 | 5 | A | G |
| 28-6991 | } | 193 | 5 | A | G |
| 28-6991 | } | 248 | 5 | A | G |
| 28-6991 | } | 294 | 5 | A | G |
| 28-6993 | } | 28 | 6 | A | G |
| 28-6993 | } | 29 | 6 | A | G |
| 28-6993 | } | 110 | 6 | A | G |
| 28-6993 | } | 127 | 6 | A | G |
| 28-6993 | } | 143 | 6 | A | G |
| 28-6993 | } | 193 | 6 | A | G |
| 28-6993 | } | 248 | 6 | A | G |
| 28-6993 | } | 294 | 6 | A | G |
| 28-7006 | | 322 | 6 | A | G |
| 28-7009 | | 44 | 12 | A | G |
| 28-7011 | | 44 | 13 | R | G |
| 28-7094 | | 228 | 1 | A | G |
| 28-8322 | | 264 | 11 | A | G |
| 28-8322.01 | | 264 | 12 | N | G |
| 28-8322.02 | | 264 | 12 | N | G |
| 28-8324 | | 264 | 13 | A | G |
| 28-8325 | | 264 | 14 | A | G |
| 28-8329 | | 264 | 15 | A | G |
| 28-8335 | } | 264 | 16 | A | G |
| 28-8335 | } | 321 | 1 | A | G (RET) |
| 28-8337 | | 264 | 17 | A | G |
| 28-8338 | | 264 | 18 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 28-8339 | | 264 | 19 | A | G |
| 28-8340 | | 264 | 20 | A | G |
| 28-8341 | | 264 | 21 | A | G |
| 28-8342 | | 264 | 22 | A | G |
| 28-9102 | | 227 | 1 | A | G |
| 28-9104 | | 227 | 2 | A | G |
| 28-9507 | | 54 | 1 | A | G |
| 28-9555 | | 137 | 1 | A | G |
| 30-801 | } | 191 | 6 | R | G |
| 30-801 | } | 191 | 7 | N | G |
| 30-802 | | 191 | 6 | R | G |
| 30-803 | } | 191 | 6 | R | G |
| 30-803 | } | 191 | 7 | N | G |
| 30-805 | } | 191 | 6 | R | G |
| 30-805 | } | 191 | 7 | N | G |
| 30-806 | } | 191 | 8 | R | G |
| 30-806 | } (from 30-809) | 191 | 9 | # | G |
| 30-807 | } | 191 | 8 | R | G |
| 30-807 | } (from 30-810) | 191 | 10 | # | G |
| 30-807 | } | 191 | 10 | A | G |
| 30-808 | } | 191 | 8 | R | G |
| 30-808 | } (from 30-811) | 191 | 11 | # | G |
| 30-808 | | 191 | 11 | A | G |
| 30-809 | } (to 30-806) | 191 | 9 | # | G |
| 30-809 | } (from 30-812) | 191 | 12 | # | G |
| 30-809 | } | 191 | 12 | A | G |
| 30-810 | } (to 30-807) | 191 | 10 | # | G |
| 30-810 | } | 191 | 13 | N | G |
| 30-811 | } (to 30-808) | 191 | 11 | # | G |
| 30-811 | } Renumbered as 30-802 | 191 | 13 | N | G |
| 30-812 | (to 30-809) | 191 | 12 | # | G |
| 30-813 | | 191 | 14 | R | G |
| 31-281 | | 44 | 14 | R | 7/1/30 |
| 31-282 | | 44 | 14 | R | 7/1/30 |
| 31-284 | | 44 | 14 | R | 7/1/30 |
| 31-285 | | 44 | 14 | R | 7/1/30 |
| 31-287 | | 44 | 15 | R | G |
| 31-402 | | 44 | 16 | A | G |
| 31-411 | | 44 | 17 | A | G |
| 31-411.01 | | 278 | 5 | A | G |
| 31-412 | } | 197 | 10 | A | G |
| 31-412 | } | 245 | 4 | A | G |
| 32-122 | } (L16, ch 167, sec 5) | 59 | 43 | A | G |
| 32-122 | } (L16, ch 352, sec 9 & ch 371, sec 11) | 59 | 44 | A | G |
| 32-122.01 | | 59 | 45 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 32-122.02 | | 59 | 46 | A | G |
| 32-122.07 | | 59 | 47 | A | G |
| 32-721 | | 59 | 48 | A | G |
| 32-823 | | 59 | 49 | A | G |
| 32-921 | | 59 | 50 | A | G |
| 32-1004 | | 59 | 51 | A | G |
| 32-1023 | | 59 | 52 | A | G |
| 32-1051 | | 59 | 53 | A | G |
| 32-1053 | | 59 | 54 | A | G |
| 32-1122 | | 59 | 55 | A | G |
| 32-1132 | | 124 | 1 | A | G (RET) |
| 32-1201.01 | | 7 | 1 | A | G |
| 32-1202 | | 7 | 2 | A | G |
| 32-1206 | | 135 | 1 | A | G |
| 32-1207 | | 135 | 2 | A | G |
| 32-1231 | | 135 | 3 | A | G |
| 32-1232 | | 59 | 56 | A | G |
| 32-1233 | | 135 | 4 | A | G |
| 32-1234 | } | 59 | 57 | A | G |
| 32-1234 | } | 135 | 5 | A | G |
| 32-1236 | | 135 | 6 | A | G |
| 32-1263.02 | | 135 | 7 | A | G |
| 32-1263.03 | | 135 | 8 | A | G |
| 32-1264 | | 135 | 9 | A | G |
| 32-1276.01 | | 135 | 10 | A | G |
| 32-1276.02 | | 135 | 11 | A | G |
| 32-1284 | | 59 | 58 | A | G |
| 32-1285 | | 135 | 12 | A | G |
| 32-1287 | | 135 | 13 | A | G |
| 32-1296 | } | 59 | 59 | A | G |
| 32-1296 | } | 135 | 14 | A | G |
| 32-1297.06 | | 135 | 15 | A | G |
| 32-1301 | } | 257 | 3 | A | G |
| 32-1301 | } | 279 | 1 | A | 4/1/23 |
| 32-1307 | | 257 | 4 | A | G |
| 32-1309 | | 257 | 5 | A | G |
| 32-1334 | | 257 | 6 | A | G |
| 32-1341 | | 257 | 7 | N | G |
| 32-1342 | | 257 | 7 | N | G |
| 32-1343 | | 257 | 7 | N | G |
| 32-1344 | | 257 | 7 | N | G |
| 32-1345 | | 257 | 7 | N | G |
| 32-1346 | | 257 | 7 | N | G |
| 32-1347 | | 257 | 7 | N | G |
| 32-1365 | | 257 | 8 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 32-1366 | | 257 | 9 | A | G |
| 32-1372 | | 257 | 10 | A | G |
| 32-1373 | | 257 | 11 | A | G |
| 32-1399 | | 257 | 12 | A | G |
| 32-1522 | | 59 | 60 | A | G |
| 32-1523.01 | | 59 | 61 | A | G |
| 32-1529 | | 59 | 62 | A | G |
| 32-1645 | | 52 | 1 | A | G |
| 32-1651 | | 128 | 1 | A | G |
| 32-1682 | | 59 | 63 | A | G |
| 32-1683 | | 59 | 64 | A | G |
| 32-1722 | | 59 | 65 | A | G |
| 32-1723 | | 59 | 66 | A | G |
| 32-1822 | | 59 | 67 | A | G |
| 32-1829 | | 59 | 68 | A | G |
| 32-1854 | | 59 | 69 | A | G |
| 32-1901 | } | 98 | 1 | A | G |
| 32-1901 | } | 362 | 1 | A | G |
| 32-1901.01 | } | 59 | 70 | A | G |
| 32-1901.01 | } | 362 | 2 | A | G |
| 32-1905 | | 362 | 3 | A | 7/1/23 |
| 32-1921.01 | | 362 | 4 | A | 7/1/23 |
| 32-1922 | | 59 | 71 | A | G |
| 32-1923.01 | } | 59 | 72 | A | G |
| 32-1923.01 | } | 362 | 5 | A | 7/1/23 |
| 32-1924 | | 362 | 6 | A | 7/1/23 |
| 32-1927 | | 362 | 7 | A | 7/1/23 |
| 32-1927.01 | | 362 | 8 | A | 7/1/23 |
| 32-1927.02 | | 362 | 9 | A | 7/1/23 |
| 32-1934 | | 362 | 10 | A | G |
| 32-1970 | } | 98 | 2 | R | G |
| 32-1970 | } | 98 | 3 | N | G |
| 32-1974 | | 356 | 1 | A | G |
| 32-1996 | | 362 | 11 | A | 7/1/23 |
| 32-2001 | | 289 | 1 | A | G |
| 32-2022 | | 59 | 73 | A | G |
| 32-2024 | | 59 | 74 | A | G |
| 32-2041.01 | | 289 | 2 | N | G |
| 32-2075 | | 95 | 1 | A | G |
| 32-2091.02 | | 59 | 75 | A | G |
| 32-2091.04 | | 59 | 76 | A | G |
| 32-2101 | } | 126 | 1 | A | G |
| 32-2101 | } | 298 | 1 | A | G |
| 32-2108 | | 59 | 77 | A | G |
| 32-2123 | | 59 | 78 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 32-2124 | } | 59 | 79 | A | G |
| 32-2124 | } | 298 | 2 | A | G |
| 32-2132 | | 298 | 3 | A | G |
| 32-2135 | | 298 | 4 | A | G |
| 32-2153 | } | 59 | 80 | A | G |
| 32-2153 | } | 126 | 2 | A | G |
| 32-2155 | | 126 | 3 | A | G |
| 32-2163 | | 298 | 5 | A | G |
| 32-2215 | | 59 | 81 | A | G |
| 32-2217 | | 59 | 82 | A | G |
| 32-2239.02 | | 207 | 6 | N | G |
| 32-2242 | | 59 | 83 | A | G |
| 32-2248 | | 59 | 84 | A | G |
| 32-2297 | | 207 | 7 | N | G |
| 32-2371 | | 59 | 85 | A | G |
| 32-2812 | | 59 | 86 | A | G |
| 32-2912 | | 59 | 87 | A | G |
| 32-3027 | | 269 | 1 | A | (6/6/22) (P108) |
| 32-3228 | | 297 | 1 | A | G |
| 32-3229.01 | | 224 | 1 | N | G |
| 32-3230 | } | 104 | 1 | N | 4/1/23 |
| 32-3230 | } Renumbered as 32-3230.01 | 216 | 1 | N | G |
| 32-3248.01 | | 134 | 1 | A | G |
| 32-3275 | | 59 | 88 | A | G |
| 32-3423 | | 59 | 89 | A | G |
| 32-3429 | | 59 | 90 | A | G |
| 32-3431 | | 116 | 1 | N | G |
| 32-3611 | | 59 | 91 | A | G |
| 32-3668 | | 59 | 92 | A | G |
| 32-3669 | | 59 | 93 | A | G |
| 32-3901 | | 23 | 1 | A | G |
| 32-3922 | | 23 | 2 | A | 1/1/23 |
| 32-3924 | | 23 | 3 | A | 1/1/23 |
| 32-3955 | | 23 | 4 | N | G |
| 32-4021 | | 59 | 94 | A | G |
| 32-4101 | | 46 | 1 | A | G |
| 32-4122 | | 59 | 95 | A | G |
| 32-4153 | | 46 | 2 | A | G |
| 32-4203 | | 281 | 1 | A | G |
| 32-4222 | } | 59 | 96 | A | G |
| 32-4222 | } | 281 | 2 | A | G |
| 32-4302 | | 265 | 2 | A | G |
| 32-4304 | | 265 | 3 | N | G |
| 33-931 | | 340 | 1 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 33-937 | | 340 | 2 | N | G |
| 33-1126 | | 346 | 1 | A | G |
| 33-1227 | | 373 | 1 | A | G |
| 33-1228 | | 373 | 2 | A | G |
| 33-1261 | } | 125 | 1 | A | G |
| 33-1261 | } | 272 | 1 | A | G |
| 33-1379 | | 286 | 1 | N | G |
| 33-1551 | | 242 | 1 | A | G |
| 33-1808 | } | 125 | 2 | A | G |
| 33-1808 | } | 272 | 2 | A | G |
| 33-1819 | | 101 | 1 | N | G |
| 33-2132 | | 16 | 1 | A | G |
| 34-221 | | 31 | 4 | A | G |
| 34-609 | | 31 | 5 | A | G |
| 35-393 | | 39 | 1 | A | G |
| 35-393.02 | | 39 | 2 | A | G |
| 35-394 | | 295 | 1 | N | G |
| 35-501 | | 350 | 1 | A | G |
| 36-401 | | 128 | 2 | A | G |
| 36-402 | | 128 | 3 | A | G |
| 36-405 | } (L21, ch 405, sec 10) | 34 | 1 | R | G |
| 36-405 | } (L21, ch 363, sec 1) | 34 | 2 | A | G |
| 36-407.02 | } | 179 | 1 | N | G |
| 36-407.02 | } Renumbered as 36-407.03 | 296 | 1 | N | G |
| 36-411 | | 258 | 1 | A | G |
| 36-420.02 | } | 117 | 2 | N | G |
| 36-420.02 | } Renumbered as 36-420.03 | 190 | 2 | N | G |
| 36-421 | | 34 | 3 | A | G |
| 36-422 | } | 34 | 4 | A | G |
| 36-422 | } | 128 | 4 | A | G |
| 36-425.06 | | 352 | 8 | A | 1/1/24 |
| 36-434.01 | | 57 | 1 | N | G |
| 36-437 | | 8 | 5 | A | G |
| 36-439 | | 128 | 5 | A | G |
| 36-439.01 | | 128 | 6 | A | G |
| 36-439.04 | | 128 | 7 | A | G |
| 36-439.05 | | 128 | 8 | A | G |
| 36-446 | | 15 | 1 | A | G |
| 36-446.03 | | 15 | 2 | A | G |
| 36-446.04 | } | 15 | 3 | A | G |
| 36-446.04 | } | 59 | 97 | A | G |
| 36-446.06 | | 59 | 98 | A | G |
| 36-501 | } | 250 | 1 | A | G |
| 36-501 | } | 299 | 1 | A | G |
| 36-503.02 | | 250 | 2 | N | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 36-509.01 | | 299 | 2 | N | G |
| 36-510.01 | | 250 | 3 | N | G |
| 36-523 | | 250 | 4 | A | G |
| 36-524 | } | 250 | 5 | A | G |
| 36-524 | } | 299 | 3 | A | G |
| 36-525 | | 250 | 6 | A | G |
| 36-526 | | 299 | 4 | A | G |
| 36-529 | | 250 | 7 | A | G |
| 36-533 | } | 250 | 8 | A | G |
| 36-533 | } | 299 | 5 | A | G |
| 36-536 | | 250 | 9 | A | G |
| 36-540 | | 299 | 6 | A | G |
| 36-541 | | 302 | 1 | A | G |
| 36-551 | | 94 | 1 | A | G |
| 36-557 | } (L21, ch 409, sec 8) | 112 | 8 | A | G (RET) |
| 36-557 | } (L21, ch 60, sec 5) | 112 | 9 | R | G (RET) |
| 36-568 | | 234 | 1 | A | G |
| 36-573 | | 316 | 2 | N | G |
| 36-591 | } (L21, ch 409, sec 9) | 112 | 10 | A | G (RET) |
| 36-591 | } (L21, ch 60, sec 8) | 112 | 11 | R | G (RET) |
| 36-595.03 | } | 316 | 3 | N | G |
| 36-595.03 | } | 316 | 4 | R | 1/1/27 |
| 36-663 | | 246 | 1 | R | G |
| 36-664 | | 246 | 2 | A | G |
| 36-672 | } (L21, ch 409, sec 12) | 240 | 1 | R | G |
| 36-672 | } (L07, ch 263, sec 6) | 240 | 2 | A | G |
| 36-681 | } | 247 | 1 | R | G |
| 36-681 | } | 263 | 1 | R | G |
| 36-681 | } | 247 | 2 | N | G |
| 36-681 | } Renumbered as 36-682 | 263 | 2 | N | G |
| 36-682 | } | 247 | 1 | R | G |
| 36-682 | } | 263 | 1 | R | G |
| 36-685 | | 180 | 1 | N | G |
| 36-755 | | 59 | 99 | A | G |
| 36-766.09 | | 44 | 18 | A | G |
| 36-795 | | 253 | 1 | A | G |
| 36-795.01 | | 253 | 2 | A | G |
| 36-795.02 | | 253 | 3 | A | G |
| 36-795.03 | | 253 | 4 | A | G |
| 36-841 | | 70 | 1 | A | G |
| 36-850 | | 374 | 2 | A | G |
| 36-850.01 | | 70 | 2 | N | G |
| 36-850.02 | | 70 | 2 | N | G |
| 36-851.01 | | 70 | 3 | A | G |
| 36-899.10 | | 231 | 1 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 36-1162 | | 44 | 19 | A | G |
| 36-1331 | | 189 | 1 | N | G |
| 36-1332 | | 189 | 1 | N | G |
| 36-1333 | | 189 | 1 | N | G |
| 36-1334 | | 189 | 1 | N | G |
| 36-1335 | | 189 | 1 | N | G |
| 36-1336 | | 189 | 1 | N | G |
| 36-1606 | } | 18 | 1 | A | G |
| 36-1606 | } | 372 | 1 | A | G |
| 36-1694 | | 44 | 20 | R | G |
| 36-1801 | } | 330 | 2 | N | G |
| 36-1801 | } | 330 | 3 | R | 1/1/27 |
| 36-1802 | } | 330 | 2 | N | G |
| 36-1802 | } | 330 | 3 | R | 1/1/27 |
| 36-1803 | } | 330 | 2 | N | G |
| 36-1803 | } | 330 | 3 | R | 1/1/27 |
| 36-1804 | } | 330 | 2 | N | G |
| 36-1804 | } | 330 | 3 | R | 1/1/27 |
| 36-1805 | } | 330 | 2 | N | G |
| 36-1805 | } | 330 | 3 | R | 1/1/27 |
| 36-1806 | } | 330 | 2 | N | G |
| 36-1806 | } | 330 | 3 | R | 1/1/27 |
| 36-1807 | } | 330 | 2 | N | G |
| 36-1807 | } | 330 | 3 | R | 1/1/27 |
| 36-1923 | | 59 | 100 | A | G |
| 36-1940 | | 59 | 101 | A | G |
| 36-1940.01 | | 59 | 102 | A | G |
| 36-1940.04 | | 59 | 103 | A | G |
| 36-2175 | | 314 | 1 | N | G |
| 36-2201 | | 381 | 1 | A | 1/1/24 |
| 36-2202 | | 381 | 2 | A | 1/1/24 |
| 36-2219 | | 274 | 1 | N | G |
| 36-2232 | } | 217 | 1 | A | G |
| 36-2232 | } | 381 | 3 | A | 1/1/24 |
| 36-2233 | | 381 | 4 | A | 1/1/24 |
| 36-2234 | | 381 | 5 | A | 1/1/24 |
| 36-2234.01 | | 250 | 10 | N | G |
| 36-2236 | | 381 | 6 | A | 1/1/24 |
| 36-2239 | | 381 | 7 | A | 1/1/24 |
| 36-2242 | | 381 | 8 | A | 1/1/24 |
| 36-2246 | | 381 | 9 | A | 1/1/24 |
| 36-2321 | | 105 | 1 | N | G |
| 36-2322 | | 105 | 1 | N | G |
| 36-2323 | | 105 | 1 | N | G |
| 36-2324 | | 105 | 1 | N | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 36-2325 | | 105 | 1 | N | G |
| 36-2326 | | 105 | 1 | N | G |
| 36-2604 | } | 284 | 1 | A | G |
| 36-2604 | } | 362 | 12 | A | 7/1/23 |
| 36-2606 | | 78 | 1 | A | G |
| 36-2901 | | 314 | 2 | A | COND |
| 36-2903.04 | | 339 | 1 | A | G |
| 36-2905.07 | | 44 | 20 | R | G |
| 36-2907 | } | 314 | 3 | A | G |
| 36-2907 | } | 328 | 1 | A | G |
| 36-2907.03 | | 219 | 5 | N | G |
| 36-2936 | | 25 | 1 | A | G |
| 36-2982 | | 338 | 1 | A | G |
| 36-2999.01 | | 44 | 20 | R | G |
| 36-2999.02 | | 44 | 20 | R | G |
| 36-2999.03 | | 44 | 20 | R | G |
| 36-2999.04 | | 44 | 20 | R | G |
| 36-2999.05 | | 44 | 20 | R | G |
| 36-2999.06 | | 44 | 20 | R | G |
| 36-2999.07 | | 44 | 20 | R | G |
| 36-2999.08 | | 44 | 20 | R | G |
| 36-3295 | | 11 | 1 | A | G |
| 36-3415 | | 305 | 1 | A | G |
| 36-3607 | | 44 | 21 | A | G |
| 36-4001 | } Renumbered as 36-4101 | 249 | 1 | N | G |
| 36-4001 | } | 352 | 9 | N | 1/1/24 |
| 36-4002 | } Renumbered as 36-4102 | 249 | 1 | N | G |
| 36-4002 | } | 352 | 9 | N | 1/1/24 |
| 36-4003 | } Renumbered as 36-4103 | 249 | 1 | N | G |
| 36-4003 | } | 352 | 9 | N | 1/1/24 |
| 36-4004 | | 352 | 9 | N | 1/1/24 |
| 36-4005 | | 352 | 9 | N | 1/1/24 |
| 36-4006 | | 352 | 9 | N | 1/1/24 |
| 36-4007 | | 352 | 9 | N | 1/1/24 |
| 36-4008 | | 352 | 9 | N | 1/1/24 |
| 36-4009 | | 352 | 9 | N | 1/1/24 |
| 36-4010 | | 352 | 9 | N | 1/1/24 |
| 36-4011 | | 352 | 9 | N | 1/1/24 |
| 37-102 | | 14 | 1 | A | G |
| 37-132 | | 14 | 2 | A | G |
| 37-241 | | 14 | 3 | A | G |
| 37-521 | | 317 | 18 | A | G |
| 37-620 | | 61 | 1 | A | G |
| 37-1302 | | 129 | 1 | A | G |
| 38-612 | | 175 | 1 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 38-643 | | 73 | 1 | A | G |
| 38-672 | | 377 | 1 | A | G |
| 38-711 | | 145 | 2 | A | G |
| 38-714 | | 145 | 3 | A | G |
| 38-737 | } | 145 | 4 | A | G |
| 38-737 | } | 324 | 1 | A | E (6/28/22) |
| 38-740 | | 145 | 5 | A | G |
| 38-741 | | 145 | 6 | A | G |
| 38-747 | | 145 | 7 | A | G |
| 38-750 | | 145 | 8 | A | G |
| 38-757 | | 145 | 9 | A | G |
| 38-758 | | 145 | 10 | A | G |
| 38-760 | | 145 | 11 | A | G |
| 38-762 | | 145 | 12 | A | G |
| 38-763 | | 145 | 13 | A | G |
| 38-764 | | 145 | 14 | A | G |
| 38-766 | | 145 | 15 | A | G |
| 38-768 | | 145 | 16 | A | G |
| 38-770 | | 145 | 17 | A | G |
| 38-775 | | 145 | 18 | A | G |
| 38-781 | | 145 | 19 | A | G |
| 38-797.06 | | 145 | 20 | A | G |
| 38-797.07 | | 145 | 21 | A | G |
| 38-797.09 | | 145 | 22 | R | G |
| 38-801 | | 73 | 2 | A | G |
| 38-803 | } (L21, ch 405, sec 12) | 73 | 3 | R | G |
| 38-803 | } (L19, ch 36, sec 2) | 73 | 4 | A | G |
| 38-805.01 | | 323 | 1 | N | E (6/28/22) |
| 38-832 | } (L21, ch 405, sec 13) | 73 | 5 | R | G |
| 38-832 | } (L19, ch 36, sec 5) | 73 | 6 | A | G |
| 38-840.01 | } (L21, ch 405, sec 14) | 73 | 7 | R | G |
| 38-840.01 | } (L19, ch 36, sec 7) | 73 | 8 | A | G |
| 38-842 | | 73 | 9 | A | G |
| 38-843 | | 221 | 1 | A | G |
| 38-844.03 | | 351 | 1 | A | E (7/6/22) |
| 38-844.05 | | 351 | 2 | A | E (7/6/22) |
| 38-844.10 | } | 351 | 3 | N | E (7/6/22) |
| 38-844.10 | } | 351 | 4 | R | 1/1/28 |
| 38-847 | } (L21, ch 34, sec 2) | 112 | 12 | A | G (RET) |
| 38-847 | } (L21, ch 251, sec 1) | 112 | 13 | R | G (RET) |
| 38-848 | } (L21, ch 405, sec 15) | 72 | 1 | R | G |
| 38-848 | } (L21, ch 405, sec 15) | 73 | 10 | R | G |
| 38-848 | } (L21, ch 34, sec 4 & ch 251, sec 2) | 72 | 2 | A | G |
| 38-848 | } (L21, ch 34, sec 4 & ch 251, sec 2) | 73 | 11 | A | G |
| 38-848.02 | } (L21, ch 405, sec 16) | 73 | 12 | R | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 38-848.02 | } (L19, ch 36, sec 10) | 73 | 13 | A | G |
| 38-849 | | 24 | 1 | A | G |
| 38-866 | } (L21, ch 405, sec 17) | 73 | 14 | R | G |
| 38-866 | } (L19, ch 36, sec 13) | 73 | 15 | A | G |
| 38-881 | | 73 | 16 | A | G |
| 38-883 | } (L21, ch 405, sec 18) | 73 | 17 | R | G |
| 38-883 | } (L19, ch 36, sec 17) | 73 | 18 | A | G |
| 38-884 | | 24 | 2 | A | G |
| 38-893 | } (L21, ch 34, sec 5) | 112 | 14 | A | G (RET) |
| 38-893 | } (L21, ch 251, sec 5) | 112 | 15 | R | G (RET) |
| 38-921 | | 145 | 23 | A | G |
| 38-1004 | | 175 | 2 | A | G |
| 38-1102 | | 88 | 1 | A | G |
| 38-1104 | | 175 | 3 | A | G |
| 38-1106 | } | 139 | 1 | A | G |
| 38-1106 | } | 175 | 4 | A | G |
| 38-1108 | | 175 | 5 | A | G |
| 38-1110 | } | 175 | 6 | A | G |
| 38-1110 | } | 378 | 1 | A | G |
| 38-1112 | | 175 | 7 | A | G |
| 38-1117 | } (L21, ch 403, sec 16) | 386 | 1 | R | G |
| 38-1117 | } (L21, ch 322, sec 1) | 386 | 2 | A | G (RET) |
| 39-171 | | 142 | 1 | N | G |
| 40-113 | | 191 | 14 | R | G |
| 40-201 | | 191 | 15 | A | G |
| 40-202 | | 191 | 16 | A | G |
| 40-207 | | 191 | 17 | R | G |
| 40-208 | | 191 | 17 | R | G |
| 40-213 | | 109 | 1 | N | G |
| 40-286 | | 191 | 18 | A | G |
| 41-101 | | 349 | 3 | A | COND |
| 41-112 | | 44 | 22 | R | G |
| 41-113 | | 44 | 22 | R | G |
| 41-121.02 | } (L21, ch 405, sec 20) | 320 | 1 | R | G |
| 41-121.02 | } (L12, ch 321, sec 103) | 320 | 2 | A | G |
| 41-151.24 | (to 41-1307) | 211 | 3 | T | G |
| 41-166 | | 277 | 13 | A | G |
| 41-177 | | 314 | 4 | N | G |
| 41-179 | | 74 | 1 | A | G |
| 41-180 | | 333 | 1 | N | G |
| 41-192 | | 366 | 1 | A | G |
| 41-197 | | 44 | 22 | R | G |
| 41-271 | | 59 | 104 | A | G |
| 41-323 | | 208 | 1 | A | G |
| 41-511.05 | | 47 | 1 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 41-608 | | 28 | 7 | A | G |
| 41-619.51 | } | 23 | 5 | A | 1/1/23 |
| 41-619.51 | } | 55 | 1 | A | G |
| 41-619.51 | } | 281 | 3 | A | G |
| 41-621 | } | 239 | 2 | A | G |
| 41-621 | } | 308 | 1 | A | G |
| 41-621.01 | | 239 | 3 | A | G |
| 41-622 | } | 239 | 4 | A | G |
| 41-622 | } | 308 | 2 | A | G |
| 41-622.01 | | 239 | 5 | A | G |
| 41-703.01 | } | 314 | 5 | N | G |
| 41-703.01 | } | 314 | 6 | R | 7/1/26 |
| 41-714 | } (L21, ch 405, sec 22) | 307 | 2 | R | G |
| 41-714 | } (L18, ch 279, sec 28) | 307 | 3 | A | G |
| 41-791 | | 40 | 1 | A | G |
| 41-792.01 | | 319 | 1 | A | G |
| 41-794 | | 319 | 2 | N | G |
| 41-867 | | 203 | 1 | N | G |
| 41-1005 | } | 276 | 4 | A | G |
| 41-1005 | } | 292 | 2 | A | E (6/13/22) |
| 41-1009 | | 265 | 4 | A | G |
| 41-1030 | | 265 | 5 | A | G |
| 41-1033 | } (L21, ch 405, sec 23) | 265 | 6 | R | G |
| 41-1033 | } (L21, ch 340, sec 1) | 265 | 7 | A | G |
| 41-1039 | | 265 | 8 | N | G |
| 41-1080.01 | | 336 | 1 | A | G |
| 41-1092 | | 265 | 9 | A | G |
| 41-1092.03 | | 265 | 10 | A | G |
| 41-1092.07 | | 265 | 11 | A | G |
| 41-1092.08 | | 265 | 12 | A | G |
| 41-1092.12 | | 265 | 13 | A | G |
| 41-1276 | } | 171 | 1 | A | G |
| 41-1276 | } (L22, ch 171, sec 1) | 317 | 19 | A | G |
| 41-1304.05 | } | 345 | 1 | A | G |
| 41-1304.05 | } | 357 | 1 | A | G |
| 41-1306 | } | 211 | 1 | R | G |
| 41-1306 | } | 211 | 2 | N | G |
| 41-1307 | } (from 41-151.24) (L21, ch 187, sec 5) | 211 | 3 | T | G |
| 41-1307 | } | 211 | 3 | A | G |
| 41-1363 | | 357 | 2 | A | G |
| 41-1364 | | 357 | 3 | A | G |
| 41-1365 | } (L21, ch 405, sec 28) | 357 | 4 | R | G |
| 41-1365 | } (L18, ch 279, sec 37) | 357 | 5 | A | G |
| 41-1375 | | 308 | 3 | A | G |
| 41-1382 | | 319 | 3 | R | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 41-1461 | | 169 | 1 | A | G |
| 41-1495 | | 181 | 1 | N | G |
| 41-1495.01 | | 181 | 1 | N | G |
| 41-1495.02 | | 181 | 1 | N | G |
| 41-1495.03 | | 181 | 1 | N | G |
| 41-1495.04 | | 181 | 1 | N | G |
| 41-1506.02 | } | 308 | 4 | R | G |
| 41-1506.02 | } | 308 | 5 | N | G |
| 41-1510 | | 312 | 1 | N | G |
| 41-1511 | | 384 | 1 | N | G |
| 41-1516 | | 235 | 1 | A | G |
| 41-1517 | } | 387 | 1 | N | G |
| 41-1517 | } | 387 | 2 | R | 1/1/44 |
| 41-1604.11 | } | 197 | 11 | A | G |
| 41-1604.11 | } | 245 | 5 | A | G |
| 41-1604.13 | } | 197 | 12 | A | G |
| 41-1604.13 | } | 245 | 6 | A | G |
| 41-1609.05 | | 44 | 22 | R | G |
| 41-1609.06 | | 44 | 22 | R | G |
| 41-1610.02 | | 327 | 1 | N | G |
| 41-1612 | | 311 | 2 | N | G |
| 41-1625 | | 90 | 1 | N | G |
| 41-1712 | | 311 | 3 | A | 7/1/25 |
| 41-1730 | | 311 | 4 | A | G |
| 41-1733 | | 307 | 4 | A | G |
| 41-1750 | } | 163 | 1 | A | 1/1/23 |
| 41-1750 | } | 186 | 1 | A | G |
| 41-1758 | } | 23 | 6 | A | 1/1/23 |
| 41-1758 | } | 55 | 2 | A | G |
| 41-1758 | } | 281 | 4 | A | G |
| 41-1758.01 | } | 23 | 7 | A | 1/1/23 |
| 41-1758.01 | } | 55 | 3 | A | G |
| 41-1758.01 | } | 281 | 5 | A | G |
| 41-1762 | | 311 | 5 | N | 7/1/25 |
| 41-1821 | | 153 | 1 | A | G |
| 41-2305 | | 280 | 1 | A | G |
| 41-2307 | | 280 | 2 | N | G |
| 41-2401 | | 311 | 6 | A | G |
| 41-2409 | | 311 | 7 | A | G |
| 41-2410 | | 311 | 8 | N | G |
| 41-2501 | } | 31 | 6 | A | G |
| 41-2501 | } | 238 | 2 | A | G |
| 41-2577 | | 31 | 7 | A | G |
| 41-2822.01 | | 363 | 1 | A | G |
| 41-3002.09 | | 366 | 2 | R | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 41-3022.01 | | 13 | 1 | R | G (RET) |
| 41-3022.02 | | 141 | 1 | R | G (RET) |
| 41-3022.03 | | 51 | 1 | R | G (RET) |
| 41-3022.04 | | 76 | 1 | R | G (RET) |
| 41-3022.05 | | 19 | 1 | R | G (RET) |
| 41-3022.06 | | 36 | 1 | R | G (RET) |
| 41-3022.08 | | 121 | 1 | R | G (RET) |
| 41-3022.10 | | 79 | 1 | R | G (RET) |
| 41-3022.11 | | 83 | 1 | R | G (RET) |
| 41-3022.12 | | 326 | 1 | R | G (RET) |
| 41-3022.13 | | 71 | 1 | R | G (RET) |
| 41-3022.14 | | 67 | 1 | R | G (RET) |
| 41-3022.15 | | 327 | 2 | R | G (RET) |
| 41-3022.16 | | 35 | 1 | R | G (RET) |
| 41-3022.18 | | 165 | 1 | R | G (RET) |
| 41-3022.19 | | 68 | 1 | R | G (RET) |
| 41-3022.20 | | 62 | 1 | R | G (RET) |
| 41-3022.21 | | 91 | 1 | R | G (RET) |
| 41-3022.22 | | 279 | 2 | R | G (RET) |
| 41-3022.25 | | 37 | 1 | R | G (RET) |
| 41-3022.26 | | 12 | 1 | R | E (3/18/22) (RET) |
| 41-3023.17 | | 279 | 3 | N | G (RET) |
| 41-3024.03 | | 12 | 2 | N | E (3/18/22) (RET) |
| 41-3025.07 | | 165 | 2 | N | G (RET) |
| 41-3026.07 | } | 35 | 2 | N | G (RET) |
| 41-3026.07 | } Renumbered as 41-3026.08 | 76 | 2 | N | G (RET) |
| 41-3027.02 | | 21 | 4 | R | G (RET) |
| 41-3027.05 | } | 326 | 2 | N | G (RET) |
| 41-3027.05 | } Renumbered as 41-3027.02 | 366 | 3 | N | G |
| 41-3030.01 | | 13 | 2 | N | G (RET) |
| 41-3030.02 | | 141 | 2 | N | G (RET) |
| 41-3030.03 | | 51 | 2 | N | G (RET) |
| 41-3030.05 | | 19 | 2 | N | G (RET) |
| 41-3030.06 | | 36 | 2 | N | G (RET) |
| 41-3030.08 | | 121 | 2 | N | G (RET) |
| 41-3030.10 | | 79 | 2 | N | G (RET) |
| 41-3030.11 | | 83 | 2 | N | G (RET) |
| 41-3030.13 | | 71 | 2 | N | G (RET) |
| 41-3030.14 | | 67 | 2 | N | G (RET) |
| 41-3030.15 | | 327 | 3 | N | G (RET) |
| 41-3030.20 | | 62 | 2 | N | G (RET) |
| 41-3030.21 | | 91 | 2 | N | G (RET) |
| 41-3030.25 | | 37 | 2 | N | G (RET) |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 41-3031.01 | | 366 | 4 | R | G |
| 41-3801 | | 159 | 1 | A | G |
| 41-3803 | | 359 | 1 | A | G |
| 41-3955.02 | | 382 | 1 | N | G |
| 41-4001 | | 55 | 4 | A | G |
| 41-4009 | | 55 | 5 | A | G |
| 41-4025 | } | 55 | 6 | A | G |
| 41-4025 | } | 59 | 105 | A | G |
| 41-4026 | | 55 | 7 | A | G |
| 41-4029 | | 55 | 8 | A | G |
| 41-4046 | | 55 | 9 | A | G |
| 41-4252 | | 50 | 4 | A | G |
| 41-4253 | | 50 | 5 | A | G |
| 41-4254 | } | 44 | 23 | A | G |
| 41-4254 | } | 50 | 6 | A | G |
| 41-4255 | | 50 | 7 | A | G |
| 41-4256 | } | 44 | 24 | R | G |
| 41-4256 | } | 50 | 8 | R | G |
| 41-4257 | | 50 | 8 | R | G |
| 41-4258 | | 50 | 9 | A | G |
| 41-4281 | | 50 | 10 | N | G |
| 41-4282 | | 50 | 10 | N | G |
| 41-5355 | | 366 | 5 | A | G |
| 41-5356 | | 366 | 6 | A | G |
| 41-5601 | | 187 | 1 | A | G |
| 41-5602 | | 187 | 2 | A | G |
| 41-5603 | | 187 | 3 | A | G |
| 41-5605 | } | 187 | 4 | A | G |
| 41-5605 | } | 236 | 11 | A | G |
| 41-5606 | | 187 | 5 | A | G |
| 41-5731 | | 317 | 20 | A | G |
| 41-5901 | | 354 | 1 | N | G |
| 42-1001 | | 41 | 1 | A | G |
| 42-1009 | } | 321 | 2 | N | G |
| 42-1009 | } | 321 | 3 | R | 1/1/30 |
| 42-1122 | | 387 | 3 | A | G |
| 42-1125.02 | | 343 | 3 | R | G |
| 42-2003 | } | 235 | 2 | A | G |
| 42-2003 | } | 387 | 4 | A | G |
| 42-5009 | | 43 | 1 | A | G |
| 42-5029.02 | | 321 | 4 | A | G |
| 42-5032.02 | | 321 | 5 | A | G |
| 42-5041 | | 321 | 6 | N | G |
| 42-5042 | | 343 | 4 | A | G |
| 42-5061 | } (L21, ch 266, sec 3, ch 412, sec 7, ch | 43 | 2 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| | 417, sec 4 & ch 443, sec 2) | | | | |
| 42-5061 | } (L21, ch 266, sec 3, ch 412, sec 7, ch 417, sec 4 & ch 443, sec 2) | 321 | 7 | A | G |
| 42-5061 | } (L21, ch 266, sec 4, ch 412, sec 8, ch 417, sec 5 & ch 443, sec 3) | 43 | 3 | A | COND |
| 42-5061 | } (L21, ch 266, sec 4, ch 412, sec 8, ch 417, sec 5 & ch 443, sec 3) | 321 | 8 | A | COND |
| 42-5071 | | 321 | 9 | A | G |
| 42-5075 | } | 235 | 3 | A | G |
| 42-5075 | } | 321 | 10 | A | G (RET) |
| 42-5151 | | 229 | 1 | A | G |
| 42-5157 | | 229 | 2 | A | G |
| 42-5159 | | 321 | 11 | A | G |
| 42-6004 | } (L21, ch 417, sec 10) | 43 | 4 | A | G |
| 42-6004 | } (L21, ch 417, sec 10) | 321 | 12 | A | G (RET) |
| 42-6004 | } (L21, ch 417, sec 11) | 43 | 5 | A | COND |
| 42-6004 | } (L21, ch 417, sec 11) | 321 | 13 | A | COND |
| 42-11111 | | 341 | 2 | A | COND |
| 42-11127 | | 341 | 3 | A | COND |
| 42-11132.02 | | 261 | 1 | N | G |
| 42-11133 | | 287 | 1 | A | G |
| 42-11152 | } | 228 | 2 | A | G |
| 42-11152 | } | 261 | 2 | A | G |
| 42-11152 | } | 341 | 4 | A | COND |
| 42-11153 | | 261 | 3 | A | G |
| 42-12003 | | 300 | 2 | A | G |
| 42-12004 | | 300 | 3 | A | G |
| 42-12006 | | 235 | 4 | A | G |
| 42-12009 | | 261 | 4 | A | G |
| 42-12052 | | 300 | 4 | A | G |
| 42-12054 | | 300 | 5 | A | G |
| 42-12057 | | 235 | 5 | A | G |
| 42-13054 | | 103 | 1 | A | G |
| 42-13302 | | 300 | 6 | A | G |
| 42-14151 | | 235 | 6 | A | G |
| 42-15001 | | 171 | 2 | A | G |
| 42-15053 | | 341 | 5 | A | COND |
| 42-16002 | | 300 | 7 | A | G |
| 42-16254 | | 228 | 3 | A | G |
| 42-17051 | | 317 | 21 | A | G |
| 42-17203 | | 315 | 4 | A | G |
| 42-18127 | | 69 | 1 | A | G |
| 42-18202 | | 17 | 1 | A | G |
| 42-19157 | | 300 | 8 | A | G |
| 43-105 | | 41 | 2 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 43-212 | | 321 | 14 | N | G |
| 43-222 | } | 235 | 7 | A | G |
| 43-222 | } | 387 | 5 | A | G |
| 43-405 | | 235 | 8 | A | G |
| 43-1014 | } | 235 | 9 | A | G |
| 43-1014 | } | 321 | 15 | A | G |
| 43-1021 | } | 235 | 10 | A | G |
| 43-1021 | } | 387 | 6 | A | G |
| 43-1022 | } | 235 | 11 | A | G |
| 43-1022 | } | 369 | 1 | A | 1/1/23 |
| 43-1026 | | 235 | 12 | N | G |
| 43-1028 | | 369 | 2 | N | 1/1/23 |
| 43-1073 | | 235 | 13 | A | G |
| 43-1076 | | 235 | 14 | R | G |
| 43-1081 | | 235 | 14 | R | G |
| 43-1081.01 | | 235 | 15 | A | G |
| 43-1082 | } | 387 | 7 | N | G |
| 43-1082 | } | 387 | 8 | R | 1/1/44 |
| 43-1088 | | 385 | 1 | A | G (RET) |
| 43-1121 | } | 235 | 16 | A | G |
| 43-1121 | } | 387 | 9 | A | G |
| 43-1130.01 | | 235 | 17 | A | G |
| 43-1165 | } | 387 | 10 | N | G |
| 43-1165 | } | 387 | 11 | R | 1/1/44 |
| 43-1169 | | 235 | 18 | R | G |
| 43-1170 | | 235 | 19 | A | G |
| 43-1311 | | 235 | 20 | A | G (RET) |
| 43-1382 | | 235 | 21 | N | G (RET) |
| 44-282 | | 45 | 8 | A | G |
| 44-332 | | 44 | 24 | R | G |
| 44-1443 | | 80 | 1 | A | G |
| 44-1460 | | 80 | 2 | A | G |
| 44-1571 | | 44 | 24 | R | G |
| 44-1572 | | 44 | 24 | R | G |
| 44-1573 | | 44 | 24 | R | G |
| 44-1574 | | 44 | 24 | R | G |
| 44-1641 | | 225 | 2 | A | E (5/9/22) |
| 44-1641.05 | | 225 | 3 | A | E (5/9/22) |
| 44-1642 | | 225 | 4 | A | E (5/9/22) |
| 44-1642.01 | | 225 | 5 | A | E (5/9/22) |
| 44-1644 | | 225 | 6 | A | E (5/9/22) |
| 44-1646 | | 225 | 7 | A | E (5/9/22) |
| 44-1961 | | 59 | 106 | A | G |
| 44-1962 | | 59 | 107 | A | G |
| 44-5101 | | 170 | 1 | N | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 44-8021 | | 207 | 8 | N | G |
| 45-105 | | 366 | 7 | A | G |
| 45-111 | | 366 | 8 | A | G |
| 45-402 | | 213 | 1 | A | G |
| 45-415 | | 277 | 14 | A | G |
| 45-1201 | | 178 | 1 | A | G |
| 46-451 | | 379 | 1 | A | G |
| 46-455 | | 8 | 6 | A | G |
| 47-9527 | | 208 | 2 | A | G |
| 48-806 | | 84 | 1 | A | G |
| 48-807 | | 171 | 3 | A | G |
| 48-815.01 | | 84 | 2 | A | G |
| 48-903 | | 92 | 1 | A | G |
| 48-3207 | | 213 | 2 | A | G |
| 48-3715.02 | | 154 | 1 | A | G |
| 48-6415 | | 366 | 9 | A | G |
| 49-152 | | 177 | 1 | A | G |
| 49-193 | | 366 | 11 | R | G |
| 49-193.01 | (to 49-1205) | 366 | 16 | T | G |
| 49-193.02 | | 366 | 11 | R | G |
| 49-193.03 | | 366 | 11 | R | G |
| 49-193.04 | | 366 | 11 | R | G |
| 49-193.05 | | 366 | 11 | R | G |
| 49-203 | | 204 | 1 | A | G |
| 49-210 | } | 177 | 2 | A | G |
| 49-210 | } | 204 | 2 | A | G |
| 49-210 | } | 312 | 2 | A | G |
| 49-211 | | 312 | 3 | N | G |
| 49-241.02 | | 204 | 3 | A | G |
| 49-242 | | 204 | 4 | A | G |
| 49-245.02 | | 177 | 3 | A | G |
| 49-250 | | 178 | 2 | A | G |
| 49-255.01 | | 204 | 5 | A | G |
| 49-257.01 | | 177 | 4 | A | G |
| 49-331 | | 177 | 5 | R | G |
| 49-332 | | 177 | 5 | R | G |
| 49-333 | | 177 | 5 | R | G |
| 49-334 | | 177 | 5 | R | G |
| 49-335 | | 177 | 5 | R | G |
| 49-336 | | 177 | 5 | R | G |
| 49-457.02 | | 177 | 5 | R | G |
| 49-542.04 | | 177 | 6 | A | G |
| 49-551.01 | | 177 | 7 | A | G |
| 49-554 | | 177 | 8 | A | G |
| 49-558.01 | | 177 | 9 | R | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 49-701 | | 178 | 3 | A | G |
| 49-761 | | 178 | 4 | A | G |
| 49-762 | | 178 | 5 | A | G |
| 49-762.01 | | 178 | 6 | A | G |
| 49-762.02 | | 178 | 7 | A | G |
| 49-762.06 | | 178 | 8 | A | G |
| 49-762.07 | | 178 | 9 | A | G |
| 49-762.08 | | 178 | 10 | A | G |
| 49-763.01 | | 178 | 11 | A | G |
| 49-769 | | 178 | 12 | A | G |
| 49-770 | | 178 | 13 | A | G |
| 49-781 | | 178 | 14 | A | G |
| 49-783 | | 178 | 15 | A | G |
| 49-791 | | 178 | 16 | A | G |
| 49-803 | | 178 | 17 | A | G |
| 49-881 | | 178 | 18 | A | G |
| 49-891 | | 178 | 19 | N | G |
| 49-891.01 | | 178 | 19 | N | G |
| 49-922 | | 87 | 1 | A | G |
| 49-927 | | 177 | 10 | A | G |
| 49-931 | | 87 | 2 | A | G |
| 49-1201 | | 366 | 12 | A | G |
| 49-1202 | | 366 | 13 | A | G |
| 49-1203 | } | 63 | 1 | A | G |
| 49-1203 | } (L22, ch 63, sec 1) | 366 | 14 | A | G |
| 49-1203.01 | | 366 | 15 | N | G |
| 49-1205 | } Renumbered as 49-1216 | 133 | 2 | N | G |
| 49-1205 | } (from 49-193.01) | 366 | 16 | T | G |
| 49-1205 | } | 366 | 16 | A | G |
| 49-1206 | | 366 | 17 | N | G |
| 49-1207 | | 366 | 17 | N | G |
| 49-1208 | | 366 | 17 | N | G |
| 49-1209 | | 366 | 17 | N | G |
| 49-1210 | | 366 | 17 | N | G |
| 49-1211 | | 366 | 17 | N | G |
| 49-1212 | | 366 | 17 | N | G |
| 49-1213 | | 366 | 17 | N | G |
| 49-1214 | | 366 | 17 | N | G |
| 49-1215 | | 366 | 17 | N | G |
| 49-1270 | | 366 | 18 | N | G |
| 49-1271 | | 366 | 19 | A | G |
| 49-1273 | } | 63 | 2 | A | G |
| 49-1273 | } (L22, ch 63, sec 2) | 366 | 20 | A | G |
| 49-1274 | } | 63 | 3 | A | G |
| 49-1274 | } (L22, ch 63, sec 3) | 366 | 21 | A | G |

| Section Number | | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|---|
| 49-1275 | } | 63 | 4 | A | G |
| 49-1275 | } (L22, ch 63, sec 4) | 366 | 22 | A | G |
| 49-1277 | | 63 | 5 | A | G |
| 49-1301 | } | 366 | 23 | N | G |
| 49-1301 | } (to 49-1501) | 366 | 24 | T | G |
| 49-1302 | } | 366 | 23 | N | G |
| 49-1302 | } (to 49-1502) | 366 | 24 | T | G |
| 49-1303 | } | 366 | 23 | N | G |
| 49-1303 | } (to 49-1503) | 366 | 24 | T | G |
| 49-1304 | | 366 | 23 | N | G |
| 49-1305 | | 366 | 23 | N | G |
| 49-1306 | | 366 | 23 | N | G |
| 49-1307 | | 366 | 23 | N | G |
| 49-1308 | | 366 | 23 | N | G |
| 49-1309 | | 366 | 23 | N | G |
| 49-1310 | | 366 | 23 | N | G |
| 49-1311 | | 366 | 23 | N | G |
| 49-1312 | | 366 | 23 | N | G |
| 49-1313 | | 366 | 23 | N | G |
| 49-1331 | | 366 | 23 | N | G |
| 49-1332 | | 366 | 23 | N | G |
| 49-1333 | | 366 | 23 | N | G |
| 49-1334 | | 366 | 23 | N | G |
| 49-1335 | | 366 | 23 | N | G |
| 49-1501 | (from 49-1301) | 366 | 24 | T | G |
| 49-1502 | (from 49-1302) | 366 | 24 | T | G |
| 49-1503 | (from 49-1303) | 366 | 24 | T | G |

| | | | | |
|---|---|---|---|---|
| L94, ch 278, sec 14 (L96, ch 308, sec 23 & L15, ch 224, sec 2) | 154 | 2 | A | G |
| L98, ch 209, sec 35 | 191 | 19 | R | G |
| L01, ch 371, sec 20 | 177 | 11 | R | G |
| L12, ch 213, sec 2 (L15, ch 39, sec 3) | 64 | 1 | A | G |
| L16, ch 240, sec 2 | 377 | 2 | A | G |
| L17, ch 295, sec 3 | 177 | 12 | A | G (RET) |
| L18, ch 259, sec 3 | 377 | 3 | A | G |
| L18, ch 278, sec 17 (L21, ch 403, sec 24) | 310 | 6 | A | G |
| L19, ch 123, sec 1 | 156 | 1 | A | G |
| L20, ch 54, sec 2 | 314 | 7 | A | G |
| L21, 1SS, ch 1, sec 1 | 1 | 1 | A | G |
| L21, ch 155, sec 2 | 3 | 2 | A | E (3/3/22) |
| L21, ch 197, sec 1 | 102 | 1 | A | G |
| L21, ch 320, sec 22 | 140 | 1 | A | G |
| L21, ch 390, sec 33 | 314 | 8 | A | G |
| L21, ch 390, sec 37 | 314 | 9 | A | G |

| Section Number | Chapter Number | Section Number | Action Taken | Effective Date |
|---|---|---|---|---|
| L21, ch 390, sec 39 | 314 | 10 | A | G |
| L21, ch 390, sec 42 | 314 | 11 | A | G |
| L21, ch 390, sec 43 | 314 | 12 | A | G |
| L21, ch 402, sec 3 | 359 | 2 | A | G |
| L21, ch 403, sec 28 | 386 | 3 | R | G |
| L21, ch 405, sec 27 | 211 | 4 | R | G |
| L21, ch 405, sec 35 | 268 | 1 | R | G |
| L21, ch 405, sec 44 | 211 | 4 | R | G |
| L21, ch 405, sec 51 | 373 | 3 | R | G |
| L21, ch 406, sec 33 | 33 | 1 | A | 3/23/22 |
| L21, ch 408, sec 115 | 366 | 25 | A | G |
| L21, ch 408, sec 117 | 313 | 1 | A | 6/28/22 |
| L21, ch 409, sec 23 | 314 | 13 | A | G |
| L21, ch 412, sec 26 | 321 | 16 | A | G |
| L21, ch 412, sec 30 | 321 | 17 | A | G |
| L22, ch 218, sec 1 | 309 | 1 | A | 6/28/22 |

# Exhibit 26

# *ARIZONA STATE SENATE*

***Fifty-Fifth Legislature, Second Regular Session***

**AMENDED**

FACT SHEET FOR H.B. 2243

voter registration; state residency; cancellation

Purpose

Requires a county recorder to cancel the voter registration of a person for whom the county recorder receives and confirms information that the person is not a U.S. citizen, is not an Arizona resident or has been issued a driver license or nonoperating license in another state. Outlines notice requirements prior to cancelling a person's voter registration. Requires the Secretary of State (SOS) and a county recorder to compare the voter registration database with prescribed databases.

Background

An Arizona resident is qualified to register to vote if the person: 1) is a U.S. citizen; 2) will be at least 18 years old by the date of the next regular general election; 3) will have been a resident for 29 days before the next election; 4) is able to write the person's name or mark, unless prevented by physical disability; 5) has not been convicted of treason or felony, unless restored to civil rights; and 6) has not been adjudicated an incapacitated person (A.R.S. § 16-101).

The SOS must develop and administer a statewide voter registration database that contains the name and registration information of every registered voter in Arizona. The database must: 1) include a unique identifier for each voter; 2) allow access to voter registration officials; and 3) allow expedited entry of voter registration information once received by county recorders. The SOS is responsible for maintaining the database including removal of ineligible voters consistent with federal code (A.R.S. § 16-168).

A county recorder must cancel a person's voter registration in certain circumstances, including when a county recorder knows of the death of a registered person and when the county recorder receives written information from the person registered that the person has a change of address outside of the county. Each month, the Department of Health Services (DHS) must provide the SOS with a record of death of every Arizona resident. The SOS must compare the record of death with the voter registration database and cancel the registration of each deceased person (A.R.S. § 16-165).

There is no anticipated fiscal impact to the state General Fund associated with this legislation.

Provisions

1. Requires a county recorder to cancel a person's voter registration when the county recorder is informed and confirms that a registered person is dead, rather than when the voter knows of the death of a registered person.

2. Requires a county recorder to cancel a person's voter registration when the county recorder receives:
   a) a form from the person on which the person has confirmed that the person is not a resident of the state;
   b) a summary report from a jury commissioner or jury manager indicating that the person has state that the person is not a county resident; or
   c) information and confirms that the person is not a U.S. citizen.

3. Requires a county recorder, before canceling the voter registration of a person after receiving a summary report form a jury commissioner or jury manager, to send the person notice (jury summary report notice) by forwardable mail and a postage prepaid and preaddressed return form that:
   a) requests the person confirm that the person is a county resident and is not knowingly registered to vote in another county or state by signing under penalty of perjury; and
   b) informs the person that failure to return the form within 35 days will result in the person's registration being cancelled.

4. Requires a county recorder, if a registered person does not provide satisfactory evidence within 35 days of receiving a jury summary report notice, to cancel the person's voter registration.

5. Requires a county recorder, before cancelling a person's voter registration after receiving information that the person is not a U.S. citizen, to send the person notice (citizenship notice) by forwardable mail that:
   a) states that the person's registration will be cancelled in 35 days unless the person provides satisfactory evidence of U.S. citizenship; and
   b) includes a list of documents the person may provide and a postage prepaid and preaddressed return envelope.

6. Requires a county recorder, if a person does not respond to a citizenship notice within 35 days, to cancel the person's voter registration and notify the county attorney and Attorney General for possible investigation.

7. Requires the Arizona Department of Transportation (ADOT), to furnish, without charge, the SOS a monthly list of persons who ADOT has been notified have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state.

8. Requires the SOS, within 10 days of receipt of the list from ADOT, to provide the appropriate county recorder with a list of registered voters in that county who have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state.

9. Requires a county recorder to promptly send notice by forwardable mail to each person who has obtained a driver license or equivalent of an Arizona nonoperating license in another state (out-of-state driver license notice) and a postage prepaid and preaddressed return form requesting the person confirm under penalty of perjury that the person:
   a) is an Arizona resident and is not knowingly registered to vote in another state; or
   b) is not an Arizona resident.

10. Requires the out-of-state driver license notice to inform the person that a failure to return the form within 90 days will result in the person's registration being placed in inactive status.

11. Requires a county recorder, if a person returns the out-of-state driver license notice within 90 days, to maintain the person's voter registration in active status.

12. Requires a county recorder, if a person fails to return the out-of-state driver license notice within 90 days, to place the person's registration in inactive status.

13. Requires the SOS, each month, to compare the statewide voter registration database to the driver license database maintained by ADOT.

14. Requires the SOS to notify the appropriate county recorder if a person who is registered to vote in that county has changed the person's residence address or is not a U.S. citizen.

15. Requires a county recorder, each month and to the extent practicable, to compare:
    a) the county's voter registration database to the Social Security Administration Database; and
    b) persons who are registered to vote in that county and who the county recorder has reason to believe are not U.S. citizens and persons who are registered to vote without satisfactory evidence of citizenship with the Systematic Alien Verification for Entitlements Program maintained by the U.S. Citizenship and Immigration Services to verify the person's citizenship status.

16. Requires a county recorder, for persons who are registered to vote with satisfactory evidence of citizenship, to compare the Electronic Verification of Vital Events System maintained by the National Association for Public Health Statistics and Information Systems, if accessible, with the information on the person's voter registration file.

17. Requires a county recorder, to the extent practicable, to review relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained that requires cancellation of registrations.

18. Requires a county recorder, after cancelling a voter registration, to send a notice by forwardable mail informing the person:
    a) that the person's registration has been canceled;
    b) the reason for the cancellation;
    c) the qualifications of electors; and
    d) instructions on registering to vote if the person is qualified.

19. Requires the SOS to quarterly report the following information to the Legislature:
    a) the number of deaths reported to the SOS by DHS, the number of voter registration cancellation notices issued by the SOS to county recorders as a result of the reports and the number of registrations cancelled as a result of the notices;
    b) the number of persons reported to the SOS who have been issued ad driver license or the equivalent of an Arizona nonoperating identification license in another state, the number of out-of-state driver license notices sent, the number of registrations that have been placed in inactive status and the number of voter registrations that have been cancelled as a result of the notices;

- c) the number of persons who have stated on a jury questionnaire that the person is not a U.S. citizen, the number of citizenship notices sent and the number of registrations that have been cancelled as a result of the notices;
- d) the number of persons who have stated on a jury questionnaire that the person is not a resident of the county, the number of jury summary report notices sent and the number of registrations that have been cancelled as a result of the notices; and
- e) the number of registrations on the inactive voter list that have been cancelled

20. Requires a jury questionnaire to inform a person that disqualification from jury duty as a result of responding to the questionnaire that the person is not a resident or U.S. citizen will result in the person's voter registration being cancelled.

21. Requires a jury commissioner or jury manager to forward, to the SOS and a county recorder, a summary report derived from the jury questionnaire data that contains information that indicates a person is not a U.S. citizen or does not reside in the county.

22. Requires the summary report to include only information necessary for a county recorder to accurately identify a person in the voter registration database.

23. Requires the voter registration form to include a statement that if the registrant permanently moves to another state after registering to vote in Arizona, the registrant's voter registration will be canceled.

24. Makes technical and confirming changes.

25. Becomes effective on the general effective date.

<u>Amendments Adopted by Committee of the Whole</u>

1. Requires a county recorder to cancel a person's voter registration when the county recorder is informed and confirms that a registered person is dead, rather than when the voter knows of the death of a registered person.

2. Requires a county recorder to cancel a person's voter registration when the county recorder receives:
   - a) a form from the person on which the person has confirmed that the person is not a resident of the state;
   - b) a summary report from a jury commissioner or jury manager indicating that the person has state that the person is not a county resident; or
   - c) information and confirms that the person is not a U.S. citizen.

3. Requires a county recorder, before canceling the voter registration of a person after receiving a summary report form a jury commissioner or jury manager, to send the person notice (jury summary report notice) by forwardable mail and a postage prepaid and preaddressed return form that:
   - c) requests the person confirm that the person is a county resident and is not knowingly registered to vote in another county or state by signing under penalty of perjury; and
   - d) informs the person that failure to return the form within 35 days will result in the person's registration being cancelled.

4. Requires a county recorder, if a registered person does not provide satisfactory evidence within 35 days of receiving a jury summary report notice, to cancel the person's voter registration.

5. Requires a county recorder, before cancelling a person's voter registration after receiving information that the person is not a U.S. citizen, to send the person notice (citizenship notice) by forwardable mail that:
   a) states that the person's registration will be cancelled in 35 days unless the person provides satisfactory evidence of U.S. citizenship; and
   b) includes a list of documents the person may provide and a postage prepaid and preaddressed return envelope.

6. Requires a county recorder, if a person does not respond to a citizenship notice within 35 days, to cancel the person's voter registration and notify the county attorney and Attorney General for possible investigation.

7. Requires the ADOT, to furnish, without charge, the SOS a monthly list of persons who ADOT has been notified have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state.

8. Requires the SOS, within 10 days of receipt of the list from ADOT, to provide the appropriate county recorder with a list of registered voters in that county who have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state.

9. Requires a county recorder to promptly send notice by forwardable mail to each person who has obtained a driver license or equivalent of an Arizona nonoperating license in another state (out-of-state driver license notice) and a postage prepaid and preaddressed return form requesting the person confirm under penalty of perjury that the person:
   a) is an Arizona resident and is not knowingly registered to vote in another state; or
   b) is not an Arizona resident.

10. Requires the out-of-state driver license notice to inform the person that a failure to return the form within 90 days will result in the person's registration being placed in inactive status.

11. Requires a county recorder, if a person returns the out-of-state driver license notice within 90 days, to maintain the person's voter registration in active status.

12. Requires a county recorder, if a person fails to return the out-of-state driver license notice within 90 days, to place the person's registration in inactive status.

13. Requires the SOS, each month, to compare the statewide voter registration database to the driver license database maintained by ADOT.

14. Requires the SOS to notify the appropriate county recorder if a person who is registered to vote in that county has changed the person's residence address or is not a U.S. citizen.

15. Requires a county recorder, each month and to the extent practicable, to compare:
    a) the county's voter registration database to the Social Security Administration Database; and
    b) persons who are registered to vote in that county and who the county recorder has reason to believe are not U.S. citizens and persons who are registered to vote without satisfactory evidence of citizenship with the Systematic Alien Verification for Entitlements Program maintained by the U.S. Citizenship and Immigration Services to verify the person's citizenship status.

16. Requires a county recorder, for persons who are registered to vote with satisfactory evidence of citizenship, to compare the Electronic Verification of Vital Events System maintained by the National Association for Public Health Statistics and Information Systems, if accessible, with the information on the person's voter registration file.

17. Requires a county recorder, to the extent practicable, to review relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained that requires cancellation of registrations.

18. Requires a county recorder, after cancelling a voter registration, to send a notice by forwardable mail informing the person:
    a) that the person's registration has been canceled;
    b) the reason for the cancellation;
    c) the qualifications of electors; and
    d) instructions on registering to vote if the person is qualified.

19. Requires the SOS to report quarterly the prescribed information relating to voter registration to the Legislature.

20. Requires a jury questionnaire to inform a person that disqualification from jury duty as a result of responding to the questionnaire that the person is not a resident or U.S. citizen will result in the person's voter registration being cancelled.

21. Requires a jury commissioner or jury manager to forward, to the SOS and a county recorder, a summary report derived from the jury questionnaire data that contains information that indicates a person is not a U.S. citizen or does not reside in the county.

22. Requires the summary report to include only information necessary for a county recorder to accurately identify a person in the voter registration database.

23. Makes technical and confirming changes.

| House Action | | | | Senate Action | | | |
|---|---|---|---|---|---|---|---|
| GE | 1/26/22 | DP | 7-6-0-0 | GOV | 3/7/22 | DP | 4-3-0 |
| 3rd Read | 2/22/22 | | 31-28-1 | | | | |

Prepared by Senate Research
June 22, 2022
MH/sr

# Exhibit 27

# ARIZONA LEGISLATIVE COUNCIL

**The following A.R.S. sections are effective 1/1/23:**

**12-281 ………… L21, ch 326**
**12-820.02 ………… L22, ch 314**
**13-502 ………… L22, ch 314**
**13-911 ………… L21, ch 432**
**13-3991 ………… L22, ch 314**
**13-3992 ………… L22, ch 314**
**13-3994 ………… L22, ch 314**
**13-3995 ………… L22, ch 314**
**13-3996 ………… L22, ch 314**
**13-3997 ………… L22, ch 314**
**13-3998 ………… L22, ch 314**
**13-3999 ………… L22, ch 314**
**13-4000………… L22, ch 314**
**13-4033 ………… L21, ch 432**
**15-444 ………… L20, ch 14**
**15-449 ………… L20, ch 14**
**15-459 ………… L20, ch 14**
**15-908 ………… L20, ch 14**
**15-950 ………… L20, ch 14**
**16-101 ………… L22, ch 99**
**16-112 ………… L22, ch 99**
**16-121 ………… L22, ch 99**
**16-121.01 ………… L22, ch 99**
**16-123 ………… L22, ch 99**
**16-127 ………… L22, ch 99**
**16-134 ………… L22, ch 99**
**16-143 ………… L22, ch 99**
**28-673 ………… L22, ch 233**
**28-1321 ………… L22, ch 233**
**28-1385 ………… L22, ch 233**
**28-1401 ………… L22, ch 233**
**28-1402 ………… L22, ch 233**
**28-1461 ………… L22, ch 233**
**28-1526 ………… L22, ch 383**
**28-3319 ………… L22, ch 233**
**32-3922 ………… L22, ch 23**
**32-3924 ………… L22, ch 23**

**41-619.51 ………………………………………… L22, blend of chs 23, 55 and 281**
**41-1750 …………………………………………… L22, blend of chs 163 and 186**
**41-1758 ………………………………………… L22, blend of chs 23, 55 and 281**
**41-1758.01 ……………………………………… L22, blend of chs 23, 55 and 281**
**43-1022 …………………………………………… L22, blend of chs 235 and 369**
**43-1028 …………………………………………………………… L22, ch 369**

**The following A.R.S. sections are effective 4/1/23:**

**32-1301 …………………………………………………………… L22, ch 279**
**32-3230 …………………………………………………………… L22, ch 104**

**The following A.R.S. sections are effective 7/1/23:**

**15-240 …………………………………………………………… L22, ch 353**
**15-448 …………………………………………………………… L22, ch 285**
**15-824 …………………………………………………………… L22, ch 285**
**15-910 …………………………………………………………… L22, ch 285**
**15-943.01 ………………………………………………………… L22, ch 285**
**15-947 …………………………………………………………… L22, ch 285**
**15-951 ………………………………………………………… L22, ch 168, sec 2**
**15-961 …………………………………………………………… L22, ch 285**
**15-971 …………………………………………………………… L22, ch 285**
**15-974 …………………………………………………………… L22, ch 285**
**15-992 …………………………………………………………… L22, ch 285**
**32-1905 …………………………………………………………… L22, ch 362**
**32-1921.01 ………………………………………………………… L22, ch 362**
**32-1923.01 ………………………………………………………… L22, ch 362**
**32-1924 …………………………………………………………… L22, ch 362**
**32-1927 …………………………………………………………… L22, ch 362**
**32-1927.01 ………………………………………………………… L22, ch 362**
**32-1927.02 ………………………………………………………… L22, ch 362**
**32-1996 …………………………………………………………… L22, ch 362**
**36-2604 …………………………………………………………… L22, ch 362**

**The following A.R.S. sections are effective 1/1/24:**

**13-712 …………………………………………………………… L22, ch 352**
**13-4501 …………………………………………………………… L22, ch 352**
**13-4508 …………………………………………………………… L22, ch 352**
**13-4509 …………………………………………………………… L22, ch 352**
**13-4515 …………………………………………………………… L22, ch 352**

**13-4517 ……………………………………………………………………… L22, ch 352**
**13-4521 ……………………………………………………………………… L22, ch 352**
**16-550 ……………………………………………………………..……… L22, ch 358**
**36-425.06 …………………………………………………………….……… L22, ch 352**
**36-2201 …………………………………………………………..……….. L22, ch 381**
**36-2202 …………………………………………………………..……….. L22, ch 381**
**36-2232 …………………………………………………………..……….. L22, ch 381**
**36-2233 …………………………………………………………..……….. L22, ch 381**
**36-2234 …………………………………………………………..……….. L22, ch 381**
**36-2236 …………………………………………………………..……….. L22, ch 381**
**36-2239 …………………………………………………………..……….. L22, ch 381**
**36-2242 …………………………………………………………...…….. L22, ch 381**
**36-2246 …………………………………………………………..……….. L22, ch 381**
**36-4001 …………………………………………………………..……….. L22, ch 352**
**36-4002 …………………………………………………………..……….. L22, ch 352**
**36-4003 …………………………………………………………..……….. L22, ch 352**
**36-4004 …………………………………………………………..……….. L22, ch 352**
**36-4005 …………………………………………………………..……….. L22, ch 352**
**36-4006 …………………………………………………………..……….. L22, ch 352**
**36-4007 …………………………………………………………..……….. L22, ch 352**
**36-4008 …………………………………………………………..……….. L22, ch 352**
**36-4009 …………………………………………………………..……….. L22, ch 352**
**36-4010 ..…………………………………………………………...…….. L22, ch 352**
**36-4011 ..…………………………………………………………...…….. L22, ch 352**

**The following A.R.S. section is effective 1/1/25:**

**45-802.01 ………………………………………………….…..……..… L19, ch 1, sec 10**

**The following A.R.S. sections are effective 7/1/25:**

**41-1712 ……………………………….…..….……………………..… L22, ch 311**
**41-1762 ……………………………….…..….……………………..… L22, ch 311**

# Exhibit 28

# SEX BY AGE BY NATIVITY AND CITIZENSHIP STATUS (ASIAN ALONE)

**Note: The table shown may have been modified by user selections. Some information may be missing.**

| | |
|---|---|
| **DATA NOTES** | |
| TABLE ID: | B05003D |
| SURVEY/PROGRAM: | American Community Survey |
| VINTAGE: | 2020 |
| DATASET: | ACSDT5Y2020 |
| PRODUCT: | ACS 5-Year Estimates Detailed Tables |
| UNIVERSE: | People who are Asian alone |
| FTP URL: | None |
| API URL: | https://api.census.gov/data/2020/acs/acs5 |
| | |
| **USER SELECTIONS** | |
| GEOS | Arizona |
| | |
| **EXCLUDED COLUMNS** | None |
| | |
| **APPLIED FILTERS** | None |
| | |
| **APPLIED SORTS** | None |
| | |
| **PIVOT & GROUPING** | None |
| | |
| **WEB ADDRESS** | https://data.census.gov/cedsci/table?text=b05003&g=0400000US04&tid=ACSDT5Y2020.B05003D |

| | |
|---|---|
| **TABLE NOTES** | Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, for 2020, the 2020 Census provides the official counts of the population and housing units for the nation, states, counties, cities, and towns. For 2016 to 2019, the Population Estimates Program provides estimates of the population for the nation, states, counties, cities, and towns and intercensal housing unit estimates for the nation, states, and counties. |
| | Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Technical Documentation section.<br><br>Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section. |
| | Source: U.S. Census Bureau, 2016-2020 American Community Survey 5-Year Estimates |
| | Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see ACS Technical Documentation). The effect of nonsampling error is not represented in these tables. |
| | Methodological changes to citizenship edits may have affected citizenship data for those born in American Samoa. Users should be aware of these changes when using 2018 data or multi-year data containing data from 2018. For more information, see: American Samoa Citizenship User Note. |
| | The Hispanic origin and race codes were updated in 2020. For more information on the Hispanic origin and race code changes, please visit the American Community Survey Technical Documentation website. |
| | The 2016-2020 American Community Survey (ACS) data generally reflect the September 2018 Office of Management and Budget (OMB) delineations of metropolitan and micropolitan statistical areas. In certain instances, the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB delineation lists due to differences in the effective dates of the geographic entities. |

| | |
|---|---|
| | Estimates of urban and rural populations, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization. |
| | Explanation of Symbols:- The estimate could not be computed because there were an insufficient number of sample observations. For a ratio of medians estimate, one or both of the median estimates falls in the lowest interval or highest interval of an open-ended distribution.N The estimate or margin of error cannot be displayed because there were an insufficient number of sample cases in the selected geographic area. (X) The estimate or margin of error is not applicable or not available.median- The median falls in the lowest interval of an open-ended distribution (for example "2,500-")median+ The median falls in the highest interval of an open-ended distribution (for example "250,000+").** The margin of error could not be computed because there were an insufficient number of sample observations.*** The margin of error could not be computed because the median falls in the lowest interval or highest interval of an open-ended distribution.***** A margin of error is not appropriate because the corresponding estimate is controlled to an independent population or housing estimate. Effectively, the corresponding estimate has no sampling error and the margin of error may be treated as zero. |
| | |
| **COLUMN NOTES** | None |
| | |

Table: ACSDT5Y2020.B05003D

| | Arizona | |
|---|---|---|
| **Label** | **Estimate** | **Margin of Error** |
| Total: | 239,190 | ±2,955 |
| Male: | 111,951 | ±2,071 |
| Under 18 years: | 23,196 | ±1,034 |
| Native | 18,431 | ±989 |
| Foreign born: | 4,765 | ±558 |
| Naturalized U.S. citizen | 1,295 | ±245 |
| Not a U.S. citizen | 3,470 | ±518 |
| 18 years and over: | 88,755 | ±1,385 |
| Native | 21,874 | ±1,272 |
| Foreign born: | 66,881 | ±1,420 |
| Naturalized U.S. citizen | 35,042 | ±1,175 |
| Not a U.S. citizen | 31,839 | ±1,543 |
| Female: | 127,239 | ±1,666 |
| Under 18 years: | 22,671 | ±959 |
| Native | 17,316 | ±885 |
| Foreign born: | 5,355 | ±662 |
| Naturalized U.S. citizen | 1,652 | ±368 |
| Not a U.S. citizen | 3,703 | ±523 |
| 18 years and over: | 104,568 | ±1,271 |
| Native | 21,655 | ±1,147 |
| Foreign born: | 82,913 | ±1,328 |
| Naturalized U.S. citizen | 48,296 | ±1,447 |
| Not a U.S. citizen | 34,617 | ±1,187 |

# Exhibit 29

# SEX BY AGE BY NATIVITY AND CITIZENSHIP STATUS (NATIVE HAWAIIAN AND OTHER PACIFIC ISLANDER ALONE)

**Note: The table shown may have been modified by user selections. Some information may be missing.**

| | |
|---|---|
| **DATA NOTES** | |
| TABLE ID: | B05003E |
| SURVEY/PROGRAM: | American Community Survey |
| VINTAGE: | 2020 |
| DATASET: | ACSDT5Y2020 |
| PRODUCT: | ACS 5-Year Estimates Detailed Tables |
| UNIVERSE: | People who are Native Hawaiian and Other Pacific Islander alone |
| FTP URL: | None |
| API URL: | https://api.census.gov/data/2020/acs/acs5 |
| | |
| **USER SELECTIONS** | |
| GEOS | Arizona |
| | |
| **EXCLUDED COLUMNS** | None |
| | |
| **APPLIED FILTERS** | None |
| | |
| **APPLIED SORTS** | None |
| | |
| **PIVOT & GROUPING** | None |
| | |
| **WEB ADDRESS** | https://data.census.gov/cedsci/table?text=b05003&g=0400000US04&tid=ACSDT5Y2020.B05003E |

| | |
|---|---|
| **TABLE NOTES** | Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, for 2020, the 2020 Census provides the official counts of the population and housing units for the nation, states, counties, cities, and towns. For 2016 to 2019, the Population Estimates Program provides estimates of the population for the nation, states, counties, cities, and towns and intercensal housing unit estimates for the nation, states, and counties. |
| | Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Technical Documentation section.<br><br>Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section. |
| | Source: U.S. Census Bureau, 2016-2020 American Community Survey 5-Year Estimates |
| | Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see ACS Technical Documentation). The effect of nonsampling error is not represented in these tables. |
| | Methodological changes to citizenship edits may have affected citizenship data for those born in American Samoa. Users should be aware of these changes when using 2018 data or multi-year data containing data from 2018. For more information, see: American Samoa Citizenship User Note. |
| | The Hispanic origin and race codes were updated in 2020. For more information on the Hispanic origin and race code changes, please visit the American Community Survey Technical Documentation website. |
| | The 2016-2020 American Community Survey (ACS) data generally reflect the September 2018 Office of Management and Budget (OMB) delineations of metropolitan and micropolitan statistical areas. In certain instances, the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB delineation lists due to differences in the effective dates of the geographic entities. |

| | |
|---|---|
| | Estimates of urban and rural populations, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization. |
| | Explanation of Symbols:- The estimate could not be computed because there were an insufficient number of sample observations. For a ratio of medians estimate, one or both of the median estimates falls in the lowest interval or highest interval of an open-ended distribution.N The estimate or margin of error cannot be displayed because there were an insufficient number of sample cases in the selected geographic area. (X) The estimate or margin of error is not applicable or not available.median- The median falls in the lowest interval of an open-ended distribution (for example "2,500-")median+ The median falls in the highest interval of an open-ended distribution (for example "250,000+").** The margin of error could not be computed because there were an insufficient number of sample observations.*** The margin of error could not be computed because the median falls in the lowest interval or highest interval of an open-ended distribution.***** A margin of error is not appropriate because the corresponding estimate is controlled to an independent population or housing estimate. Effectively, the corresponding estimate has no sampling error and the margin of error may be treated as zero. |
| | |
| **COLUMN NOTES** | None |
| | |

Table: ACSDT5Y2020.B05003E

| | Arizona | |
|---|---|---|
| **Label** | **Estimate** | **Margin of Error** |
| Total: | 14,633 | ±654 |
| Male: | 7,777 | ±397 |
| Under 18 years: | 1,680 | ±226 |
| Native | 1,535 | ±216 |
| Foreign born: | 145 | ±74 |
| Naturalized U.S. citizen | 42 | ±44 |
| Not a U.S. citizen | 103 | ±63 |
| 18 years and over: | 6,097 | ±337 |
| Native | 5,066 | ±385 |
| Foreign born: | 1,031 | ±252 |
| Naturalized U.S. citizen | 306 | ±130 |
| Not a U.S. citizen | 725 | ±198 |
| Female: | 6,856 | ±467 |
| Under 18 years: | 1,677 | ±170 |
| Native | 1,468 | ±177 |
| Foreign born: | 209 | ±94 |
| Naturalized U.S. citizen | 49 | ±51 |
| Not a U.S. citizen | 160 | ±98 |
| 18 years and over: | 5,179 | ±381 |
| Native | 3,958 | ±415 |
| Foreign born: | 1,221 | ±274 |
| Naturalized U.S. citizen | 410 | ±114 |
| Not a U.S. citizen | 811 | ±235 |