**MARK BRNOVICH**
**ATTORNEY GENERAL**
Joseph A. Kanefield (No. 015838)
*Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 028698)
*Division Chief*
Drew C. Ensign (No. 025463)
*Deputy Solicitor General*
Jillian B. Francis (No. 030117)
Robert J. Makar (No. 033579)
*Assistant Attorney General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Email: Beau.Roysden@azag.gov
Email: Drew.Ensign@azag.gov

**FENNEMORE CRAIG, P.C.**
Douglas C. Northup (No. 013987)
Timothy J. Berg (No. 004170)
Emily Ward (No. 029963)
2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
Telephone: (602) 916-5000
Email: dnorthup@fennemorelaw.com
Email: tberg@fennemorelaw.com
Email: eward@fennemorelaw.com
*Attorneys for Defendants State of Arizona and Mark Brnovich, Attorney General*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mi Familia Vota,<br><br>Plaintiff,<br><br>v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State, et al.,<br><br>Defendants.<br><br>---<br><br>**AND CONSOLIDATED CASES** | Case No: 2:22-cv-00509-SRB (Lead)<br><br>**STATE'S CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' COMPLAINTS UNDER RULES 12(B)(1) AND (B)(6)** |

## TABLE OF CONTENTS


GLOSSARY ........ xi

INTRODUCTION ........ 1

BACKGROUND ........ 4

LEGAL STANDARD ........ 8

ARGUMENT ........ 9

I. SOME OF PLAINTIFFS' CLAIMS ARE NON-JUSTICIABLE ..... 9

A. Private Plaintiffs Lack Article III Standing ........ 9

1. Private Plaintiffs Cannot Rely On Representational Standing ........ 9

2. Private Plaintiffs Have Not Adequately Alleged Organizational Standing Either ........ 10

3. Several Plaintiffs Lack Article III Traceability & Redressability ........ 11

B. Many Claims Here Are Unripe ........ 12

1. Plaintiffs Face No "Genuine Threat Of Imminent Prosecution" ........ 12

2. Many Of Plaintiffs' Claims Lack Prudential Ripeness ........ 13

II. PLAINTIFFS HAVE NOT PLED VIABLE CONSTITUTIONAL CLAIMS ........ 14

A. Plaintiffs' *Anderson-Burdick* Claims Fail ........ 14

1. Overview of *Anderson-Burdick* Doctrine ........ 14

2. The Burdens Here Are Not Substantial ........ 14

3. The State's Interests In Securing Its Elections Suffices ........ 16

B. Freestanding Procedural Due Process Claims Are Barred ... 16

C. Plaintiffs' Equal Protection Claims Fail ........ 17

1. Plaintiffs' Disparate Treatment Claims Fail ........ 17

2. Plaintiffs' Discriminatory Intent Claims Likewise Fail ........ 20

III. PLAINTIFFS FAIILED TO STATE VIABLE NVRA CLAIMS ... 22

A. The NVRA Does Not Apply To State or Presidential Elections....................22
B. All Plaintiffs' NVRA Claims Fail as a Matter of Law .........24
IV. PLAINTIFFS' SECTION 10101 CLAIMS FAIL ..........................25
A. Private Plaintiffs Lack A Cause Of Action..........................25
B. Plaintiffs Fail To Allege Violations Of Section 10101.........26
V. LUCHA's VRA § 2 CLAIM FAILS ..............................................29
CONCLUSION ......................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez*,
138 S. Ct. 2305 (2018) ....................21

*Angle v. Miller*,
673 F.3d 1122 (9th Cir. 2012) ....................14

*Arizona Democratic Party v. Hobbs ("Hobbs I")*,
485 F.Supp.3d 1073 (D. Ariz. 2020) ....................16

*Arizona Democratic Party v. Hobbs ("Hobbs II")*,
976 F.3d 1081 (9th Cir. 2020) ....................30

*Arizona Democratic Party v. Hobbs ("Hobbs III")*,
18 F.4th 1179 (9th Cir. 2021) ....................2, 16, 17

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ....................4, 18, 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................8, 21

*Ass'n of Cmty. Orgs. for Reform Now v. Miller*,
129 F.3d 833 (6th Cir. 1997) ....................22

*Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998) ....................1

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) ....................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................8, 21

*Brnovich v. DNC*,
141 S. Ct. 2321 (2021) ....................3, 4, 28, 29, 30

*Burson v. Freeman*,
504 U.S. 191 (1992) ....................19, 20

*Carver v. Lehman*,
558 F.3d 869 (9th Cir. 2009) ....................17

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ....................23

*City of Mobile v. Bolden*,
446 U.S. 55 (1980) ....................18

*City of Rancho Palos Verdes v. Abrams*,
544 U.S. 113 (2005) ....................25

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ....................15

*Commonwealth of Northern Mariana Islands v. Zhen*,
68 F. App'x 7 (9th Cir. 2003) ....................17

*Coronado v. Napolitano*,
No. CV 07-1089-PHX-SMM, 2008 WL 4838707 (D. Ariz. Nov. 6, 2008) ....................20

*Crawford v. Marion Cty. Election Bd.*,
553 U.S. 181 (2008) ....................2, 15, 16, 29

*De Martinez v. Ashcroft*,
374 F.3d 759 (9th Cir. 2004) ....................19

*Dekom v. New York*,
2013 WL 3095010 (E.D.N.Y. June 18, 2013) ....................26

*Diaz v. Cobb*,
435 F. Supp. 2d 1206 (S.D. Fla. 2006) ....................28

*DNC v. Wis. State Legislature*,
141 S. Ct. 28 (2020) ....................26

*Dudum v. Arntz*,
640 F.3d 1098 (9th Cir. 2011) ....................14, 16, 17

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
489 U.S. 214 (1989) ....................19

*Fair Elections Ohio v. Husted*,
770 F.3d 456 (6th Cir. 2014) ....................11

*Flemming v. Nestor*,
363 U.S. 603 (1960) ....................21

*Frank v. Walker*,
768 F.3d 744 (7th Cir. 2014) ....................15

*Freeman v. City of Santa Ana*,
68 F.3d 1180 (9th Cir. 1995) ....................17

*Friends of the Earth v. Sanderson Farms, Inc.*,
992 F.3d 939 (9th Cir. 2021) ....................10

*Fusilier v. Landry*,
963 F.3d 447 (5th Cir. 2020) ....................21

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012) .......... 2, 15, 16, 19

*Gonzalez v. Arizona*,
No. 06-CV-1268, 2007 WL 9724581 (D. Ariz. Aug. 28, 2007) .......... 28

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
992 F.3d 1299 (11th Cir. 2021) .......... 15

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .......... 2, 11

*Hayden v. Pataki*,
2004 WL 1335921 (S.D.N.Y. June 14, 2004) .......... 25

*Jacobson v. Fla. Sec'y of State*,
974 F.3d 1236 (11th Cir. 2020) .......... 10, 11

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083 (9th Cir. 2010) .......... 10

*Leach v. Hobbs*,
250 Ariz. 572 (2021) .......... 11

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) .......... 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 10

*Martin v. Crittenden*,
347 F. Supp. 3d 1302 (N.D. Ga. 2018) .......... 26

*Mays v. LaRose*,
951 F.3d 775 (6th Cir. 2020) .......... 16

*McDonald v. Board of Election Comm'rs*,
394 U.S. 802 (1969) .......... 18, 19

*McReynolds v. Merrill Lynch & Co., Inc.*,
No. 08 C 6105, 2011 WL 1196859 (N.D. Ill. Mar. 29, 2011) .......... 20

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) .......... 11

*Mendoza v. Blodgett*,
960 F.2d 1425 (9th Cir. 1992) .......... 17

*Mi Familia Vota v. Hobbs*,
977 F.3d 948 (9th Cir. 2020) .......... 30

*NAACP v. City of Kyle*,
626 F.3d 233 (5th Cir. 2010) .......... 10

*Nader v. Brewer*,
531 F.3d 1028 (9th Cir. 2008) .......... 14

*Navarro v. Block*,
72 F.3d 712 (9th Cir. 1995) .......... 20

*Ne. Ohio Coal. for the Homeless v. Husted*,
837 F.3d 612 (6th Cir. 2016) .......... 26

*Nw. Austin Mun. Util. Dist. No. 1 v. Holder*,
557 U.S. 193 (2009) .......... 23

*Org. for Black Struggle v. Ashcroft*,
493 F. Supp. 3d 790 (W.D. Mo. 2020) .......... 26

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) .......... 18

*Prete v. Bradbury*,
438 F.3d 949 (9th Cir. 2006) .......... 14, 15

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 13

*Rodriguez v. City of San Jose*,
930 F.3d 1123 (9th Cir. 2019) .......... 10

*Shelby Cty. v. Holder*,
570 U.S. 529 (2013) .......... 23

*Short v. Brown*,
893 F.3d 671 (9th Cir. 2018) .......... 14

*Soltysik v. Padilla*,
910 F.3d 438 (9th Cir. 2018) .......... 16

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 9

*Texas v. United States*,
523 U.S. 296 (1998) .......... 2, 12, 13, 28

*Thomas v. Anchorage Equal Rts. Comm'n*,
220 F.3d 1134 (9th Cir. 2000) .......... 2, 12, 13

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) .......... 14

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) ....................23
*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ....................19
*Washington v. Davis*, 426 U.S. 229 (1976) ....................19

**STATUTES**

52 U.S.C. § 10101 (c) ....................25
52 U.S.C. § 10101 (c)-(g) ....................25
52 U.S.C. § 10101(a)(2)(a) ....................25, 27
52 U.S.C. § 10101(a)(2)(B) ....................25, 27
52 U.S.C. § 20501(b)(1) ....................23
52 U.S.C. § 20502(2) ....................23
52 U.S.C. § 20503(a) ....................23
52 U.S.C. § 20504 ....................24
52 U.S.C. § 20505(a) ....................23, 24
52 U.S.C. § 20506 ....................24
52 U.S.C. § 20507(a)(1) ....................24
52 U.S.C. § 30101(3) ....................23
A.R.S. § 16-101 ....................27
A.R.S. § 16-101(A)(1) ....................4
A.R.S. § 16-112(2)(b)(4) ....................24
A.R.S. § 16-121.01(a) ....................28
A.R.S. § 16-127(a)(1) ....................21
A.R.S. § 16-134(B) ....................6, 27
A.R.S. § 16-166(F) ....................5
A.R.S. § 16-452 ....................11
A.R.S. § 16-542 ....................30
A.R.S. § 16-579(A)(1) ....................7

**CONSTITUTIONAL PROVISIONS**

Ariz. Const. art. VII, §2, cl. A....27
U.S. Const. amend. XIV §1....7
U.S. Const. art II, § 1, cl. 2....22
U.S. Const. art. I, § 4, cl. 1....22
U.S. Const., art. I, §4....23

**OTHER AUTHORITIES**

Arizona Secretary of State, 2019 Elections Procedures Manual, available at https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf (last accessed September 15, 2022)....4
HB 2243 § 10(K)....7
HB 2243 § 2....27
HB 2243 § 2(A)(10)....7
HB 2243 § 2(D)-(H)....7
HB 2492 § (2)(B)(4)....24
HB 2492 § 1(A)(1)....4
HB 2492 § 4....6
HB 2492 § 4(A)....28
HB 2492 § 4(C)....5, 27
HB 2492 § 4(E)....5, 6
HB 2492 § 5....21
HB 2492 § 5(A)....6
HB 2492 § 4(A)....7
H.R. Rep. No. 88-914 (Nov. 20, 1963)....26
Letter from Douglas A. Ducey to Katie Hobbs (Mar. 30, 2022), https://azgovernor.gov/sites/default/files/hb2492_signing_letter.pdf....4
News Release, Rep. Jake Hoffman (Mar. 30, 2022), https://www.azleg.gov/press/house/55LEG/2R/220330HOFFMANHB2492.pdf....4

## GLOSSARY

| **Defined Term** | **Definition** |
|---|---|
| 35-Day Notice | When a county recorder receives notice that a person is not a U.S. citizen, the county recorder will send the person notice that their registration will be canceled in 35 days unless the person provides satisfactory evidence of U.S. citizenship pursuant to § 16-166. The notice shall provide a list of documents the individual can provide to establish citizenship and a postage prepaid preaddressed return envelope. HB 2243 § 2(A)(10). |
| Acts | HB 2243 and HB 2492 |
| AAANHPI | Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander For Equity Coalition |
| Birthplace Requirement | A person is presumed to be properly registered to vote on completion of a registration form that contains the applicant's place of birth, among other information, as prescribed by HB 2492 § 4(A). |
| Citizenship Question | A person is presumed to be properly registered to vote on completion of a registration form that contains a mark in the "yes" box next to the question regarding citizenship, among other information, as prescribed by HB 2492 § 4(A). |
| Database Allegations | Plaintiffs' various allegations that the databases contain incorrect or outdated data (Latinx alleges that "there is no database that has current, up-to-date citizenship status information" (¶ 70); LUCHA alleges that the databases "are known to have unreliable citizenship data" (¶ 93) and that "none of [the] databases are designed to contain or reflect current U.S. citizenship status" (¶ 97); DNC alleges the "databases[] contain unreliable and outdated data" (¶ 36); AAANHPI alleges the databases are "outdated and inaccurate" (¶¶ 73, 86)). |
| Federal Form | The National Mail Voter Registration Form prescribed by the U.S. Election Assistance Commission pursuant to the National Voter Registration Act of 1993. |
| HB 2243 | 2022 Ariz. Sess. Laws ch. 370; codified at A.R.S. §§ 16-153, -165, 21-314 |
| In-Person Voting Limitation | If the county recorder is unable to match the applicant with the appropriate citizenship information, the county recorder shall notify the applicant that the county recorder could not verify that the applicant is a U.S. citizen and the applicant will not be qualified to vote by |

| | |
|---|---|
| | mail with an early ballot. HB 2492 §§ 4(E), 5(A)(2) |
| Investigation Requirement | If the county recorder or other officer in charge of elections matches the applicant with information that the applicant is not a U.S. citizen, the officer shall reject the application, notify the applicant that the application was rejected because the applicant is not a U.S. citizen, and forward the application to the county attorney and attorney general for investigation. HB 2492 § 4(E). |
| Monthly Check | HB 2243 requires that each month: the department of health services submit to the secretary of state the names of deceased persons to be canceled from the voter registration database; the department of transportation furnish a list of persons who have been issued a driver's license or nonoperating license in another state so that it may be confirmed whether they are resident of this state; the secretary of state compare the statewide voter registration database to the driver license database to notify the county recorder if a person has changed their residence or is not a U.S. citizen; to the extent practicable, the county recorder shall compare the county's voter registration database to the Social Security Administration database; to the extent practicable, the county recorder shall compare persons who are registered to vote in that county and whom the county recorder has reason to believe are not U.S. citizens and persons who are registered to vote without satisfactory evidence of citizenship with the Systematic Alien Verification for Entitlements ("SAVE") program. HB 2243 § 2(D)-(H). |
| POC | Proof of citizenship, as defined in A.R.S. § 16-166(F). |
| POR | Proof of residence, as defined in A.R.S. § 16-579(A)(1). |
| Presidential-Ballot Limitation | If the county recorder is unable to match the applicant with the appropriate citizenship information, the county recorder shall notify the applicant that the county recorder could not verify the applicant is a U.S. citizen and the applicant will not be qualified to vote in a presidential election. HB 2492 § 4(E) & § 5(A)(1). |
| Private Plaintiffs | All Plaintiffs with the exception of the United States |
| Removal Process | When the county recorder obtains information and confirms that a person registered to vote is not a U.S. citizen, before canceling the registration, the county recorder shall send the person notice that the person's registration will be canceling in 35 days unless the person provides satisfactory evidence of U.S. |

| | |
|---|---|
| | citizenship pursuant to A.R.S. § 16-166. If the person registered does not provide satisfactory notice within 35 days, the county recorder shall cancel the registration. HB 2243 § 2(A)(10). |
| State | The State of Arizona or the State and its Attorney General (as context indicates) |
| State Form | The state voter registration form prescribed by the Secretary of State pursuant to A.R.S. § 16-152(C). |
| Valid ID | Documentary identification required to vote in person as defined by A.R.S. § 16-579. |
| Verification Requirement | Within 10 days after receiving an application for registration to vote on a Federal Form that is not accompanied by satisfactory evidence of citizenship, the County Recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant and at a minimum shall compare the information with the following, provided the county has access: (1) Department of Transportation databases; (2) Social Security Administration databases; (3) United States Citizenship and Immigration Services SAVE program; (4) a National Association for Public Health Services and Information Systems electronic verification of vital events system; and (5) any other state, city, town, county, or federal database and any other database relating to voter registration to which the county recorder or other officer in charge has access. |

Pursuant to Rules 12(b)(1) and (b)(6), the State of Arizona and Mark Brnovich, Arizona Attorney General (hereinafter, the "State") move to dismiss each of Defendants' complaints in this consolidated matter.[1]

## INTRODUCTION

Arizona, like virtually all states, limits voting to U.S. citizens. That much is constitutionally uncontroversial. One of the principal disputes here is whether the State must accept a bare attestation of citizenship as sufficient, or whether it can ask for some proof of citizenship. This is important to the State as "[t]he right to vote is one of the badges of citizenship. The dignity and very concept of citizenship are diluted if noncitizens are allowed to vote." *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998). Plaintiffs challenge two statutes (the "Acts") that relate to this proof requirement.

Plaintiffs' complaints lack neither numerosity or length: six in all totaling 255 pages and 965 paragraphs, asserting 34 distinct claims against two statutes. What those claims do lack, however, is justiciability and merit.

**I.** As to justiciability, Private Plaintiffs lack Article III standing because they (1) cannot adequately allege representational standing without naming individual affected members—which *none* of them have done, and (2) have not adequately alleged organizational standing because they do not identify specific resource diversions actually *caused* by the Acts and further do not identify what activities resources have been diverted *from*, thereby causing injury. Instead, Private Plaintiffs' allegations amount to "simply a setback to the organization's abstract social interests," which does not satisfy Article

[1] This motion seeks dismissal of all five Complaints in the consolidated action (No. 22-cv-509), as well as in *AAANHPI v. Hobbs*, No. 22-cv-1381, in which the State's motion to consolidate is pending. The State is concurrently filing a motion for leave in *AAANHPI* to have this consolidated motion to dismiss apply to that action as well. For all the reasons explained in the State's motion to consolidate, the State respectfully submits that this approach is in the interests of judicial economy.

Counsel for the State was alerted yesterday that a seventh action challenging HB 2492 and/or HB 2243 will be filed Monday, September 19. The State intends to seek consolidation of that seventh action as well.

III. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In addition, several Private Plaintiffs here have failed to name all (or any) County Recorders, which prevents them from establishing Article III traceability and redressability.

Some of the claims at issue here are unripe as well. In particular, Private Plaintiffs do not allege that any of their members intend not to check the Citizenship Question or fill in the Birthplace Requirement field. They thus have not alleged "'a concrete plan' to violate the law in question," that could establish Article III ripeness. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). (Any such resulting injury would likely be self-inflicted in any event.) In addition, prudential ripeness is lacking for (1) Private Plaintiffs' speculation that inaccurate or outdated information in databases will cause injury, (2) Plaintiffs' equivalent speculation that the Investigation Requirement will be exploited or implemented in bad faith or otherwise cause significant injury, and (3) LUCHA's VRA §2 claim, which is premised on disparate impacts for which no actual data exists. All of these claims rest on speculation about "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted),

**II.** Private Plaintiffs' constitutional claims also fail on the merits. Their *Anderson-Burdick* unconstitutional burden claims lack merit because the burdens at issue are not substantial, particularly under the Supreme Court's decision in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) and *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc). Similarly, the State's interest in securing its elections and maintaining voter confidence easily suffice to sustain the Acts under *Crawford* and *Gonzalez*.

Plaintiffs' various attempts to assert procedural due process claims outside of the *Anderson-Burdick* framework violates controlling Ninth Circuit precedent, including *Arizona Democratic Party v. Hobbs ("Hobbs III")*, 18 F.4th 1179, 1195 (9th Cir. 2021).

Plaintiffs' equal protection claims similarly are not viable. As to their disparate treatment claims, they fail first because they are governed by the *Anderson-Burdick*

framework. They further fail because the Acts are completely facially neutral as to race, tribal status, age, and virtually every other salient characteristic. The sole distinction—between those individuals using the Federal Form versus the State Form—is not a suspect class triggering heightened scrutiny. Furthermore, the State has several rational bases for distinguishing between the two classes—not least of which is the greater confidence that the latter individuals are indeed citizens and residents of their districts.

Finally, Plaintiffs' intentional discrimination claims fail because Private Plaintiffs have not plausibly alleged that the Legislature acted with discriminatory intent and do not supply sufficient non-conclusory allegations to overcome the presumption of good faith.

**III.** Plaintiffs' NVRA claims fail because, quite simply, the NVRA does not apply to registration for any of the elections regulated by the Acts. The Acts address only state and presidential elections. The NVRA clearly does not apply to state elections. And Congress' constitutional authority to regulate "Elections for Senators and Representatives," U.S. Const. art. I, § 4, cl. 1, does not extend to presidential elections—the regulation of which is left to the States. Congress thus does not have constitutional authority to supersede state laws or enact federal laws relating to presidential elections. In any event, none of the challenged provisions of the Act run afoul of the NVRA.

**IV.** Private Plaintiffs' Section 10101 claims fail at the threshold because they lack a private right of action to enforce the provision—the majority of courts have held that the materiality statute is only enforceable in an action brought by the Attorney General. In addition, Plaintiffs' claims fail because they attack the validity of a state law, which is explicitly excepted from the materiality provision (error or omission that is material "under State law"). The materiality provision targets executive actions that deny the right of an eligible individual to vote—which is not at issue here. Instead, the Acts prescribe denial of ineligible potential voters and a cure process, not disenfranchisement, for eligible voters who have failed to properly register. In any event, the information sought by the Acts is material to ascertaining eligibility to vote and thus cannot run afoul of Section 10101.

**V.** Finally, LUCHA's VRA § 2 claim fails to allege a plausible violation of that provision under *Brnovich v. DNC*, 141 S. Ct. 2321 (2021). As discussed below, the burdens involved are not substantial and are justified by compelling state interests. Even more importantly, LUCHA's complaint fails to plausibly allege any meaningful disparate racial impacts. Indeed, the most it says is that the Acts "will not equally affect Arizona residents." LUCHA at ¶368. But the VRA does not mandate the complete absence of all disparate impacts: indeed, it would be "virtually impossible for a State to devise rules that do not have some disparate impact." *Brnovich*, 141 S. Ct. at 2343. The bare allegation of the existence of speculative and unquantified disparate impacts does not plausibly plead a violation of section 2.

**BACKGROUND**

As with nearly every other state, only U.S. citizens are eligible to vote in Arizona. A.R.S. § 16-101(A)(1). This case involves facial challenges to HB 2243 and HB 2492—two bills recently enacted to promote election modernization, prevent voter fraud, and safeguard voter confidence in Arizona's election system, in part by requiring Arizona residents to show evidence of U.S. citizenship.

Citizens can register to vote using either the Federal Form or State Form. The Federal Form does not itself currently require proof of citizenship, and instead only requires that signer attest that he or she is a U.S. citizen. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 7 (2013). The Supreme Court has held that the State is required to accept the Federal Form, and cannot require POC along with the Federal Form to register applicants to vote. *Id.* at 20. Individuals that register using the Federal Form are only permitted to vote for federal offices and are provided ballots commonly known as the "Federal Only" ballot.[2]

[2] Arizona Secretary of State, 2019 Elections Procedures Manual, pg 3(A), available at https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf (last accessed September 15, 2022).

**A. HB 2492**

HB 2492 was enacted on March 30, 2022, and is set to take effect on January 1, 2023. One of the bill's sponsors, Rep. Jake Hoffman, explained that HB 2492, "which requires verification of U.S. citizenship to be eligible to vote in Arizona elections, is a giant step toward ensuring elections are easy, convenient, and secure in our state."[3] And, in signing the bill into law, Governor Ducey stated: "Election integrity means counting every lawful vote and prohibiting any attempt to illegally cast a vote. HB 2492 is a balanced approach that honors Arizona's history of making voting accessible without sacrificing security in our elections."[4]

The relevant changes of HB 2492 are as follows:

***Proof of Citizenship ("POC") Requirement.*** Only U.S. citizens who "ha[ve] provided satisfactory evidence of citizenship as prescribed in section 16-166" ("POC") are eligible to vote in Arizona. HB 2492 § 1(A)(1). To show "satisfactory evidence of citizenship," a person can use several common forms of identification, including the number from a driver or nonoperating identification license, copy of a birth certificate, or copy of a passport. A.R.S. § 16-166(F). A person that does not have these documents can also show "satisfactory evidence of citizenship" by providing: (1) certificate of naturalization or the certificate number, (2) other documents or methods of proof that are established pursuant to the Immigration Reform and Control Act of 1986, or (3) an applicant's Bureau of Indian Affairs card number, tribal treaty card number, or tribal enrollment number. *Id.*

When a person uses the State Form, the "application for registration shall be accompanied by satisfactory evidence of citizenship as prescribed in section 16-166, subsection F." HB 2492 § 4(C). "[T]he county recorder or other officer in charge of

---

[3] News Release, Rep. Jake Hoffman (Mar. 30, 2022), https://www.azleg.gov/press/house/55LEG/2R/220330HOFFMANHB2492.pdf.

[4] *See* Letter from Douglas A. Ducey to Katie Hobbs (Mar. 30, 2022), https://azgovernor.gov/sites/default/files/hb2492_signing_letter.pdf.

elections shall reject any application that is not accompanied by satisfactory evidence of citizenship." *Id.* Where the application lacks satisfactory evidence of citizenship, "[t]he county recorder or other officer in charge of elections shall send a notice to the applicant as prescribed in section 16-134, subsection B." *Id.* Section 16-134(B) provides that "the county recorder shall notify the applicant within ten business days of receipt of the registration form" and "shall specify the missing or illegible information." A.R.S. § 16-134(B).

***POC Procedures Regarding Federal Form.*** Different procedures apply when the applicant uses the Federal Form. "[W]ithin ten days after receiving an application for registration on" the Federal Form, "that is not accompanied by [POC], the county recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant," including review of a number of specific databases. *Id.* If the county official "matches the applicant with information that verifies the applicant is a United States citizen … the applicant shall be properly registered." HB 2492 § 4(E). Significantly, if the applicant provides satisfactory evidence of citizenship/POC, which includes the number on a naturalization certificate (assuming verification by the USCIS) or the number from a drivers' license or nonoperating identification license issued after October 1, 1996, then the county official must register the applicant and need not use any databases to confirm citizenship status. HB 2492 § 4.

However, if the applicant fails to provide POC and the county official "matches the applicant with information that the applicant is not a United States citizen, the county recorder … shall reject the application, notify the applicant that the application was rejected because the applicant is not a United States citizen and forward the application to the county attorney and attorney general." HB 2492 § 4(E).

***Presidential-Ballot and In-Person Voting Limitations.*** For individuals using the Federal Form, a different rule applies if county recorders can verify neither citizenship nor absence of U.S. citizenship. In that case, "the county recorder … shall notify the applicant

that … [it] could not verify that the applicant is a United States citizen and that the applicant will not be qualified to vote in a presidential election or by mail … until satisfactory evidence of citizenship is provided." *Id.* Consistent with that notice, section 5 provides that such voters are "not eligible to receive an early ballot by mail," ("In-Person Voting Limitation") and are "not eligible to vote in presidential elections," ("Presidential-Ballot Limitation"). *Id.* § 5(A).

***Proof of Residency ("POR") Requirement.*** HB 2492 provides that except for specified individuals temporarily absent (e.g., military posted overseas), persons registering to vote must provide "an identifying document that establishes proof of location of residence" ("POR"). *Id.* § 5(A). Acceptable documents include a "valid form of identification that bears the photograph, name and address of the elector," or "[t]wo different items that contain the name and address of the elector," such as "a utility bill, a bank or credit union statement…, Arizona vehicle registration, an Arizona vehicle insurance card, an Indian census card, tribal enrollment card or other form of tribal identification." A.R.S. § 16-579(A)(1).

***Birthplace Requirement and Citizenship Question***. HB 2492 adds two additional requirements for the State Form: applicants must provide their birthplace under ("Birthplace Requirement"), and mark a check box if they are a U.S. citizen, ("Citizenship Question"). HB 2492 § 4(A). That additional information facilitates ascertaining if a registrant is a U.S. citizen. *See* U.S. Const. amend. XIV §1 (establishing birthright citizenship).

**B. HB 2243**

HB 2243's purpose is to ensure effective and fair maintenance of the voter rolls. The statute requires county officials to conduct monthly reviews of the voter rolls to ensure registered voters are eligible to vote. HB 2243 § 2(D)-(H). If "the county recorder obtains information" in performing these reviews and "confirms that the person registered is not a

United States citizen," then the county recorder must initiate statutorily required process. *Id.* § 2(A)(10).

Under that process, "the county recorder shall send the person notice by forwardable mail that the person's registration will be canceled in thirty five days unless the person provides satisfactory evidence of United States citizenship, including among other possibilities, the number from the registered voter's driver license, nonoperating identification license, or naturalization certificate" ("35-Day Notice").

Consequently, while the county recorders must review the rolls, they cancel a registration only when they verify that the registered voter is not a U.S. citizen, and only then, after they provide notice and an opportunity to provide POC. Further, HB 2243 states that the county recorder "shall send a notice … that the person's registration has been canceled, the reason for cancellation, the qualifications of electors pursuant to section 16-101 and instructions on registering to vote if the person is qualified." HB 2243 § 10(K).

**LEGAL STANDARD**

Plaintiffs' claims should be dismissed for lack of jurisdiction and/or for the failure to state a claim. "The burden of establishing ripeness and standing rests on the party asserting the claim." *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009).

On a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A complaint must contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ARGUMENT

### I. SOME OF PLAINTIFFS' CLAIMS ARE NON-JUSTICIABLE

#### A. Private Plaintiffs Lack Article III Standing

To establish standing, a plaintiff "must show [(1)] that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; [(2)] it must be fairly traceable to the challenged action of the defendant; and [(3)] it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted). Private Plaintiffs have failed to plausibly allege standing here.

##### 1. Private Plaintiffs Cannot Rely On Representational Standing

None of the named plaintiffs here are actual voters—only organizations. And while those organizations attempt to rely on harms to their members, who are actual or potential voters, those attempts are unavailing.

To establish such representational standing, Plaintiffs must "identify members who have suffered the requisite harm." *Id*. at 499. Private Plaintiffs thus were required "to make specific allegations establishing that *at least one identified member* had suffered or would suffer harm." *Id.* (emphasis added). But not one of the Private Plaintiffs even attempts to name individual affected members.

The Supreme Court has further held that "[t]his requirement of naming the affected members *has never been dispensed with in light of statistical probabilities*, but only where *all* the members of the organization are affected by the challenged activity." *Id.* at 498-99 (first emphasis added). No Private Plaintiff alleges that *all* of its members are affected by HB 2492 or 2243. Instead, they rely on precisely the sort of "statistical probabilities" that are "never" sufficient. *Id.* For example, DNC argues (at ¶15) that "it is extremely likely that one or more members of ADP[] will be removed from the rolls because of HB2492." Similarly, LUCHA argues (at ¶212) that its members are "more likely to lack the requirement documentation under HB 2492." This is precisely the sort of "statistical

probabilities" that *Summers* makes plain does not suffice. 555 U.S. at 498-99. All Private Plaintiffs thus lack representational standing.

### 2. Private Plaintiffs Have Not Adequately Alleged Organizational Standing Either

An organization may establish an injury-in-fact when it suffers "both a diversion of its resources and a frustration of its mission," but it may not "manufacture the injury" by "simply choosing to spend money fixing a problem." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). Instead, the plaintiff organization "must … show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.* No Private Plaintiff here adequately alleges such a cognizable diversion of resources, however.

In particular, no Plaintiff identifies "any specific projects that [they] had to put on hold or otherwise curtail in order to respond to the" law it challenges. *See NAACP v. City of Kyle*, 626 F.3d 233, 238-39 (5th Cir. 2010). Additionally, Plaintiffs must show that they are actually changing their allocation of resources, not going about "business as usual," *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942-43 (9th Cir. 2021)—which is what the vast majority of purported diversions amount to.

For example, Poder Latinx alleges that it will be forced to hire an additional employee and AAANHPI alleges it decreased its voter registration goal, which purportedly caused it to lose approximately $50,000 in funding. But standing requires an injury that is "fairly traceable" to the challenged conduct, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and decisions to hire an additional employee or reduce voter registration goals, which putatively caused some *third party* to reduce funding, are not fairly traceable to the new legislation (and often self-inflicted). *Lake Forest*, 624 F.3d at 1088 n.4 ("An organization may sue only if it was forced to choose between suffering an injury and diverting resources to counteract the injury."); *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1136 (9th Cir. 2019) (must find the issue "requires" diverting resources).

Nor do Plaintiffs "explain[] what activities [that they] would divert resources away from in order to spend additional resources on combatting the [alleged harms]." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020). That too is fatal for organizational standing. *Id.* Because no Private Plaintiff has alleged what their resources were diverted away from—let alone what harms were thereby caused by the diversion—none has adequately alleged organizational standing. Instead, Plaintiffs have at most alleged "simply a setback to the organization's abstract social interests," which does not suffice. *Havens*, 455 U.S. at 379. That is particularly true here as Plaintiffs' "abstract social interest in maximizing voter turnout … cannot confer Article III standing." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014).

**3. Several Plaintiffs Lack Article III Traceability & Redressability**

Finally, several Private Plaintiffs lack standing because their failures to join County Recorders precludes them from establishing Article III traceability and redressability. All of the challenged provisions of HB 2492 and 2243 are implemented and enforced by the County Recorders—not the Secretary of State or Attorney General (neither of whom can register or de-register *anyone*). Here, as in *Jacobson*, "any injury would be traceable only to [the County election officials] and redressable only by relief against them." 974 F.3d at 1253.

*Mecinas v. Hobbs*, 30 F.4th 890 (9th Cir. 2022) is not to the contrary. There, the Ninth Circuit held that a claim asserted solely against the Secretary was redressable because the Secretary promulgates the Election Procedure Manual [EPM], which the County Recorders are "bound to follow." *Id.* at 900. But unlike ballot order, registration procedures are not a proper subject for the EPM, and their inclusion in such would be improper and not bind the County Recorders. *See, e.g.*, *Leach v. Hobbs*, 250 Ariz. 572, 576 (2021) ("[A]n EPM regulation that exceeds the scope of its statutory authorization or contravenes an election statute's purpose does not have the force of law."); A.R.S. § 16-452 (establishing proper subjects for EPM, which does not include registration

procedures).

Neither LUCHA nor DNC names *any* County Recorders, and Poder Latinx curiously names only one. Their complaints should therefore be dismissed for failure to allege Article III traceability and redressability standing requirements. Alternatively, even if not an Article III violation, such failure to name County Recorders violates Rule 19 and those Private Plaintiffs should be compelled to join such Defendants or have their suits dismissed for failure to name indispensable parties.

**B. Many Claims Here Are Unripe**

Several claims here are also not justiciable because they are not ripe for decision, either as a matter of Article III or prudential ripeness. In particular, (1) Private Plaintiffs' challenges to the Citizenship Question and Birthplace Requirements lack any genuine threat of imminent enforcement, and (2) Private Plaintiffs' Database and Investigation Requirement Allegations and VRA § 2 claims are prudentially unripe as they depend enormously on speculation and supposition, without any actual implementation data that could validate or refute that speculation.

**1. Plaintiffs Face No "Genuine Threat Of Imminent Prosecution"**

For constitutional ripeness, "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Thomas*, 220 F.3d at 1139. "Rather, there must be a 'genuine threat of imminent prosecution.'" *Id.* (citation omitted). "In evaluating the genuineness of a claimed threat of prosecution, [courts] look to whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.* (citation omitted).

Private Plaintiffs notably do not allege that anyone has a "concrete plan" to complete State Forms without checking the Citizenship Question box or filling in the Birthplace Requirement field. Plaintiffs thus have not alleged any "genuine threat of

imminent" enforcement of either such requirement against any Private Plaintiff or their members.

**2. Many Of Plaintiffs' Claims Lack Prudential Ripeness**

Some of Plaintiffs' claims also lack prudential ripeness. "[A] claim is not ripe for adjudication when it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas*, 523 U.S. at 300 (citation omitted). In evaluating prudential ripeness, this Court looks to "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas*, 220 F.3d at 1141 (citation omitted).

Here, Private Plaintiffs' allegations that errors or outdated data in databases ("Database Allegations") would thwart efforts to register to vote are entirely speculative and lacking in any actual real-world implementation data. *See*, *e.g.*, LUCHA FAC ¶93. Similarly, Plaintiffs' fears that anyone would be wrongfully investigated because of the Acts, or wrongly removed because of bad faith complaints/implementation, is entirely speculative. Such hypothetical issues are not currently fit for review and would be appropriately raised by as-applied challenges involving concrete denials, rather than postulated effects of the quality of database data. As Justice Stevens explained, by deferring adjudication, this Court can "enhance the likelihood [the claims] will be resolved correctly on the basis of historical facts rather than speculation." *Purcell v. Gonzalez*, 549 U.S. 1, 6 (2006) (Stevens, J., concurring).

Similarly, LUCHA's VRA § 2 claim depends enormously on speculated racial disparate impacts—which necessarily are pure conjecture since the Acts have never been implemented. Such conjectural disparities rest upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas*, 523 U.S. at 300 (quotation marks omitted).

These issues are thus not fit for review. Because Private Plaintiffs' relevant allegations are no more than speculation, they similarly have not established meaningful

hardship from withholding judicial review until actual implementation data exists.

## II. PLAINTIFFS HAVE NOT PLED VIABLE CONSTITUTIONAL CLAIMS

Private Plaintiffs assert a variety of constitutional claims under *Anderson-Burdick* doctrine, procedural due process, and the Equal Protection Clause. None are viably pled.

### A. Plaintiffs' *Anderson-Burdick* Claims Fail

Four Plaintiffs assert unconstitutional burden claims under *Anderson-Burdick* doctrine (all Private Plaintiffs save Poder Latinx). Those claims fail because the burdens involved are not significant (and often minimal) and justified by the State's compelling interests.

#### 1. Overview of *Anderson-Burdick* Doctrine

Challenges to electoral statutes and regulations that allege an unconstitutional burden are governed by the *Anderson-Burdick* framework. That framework recognizes that "'States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election—and campaign-related disorder.'" *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

Under the *Anderson-Burdick* framework, "an election regulation that imposes a severe burden is subject to strict scrutiny." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008). In contrast, '"*[l]esser burdens* trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."' *Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012) (quoting *Prete*, 438 F.3d at 961) (cleaned up). Notably, "voting regulations are rarely subjected to strict scrutiny." *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011). Moreover, "[e]laborate, empirical verification of weightiness is not required." *Timmons*, 520 U.S. at 352.

#### 2. The Burdens Here Are Not Substantial

The burden imposed by the Citizenship Questionnaire and Birthplace Requirement are minimal at most, since all competent voters know such information and can readily

check a box or write their birthplace. Any burden is certainly *far* less than completing an application for a mail-in ballot, which the Ninth Circuit has held imposes only "*an extremely small*" burden "to the extent that [it] … could be viewed as a burden" at all. *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018). The burden here is thus less-than-extremely-small, if cognizable at all.

Similarly, the burden imposed by the POC and POR requirements are not severe under *Crawford*. There, the Supreme Court upheld a voter ID requirement for in-person voting against an *Anderson-Burdick* challenge, explaining that "the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph *surely does not qualify as a substantial burden* on the right to vote." *Crawford*, 553 U.S. at 198 (emphasis added) (plurality opinion); *accord id.* at 204 (Scalia, J., concurring joined by Thomas and Alito, JJ.) ("[T]he burden at issue is minimal and justified").

Notably, the POR requirement can be satisfied by presenting *either* a photo ID with address listed (including drivers' licenses and state identification cards) or documents like utility bills or tribal enrollment card. The burden is thus the same or smaller than in *Crawford*.

Similarly, the POC requirement is no more burdensome than in *Crawford*. Indeed, it is perhaps significantly *less so*, since POC need only be provided *once*, when a voter registers to vote—unlike the *Crawford* photo ID requirement, which must be presented *every time* a voter wished to cast a ballot. *Crawford*, 553 U.S. at 185.

The Ninth Circuit's en banc decision in *Gonzalez* likewise confirms that the burden here is not severe (and that HB 2492 and 2243 are constitutional). There, the Ninth Circuit upheld an Arizona law that required producing documents that "may require payment of a fee" against an *Anderson-Burdick* challenge. *Gonzalez*, 677 F.3d at 409-10. As the court recognized, "any payment associated with obtaining the documents required … is related to the state's legitimate interest in assessing the eligibility and qualifications of voters, the photo identification requirement is not an invidious restriction under *Harper*, and *the*

*burden is minimal* under *Crawford*." *Id.* at 410 (emphasis added).

### 3. The State's Interests In Securing Its Elections Suffices

Because the Acts do not impose a "severe burden" under the *Anderson-Burdick* framework, this Court's inquiry into the constitutionality of the Acts "is limited to whether the chosen method is reasonably related to [an] important regulatory interest." *Prete*, 438 F.3d at 971. *Anderson/Burdick* treats the State's interests as a "legislative fact." *Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014). States need not submit "any record evidence in support of" their interests. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009); *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1334 (11th Cir. 2021). States can rely on "post hoc rationalizations," can "come up with [their] justifications at any time," and have no "limit[s]" on the type of "record [they] can build in order to justify a burden placed on the right to vote." *Mays v. LaRose*, 951 F.3d 775, 789 (6th Cir. 2020). Here, the State's interests in reducing administrative burdens and in securing its elections easily satisfies this standard.

As in *Crawford*, the State's interest in securing its elections and maintaining voter confidence easily sustains these not-severe (and often minimal-at-most) burdens. *Crawford*, 553 U.S. at 194-97 (plurality opinion); *id.* at 209 (Scalia, J., concurring in the judgment); *see also Gonzalez*, 677 F.3d at 409-10. Indeed, HB 2492 and 2243 are even more narrowly tailored than in *Crawford*, since voters need only produce POC and POR *once*, rather than *every time* they seek to vote.

## B. Freestanding Procedural Due Process Claims Are Barred

Several Plaintiffs (Mi Familia et al., Poder Latinx, DNC et al., and AAANHPI) attempt to assert freestanding procedural due process claims in addition to their *Anderson-Burdick* claims. Those attempts are squarely foreclosed by Ninth Circuit precedent. "[A] single analytic framework" governs constitutional challenges to the burdens imposed by electoral regulations. *Dudum*, 640 F.3d at 1106 n.15. For such claims, "each is folded into the *Anderson/Burdick* inquiry." *Soltysik v. Padilla*, 910 F.3d 438, 449 n.7 (9th Cir. 2018).

The Ninth Circuit has specifically applied this rule to procedural due process claims: "the *Anderson/Burdick* framework applies to Plaintiffs' procedural due process claim" and controls even if "the *Eldridge* test would strike a different balance." *Hobbs III*, 18 F.4th at 1195.

DNC rather outrageously cites (at 15 n.8) *Arizona Democratic Party v. Hobbs ("Hobbs I")*, 485 F.Supp.3d 1073, 1093 (D. Ariz. 2020), for the proposition that "[m]ulitple district courts … have considered procedural due process challenges to election regulations under ordinary procedural due process principles[.]" DNC neglects to mention *Hobbs I*'s subsequent history: the Ninth Circuit expressly reversed that precise holding in *Hobbs III*, 18 F.4th at 1194-95—an omission all the more indefensible as the DNC group includes Plaintiff Arizona Democratic Party, who *lost this precise issue* in *Hobbs III*.

Because *all* of these putative due process claims are governed by the *Anderson-Burdick* framework rather than *Matthews*, these claims add nothing and can be readily rejected as duplicative/superfluous, as the Ninth Circuit did in *Hobbs III*.

Moreover, those claims additionally fail because Plaintiffs lack a cognizable liberty interest in voting without providing POC, POR, or a place of birth. "A liberty interest may arise from either of two sources: the due process clause itself or state law." *Carver v. Lehman*, 558 F.3d 869, 872 (9th Cir. 2009). No Plaintiff claims any such liberty interest arises under the Due Process Clause itself. And state law, by affirmatively requiring POC/POR etc., necessarily does use the "explicitly mandatory language" that might give rise to a liberty interest in voting without meeting such requirements. *Mendoza v. Blodgett*, 960 F.2d 1425, 1428-29 (9th Cir. 1992) (citation omitted).

### C. Plaintiffs' Equal Protection Claims Fail

#### 1. Plaintiffs' Disparate Treatment Claims Fail

As an initial matter, Plaintiffs' equal protection challenges to the burdens imposed by HB 2492 and 2243 fail because such claims are properly considered under the *Anderson-Burdick* framework and thus lack merit as discussed above. *Supra* § II.A, B;

*Dudum*, 640 F.3d at 1106 n.15 ("[A] single analytic framework" governs "First Amendment, Due Process, or Equal Protection claims" challenging electoral burdens); *Hobbs III*, 18 F.4th at 1194-95.

But even if considered under the traditional standards, an equal-protection discriminatory treatment claim requires differential treatment based on some classification. *See Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) ("The first step in equal protection analysis is to identify the [defendants'] classification of groups.") (cleaned up) (citation omitted); *accord Commonwealth of Northern Mariana Islands v. Zhen*, 68 F. App'x 7, 8 (9th Cir. 2003). A plaintiff can only establish an equal protection discriminatory treatment claim if it shows the law is *facially* discriminatory. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271-73 (1979).

With respect to Plaintiffs' national-origin and race-based claims,[5] HB 2243 and 2492 are not facially discriminatory whatsoever. Both statutes require *all* persons—no matter their race or national origin—to provide POC and POR and satisfy the other statutory requirements. They are completely neutral as a facial matter. Instead, each applies when one registers to vote (HB 2492) or a county recorder receives information that a registered voter is not a U.S. citizen (HB 2243). And Plaintiffs' attempts to rely on disparate impacts do not suffice to establish a discriminatory treatment claim. *See*, *e.g.*, *Feeney*, 442 U.S. at 279.

As to Plaintiffs' Federal-Form vs. State-Form classification claims, such classifications are not suspect classes. Such claims are therefore only subject to rational-basis review. *See McDonald v. Board of Election Comm'rs*, 394 U.S. 802, 806 (1969). And here a rational basis is readily apparent: because those using the State Form are required to provide POC and POR, the State can be substantially more confident that the voters are indeed U.S. citizens and reside in the districts in which they intend to cast a

[5] AAANHPI's Fifteenth Amendment claim fails for these same reasons as the same standard applies. *City of Mobile v. Bolden*, 446 U.S. 55, 63-65, 95, 101-03 (1980).

vote.[6] Indeed, the Supreme Court has acknowledged this interest. *See Inter Tribal*, 570 U.S. at 12-13 (explaining that in addition to using the Federal Form, States may create their own state-specific voter registration forms that require additional information). Arizona has a legitimate interest in enforcing voter qualifications, and to effectuate that interest Arizona may rationally require State Form applicants to submit additional information, including information as prescribed by HB 2492. Indeed, if a bare attestation were sufficient to establish a fact conclusively, there would be no need for the IRS to audit any taxpayer that certified that their tax returns were correct. But the federal government does not always take taxpayers at their word, and often demands documentary proof (such as W-2 forms). The State equally has a rational basis in insisting upon POC and POR.

More generally, HB 2243 and 2492 were enacted to combat voter fraud and safeguard voter confidence in Arizona elections by ensuring all voters are U.S. citizens that are eligible to vote. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 208-09 (1992); *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *Gonzalez*, 677 F.3d at 410 (9th Cir. 2012). The statutes plainly advance those interests. Facially neutral legislation that rationally furthers legitimate government purposes—without more—does not violate the Equal Protection Clause. *See Washington v. Davis*, 426 U.S. 229, 246 (1976) (holding equal protection claim challenging mandated police officer test failed where test was "neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue"); *De Martinez v. Ashcroft*, 374 F.3d 759, 764 (9th Cir. 2004) ("A legislative classification must be wholly irrational to violate equal protection."); *McDonald*, 394 U.S. at 809 ("[S]tatutory classifications will be set aside only if no grounds can be conceived to justify them").

[6] Similarly, the Citizenship Question and Birthplace requirements serve rational bases, as they assist the State in ascertaining citizenship (particularly as the Fourteenth Amendment establishes birthplace citizenship) and further assist in any necessary prosecutions for fraudulent registration forms: while a would-be registrant might disclaim *mens rea* for perjury, such denials are less plausible if the would-be voters have also specifically checked that they are U.S. citizens and/or supplied false birthplaces.

Finally, the State has a rational interest in complying with federal law but exercising its own sovereign choices where it is not preempted by federal law. The Acts follow these distinctions, particularly as Congress lacks authority to regulate state and presidential elector elections. *See infra* § III.A.

**2. Plaintiffs' Discriminatory Intent Claims Likewise Fail**

Plaintiffs also have not sufficiently alleged a discriminatory purpose underlying HB 2492 or HB 2243. *See Davis*, 426 U.S. at 246 (rejecting equal protection claim for police officer test that had a disparate impact because the plaintiffs failed to establish that the test had a discriminatory purpose); *see also Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (holding that disparate impact alone is insufficient; "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause").

In *Lee v. City of Los Angeles*, the Ninth Circuit affirmed dismissal of the plaintiffs' equal protection claim because they pleaded only conclusory allegations of discriminatory intent. 250 F.3d 668, 686-87 (9th Cir. 2001). "Discriminatory purpose," the court explained, "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (quoting *Navarro v. Block*, 72 F.3d 712, 716 n.5 (9th Cir. 1995)). This Court has likewise dismissed an equal protection claim based on disenfranchisement of certain Arizona residents because plaintiffs did not plead sufficient allegations of discriminatory purpose. *Coronado v. Napolitano*, No. CV 07-1089-PHX-SMM, 2008 WL 4838707, at *4 (D. Ariz. Nov. 6, 2008).

Here, Plaintiffs fail to allege any discriminatory purpose—certainly any that would comport with the *Iqbal* pleading standard. *See McReynolds v. Merrill Lynch & Co., Inc.*, No. 08 C 6105, 2011 WL 1196859, at *4 (N.D. Ill. Mar. 29, 2011) ("In short, plaintiffs allege that the system was designed with discriminatory intent, but under *Iqbal* they must

do more. They must plead sufficient factual matter to show that defendants adopted and implemented the retention system not for a neutral reason, but for the purpose of discriminating against African-American [Financial Advisors].").

At best, Plaintiffs contend that because *they believe* that voter fraud is not an issue in Arizona, this Court should infer that the Arizona Legislature "must have had a discriminatory intent" in passing laws designed to prohibit voter fraud. But "because a government has such a compelling interest in securing the right to vote freely and effectively, th[e] Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question." *Burson*, 504 U.S. at 208-09 (citation omitted).

Plaintiffs' discriminatory intent claims further have not supplied non-conclusory allegations that could overcome the presumption of good faith owed to Arizona legislators. "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Although legislative decisions are not immune from review, courts *must* afford state legislatures a presumption of good faith. *Id.* at 2324; *Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020). "Only the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground [of improper legislative motive.]" *Flemming v. Nestor*, 363 U.S. 603, 617 (1960). In satisfying that burden, Plaintiffs may put forward both direct and circumstantial evidence of illegitimate intent. *Abbott*, 138 S. Ct. at 2327.

Plaintiffs say a lot in their complaints, but virtually nothing they say bears meaningfully on the key question here—whether the legislature had an illegitimate intent that motivated its enactments. *See Iqbal*, 556 U.S. at 680-81 (claim of racial discrimination not adequately plead where allegations recite in a conclusory manner the elements of the claim and allege a mere knowledge of disparate impact, "given more likely explanations"); *Twombly*, 550 U.S. at 556-57 (allegations of parallel conduct and conclusory assertion of

agreement not enough to show antitrust violation when parallel conduct could "just as well be independent action"). Plaintiffs' discriminatory intent claims should thus be dismissed.

## III. PLAINTIFFS FAIILED TO STATE VIABLE NVRA CLAIMS

Plaintiffs allege a range of violations of the NVRA, citing various sections of the statute in support of their claims. Almost all their claims fail for one simple reason: the NVRA does not cover registration for *any* of the elections regulated by the Acts. The Acts regulate only state and presidential elections. *See* HB 2492 § 5; A.R.S. § 16-127(a)(1). But the NVRA explicitly does not apply to state elections, and it cannot constitutionally apply to presidential elections. The Acts and the NVRA therefore do not conflict.

### A. The NVRA Does Not Apply To State or Presidential Elections

Congress enacted the NVRA as an exercise of its power under the Elections Clause of Article I. *Inter Tribal Council*, 570 U.S. at 7-8; *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 836-37 (6th Cir. 1997) (upholding power of Congress to enact the NVRA under the Elections Clause). That clause reads in full:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1. The Framers' decision to specify "Senators and Representatives" in this clause, as opposed to all federal elections, was no accident. A different clause provides that electors for President and Vice President shall be appointed "in such manner as the Legislature [of each state] may direct." *Id.* art II, § 1, cl. 2.

Unlike Congressional elections, where Congress may regulate "Times, Places, and Manner," for selection/election of Presidential electors, "Congress may [only] determine the Time of chusing the Electors, and the Day on which they shall give their Votes," *id.* art II, § 1, cl. 4. Article II thus conspicuously excludes any Congressional power over "Places and Manner" of presidential elections. *See, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen [drafters] includes particular language in one section of a

statute but omits it in another section of the same Act, it is generally presumed that [the drafters] act[ed] intentionally and purposely in the disparate inclusion or exclusion."); *accord Christensen v. Harris Cty.*, 529 U.S. 576, 583 (2000) ("When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." (cleaned up)); *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018). Article II also notably *excludes* Congress from the selection of presidential electors, by providing that "no Senator or Representative ... shall be appointed an elector." *Id.*

The NVRA thus can apply constitutionally only to "Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. It may apply on its face to "elections for Federal office," generally. *See* 52 U.S.C. §§ 20501(b)(1), 20503(a). And it may purport to include presidential elections within its reach. *See id.* §§ 20502(2), 30101(3). But the Constitution does not permit such an arrangement. Instead, states in our federalist system run their own elections. Congress can modify state regulations by regulating "Places and Manner," but only for federal *congressional* elections, U.S. Const., art. I, §4.

Because extending the NVRA to Presidential elections would violate the Constitution, "[i]t is ... incumbent upon [courts] to read the statute to eliminate those [constitutional] doubts so long as such a reading is not plainly contrary to the intent of [the enacting legislature]." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994). This Court can readily do so by reading the NVRA to apply only to Congressional elections. But if that reading is not textually permissible, any extension of the NVRA to state or presidential elections plainly exceeds Congress's powers under Articles I and II.[7]

---

[7] The NVRA is plainly an exercise of Congress's power under the Article I Election Clause, and not § 5 and §2 of the Fourteenth and Fifteenth Amendments, respectively. That much is clear from the NVRA's limitation to federal elections and lack of detailed findings that would suggest that Congress intended to exercise its authority under the Reconstruction Amendments. But even if the NVRA was deemed to be an attempt exercise authority under those constitutional provisions, the NVRA would then run afoul of the requirement of "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997); *accord Shelby Cty. v. Holder*, 570 U.S. 529, 542 n.1 (2013). *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 204 (2009).

**B. All Plaintiffs' NVRA Claims Fail as a Matter of Law**

Any supposed conflict between the Acts and the NVRA evaporates under a correct understanding of the NVRA's reach. The Acts govern registration only for state and presidential elections. Because the NVRA governs only federal congressional elections, as explained, *supra* § III.A, it therefore cannot preempt either Act. In particular, Plaintiffs' common complaint that States must "accept and use the mail voter registration application form" promulgated under the NVRA has no bearing here. *See* 52 U.S.C. § 20505(a); MFV-Cmpt. ¶94; LUCHA-Cmpt. ¶352; USA-Cmpt. ¶63; DNC-Cmpt. ¶70. The NVRA only imposes this requirement on "registration of voters in elections for Federal office," which excludes presidential elections. 52 U.S.C. § 20505(a). The Acts do nothing to the contrary.

Other claims suffer from additional flaws. Plaintiffs argue the NVRA requires registration at motor vehicle agencies, public-assistance agencies and other NVRA-mandated agencies, 52 U.S.C. §§ 20504, 20506; LUCHA-Cmpt. ¶353-54. But Arizona continues to comply with these provisions by providing registration to vote in federal congressional elections with the Federal Form at the required agencies. Indeed, Arizona continues under the Acts to incorporate the NVRA's requirements into its provision for registration with a driver's license application. *See* HB 2492 § (2)(B)(4); A.R.S. § 16-112(2)(b)(4). Plaintiffs also charge the State defendants with failing to accept timely-received registration applications. 52 U.S.C. § 20507(a)(1); MFV-Cmpt. ¶95; LUCHA-Cmpt. ¶355. But the Acts do not change the timing rules for accepting applications or say anything about refusing timely applications.

The DNC further argues that the Act allows removal of voters from the rolls shortly before election, as forbidden by § 20507(c)(2)(A); DNC-Cmpt. ¶85. But nothing in the Acts provides for removal of voters from the rolls immediately before an election, federal or otherwise. The DNC rather seizes on the *silence* of the Acts to construct a hypothetical scenario in which ineligible voters are removed from the rolls near an election, in violation

of the NVRA but not of the Acts. But the Acts are not preempted simply because they fail to prohibit everything the NVRA prohibits.

Finally, Private Plaintiffs argue that the Acts violate the requirement of § 20507(b)(1) that any program to maintain accurate voter rolls must be "uniform and nondiscriminatory." LUCHA FAC ¶356; DNC-Cmpt. ¶74; Poder Latinx FAC ¶87. But requiring proof of citizenship as a condition for registration or voting by mail is not discriminatory. Nor is removal from the rolls of voters determined not be citizens.

## IV. PLAINTIFFS' SECTION 10101 CLAIMS FAIL

The federal materiality statute forbids any "person acting under color of law" from:

> Deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B). The same statute also forbids the application of "any standard, practice, or procedure different from [those] applied ... to other individuals within the same county, parish, or similar political subdivision." *Id.* § 10101(a)(2)(a). Private Plaintiffs have no cause of action to sue under this statute, and neither Private Plaintiffs nor the United States plausibly allege that the Acts violate it.

### A. Private Plaintiffs Lack A Cause Of Action Under Section 10101

Private Plaintiffs' Section 10101 claims fail at the threshold because they lack a private right of action to enforce that provision. Plaintiffs will cite 42 U.S.C. § 1983, but § 1983 is not available if Congress "did not intend that remedy" for the statutory right in question. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005). For the materiality statute, Congress included a public judicial remedy for "the [U.S.] Attorney General" alone. 52 U.S.C. § 10101(c). That remedy is contained in the same statute and is highly detailed—dictating who can be the defendant, creating special forms of relief, articulating rebuttable evidentiary presumptions, creating new federal jurisdiction, eliminating exhaustion requirements, appointing and compensating private referees,

specifying fast deadlines, assigning counsel to defendants, and creating jurisdiction for three-judge district courts and direct appeals to this Court. *See* § 10101(c)-(g). The "'express provision of one method of enforcing a substantive rule,'" especially a "'comprehensive enforcement scheme'" like this one, "'suggests that Congress intended to preclude others.'" *Rancho Palos Verdes*, 544 U.S. at 120-21 (citations omitted). Hence "the majority of courts" hold that the materiality statute "is only enforceable by the United States in an action brought by the Attorney General." *Hayden v. Pataki*, 2004 WL 1335921, at *5 (S.D.N.Y. June 14, 2004); *accord Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016); *Dekom v. New York*, 2013 WL 3095010, at *18 (E.D.N.Y. June 18, 2013) (collecting cases), *aff'd*, 583 F. App'x 15 (2d Cir. 2014).

**B. Plaintiffs Fail To Allege Violations Of Section 10101**

**1.** On the merits, Plaintiffs' claims fail right out of the gate because they contest the validity of a *State law*, when "State law" is the standard against which any denial is measured. The materiality statute governs *ad hoc* executive actions that *exceed* state law, without dictating the *substance* of state law itself. Because the statute asks whether an error or omission was material "under State law," Plaintiffs must allege that the defendant went *beyond* state law. *See, e.g.*, *Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (holding officials "may reject applications and ballots that do not clearly indicate the required information required by Missouri statute without offending 52 U.S.C. § 10101(a)(2)(B)"); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018) (holding that an election practice violated the materiality statute where it was not required by "Georgia law"). As members of Congress explained at the time the statute was passed, Congress's concerns "c[a]me not from discriminatory *laws*," but "'from the discriminatory *application and administration* of apparently nondiscriminatory laws.'" H.R. Rep. No. 88-914 (Nov. 20, 1963), 1964 U.S.C.C.A.N. 2391, 2491 (emphasis added).

Here, of course, Plaintiffs' problem is with state law itself. But reading the materiality statute broadly enough to cover the substance of state laws would not only

contravene its text and history but also give a "*de facto* green light to federal courts to rewrite dozens of state election laws around the country," wherever any state imposes any requirements on voters beyond what a court deems to be the state's material voter qualifications. *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurral). Indeed, under some Plaintiffs' reading, even requiring voters to "check a box" to affirm that they fulfill the state's voter qualifications goes too far, because "[w]hether a prospective voter ... fails to check a box" is not *itself* material to eligibility to vote. MFV-Cmpt. ¶102.

Poder Latinx's claim under the related provision, 52 U.S.C. § 10101(a)(2)(A), fails for similar reasons (and lack of cause of action). Doc. 106, ¶¶99 *et seq*. That provision of the Civil Rights Act forbids the application of any "standard, practice, or procedure" in determining any individual's qualification to vote that are "different from the standards, practices, or procedures applied under such law or laws to other individuals within the same ... political subdivision." *Id*. Like the materiality provision, this provision only covers ad hoc executive action and sets "State law" as the baseline for proper determination of voter qualifications. Plaintiffs cannot attack State law head-on with a federal statute demanding only the uniform implementation of State law.

**2.** Even if the materiality statute did dictate the substance of state law, it would still cover only state laws that "[d]eny the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B). But the Acts do no such thing. Under the Acts, any "error or omission" is grounds not for automatic denial but for the initiation of a cure process. An application lacking satisfactory evidence of citizenship triggers, not an outright rejection, but a notice and opportunity to cure. HB 2492 § 4(C); A.R.S. § 16-134(B) (providing that "the county recorder shall notify the applicant within ten business days of receipt of the registration form" and "shall specify the missing or illegible information"). And under HB 2243, evidence confirming that a registered voter is not a citizen triggers, not an automatic

cancellation, but a 35-Day Notice allowing the person to produce evidence of citizenship. HB 2243 § 2 (amending A.R.S. §161-165(a)(9)).

**3.** Finally, even if the Acts did deny the right to vote due to an application's errors or omissions, any error or omission would be "material in determining whether such individual is qualified under State law to vote in such election" and therefore not covered by § 10101(a)(2)(B). Arizona requires voters to be U.S. citizens and residents of the state. Ariz. Const. art. VII, §2, cl. A; A.R.S. § 16-101. The information required by the Acts—proof of citizenship, proof of residence, statement of birthplace, and checking a box to affirm U.S. citizenship—are all material to those requirements. Plaintiffs allege that the Acts' requirements are not material because they are duplicative of each other, or because voter eligibility could be ascertained in other ways. USA-Cmpt. ¶¶67-68; MFV-Cmpt. ¶102; LUCHA FAC ¶¶345-49; DNC-Cmpt. ¶¶89-90. But "material" means "relevant," not a bare, non-duplicative minimum. *See Gonzalez v. Arizona*, No. 06-CV-1268, 2007 WL 9724581, at *2 (D. Ariz. Aug. 28, 2007) ("Citizenship is material in determining whether an individual may vote and Arizona's decision to require more proof than simply affirmation by the voter is not prohibited."); *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006) ("Even if the check-boxes were duplicative of the oath, failing to check one or more boxes would not be an immaterial omission under the VRA.").

All the information required by the Acts is at least material to voter eligibility. Checking the citizenship box is a minimally burdensome affirmation by the voter of fulfillment of the most basic eligibility requirement under state law. Proof of citizenship attests that a voter is indeed eligible. Proof of residence verifies the State's only other requirement of eligibility. And birthplace—for which HB 2492 does not require documentary proof, *see* § 4(A); A.R.S. § 16-121.01(a)—is material to eligibility because it helps define what sort of proof can serve to demonstrate citizenship. All of this information helps election officials verify the eligibility of would-be voters, and the

materiality statute does not prevent the State from doing so in one way just because it might hypothetically be done in another way.

## V. LUCHA's VRA § 2 CLAIM FAILS

Finally, alone amongst Plaintiffs, LUCHA asserts a claim under the results-test of section 2 of the VRA. That claim is unripe, since it depends enormously on speculative racial disparities that "may not occur as anticipated, or indeed may not occur at all.'" *Texas*, 523 U.S. at 300. *See supra* § I.B. But even if now ripe, the claim fails under *Brnovich v. DNC*, 141 S. Ct. 2321 (2021).

*Brnovich* makes clear that "[m]ere inconvenience cannot be enough to demonstrate a violation of § 2" and further that claims under § 2 "must tolerate the 'usual burdens of voting.'" *Id.* at 2338 (quoting *Crawford*, 553 U.S. at 198). As explained above (*supra* § II.A), the burdens involved here are simply not significant and gravely undermine LUCHA's claim. Similarly, *Brnovich* requires consideration of "the strength of the state interests," which are compelling here as explained above and in *Crawford* and *Gonzalez*. *Supra* § II.A.

In addition, the Supreme Court in *Brnovich* made plain that "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." *Id.* at 2339. But LUCHA's Complaint makes little effort to quantify the size of an alleged disparities, saying only that "the impact on these populations is unique because the law *will not equally affect* Arizona residents writ large." LUCHA FAC ¶369 (emphasis added).

But the VRA does not mandate that electoral laws affect all groups exactly equally. Indeed, "differences in employment, wealth, and education may make it virtually impossible for a State to devise rules that do not have some disparate impact." *Brnovich*, 141 S. Ct. at 2343. But that reality omnipresent for all or nearly all election regulations does not suffice (although it is largely what LUCHA offers, *see*, *e.g.*, LUCHA FAC ¶¶174, 186 (disparities in education), ¶¶172-73 (disparities in income)).

Ultimately, LUCHA's bare allegation that the Acts "will not equally affect Arizona residents" (at ¶368) does not plausibly allege a violation of the VRA without substantially more detail establishing that the disparities are plausibly meaningful. LUCHA's complaint fails to do so.

Finally, *Brnovich* makes clear that for purposes of § 2, courts "must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision." 141. S. Ct. at 2339. That factor strongly favors the State as "Arizona law generally makes it *very easy to vote*." *Id.* (emphasis added).

Arizona makes voting substantially easier than its sister states through a variety of means, including (1) online registration, (2) not requiring any excuse to obtain an absentee/mail-in ballot, (3) making it easy to sign up for automatic mailing of ballots for all eligible elections, (4) pre-paying postage, (5) maintaining polling places despite high vote-by-mail usage, (6) placing voting drop boxes in areas with limited mail service, and (7) requiring nothing more than a timely signature to vote by mail (unlike other states that require witnesses or notarization). *Id.* at 2344, 2346; *Mi Familia Vota v. Hobbs*, 977 F.3d 948, 952 (9th Cir. 2020) ("Registration could be accomplished online or by mail."); A.R.S. § 16-542 (postage pre-paid); *Arizona Democratic Party v. Hobbs ("Hobbs II")*, 976 F.3d 1081, 1085-86 (9th Cir. 2020) (describing signature requirement).

All of those factors further militate against the plausibility of LUCHA's VRA claim—particularly where the most that it will say about disparate impacts is that the Acts will not "will not equally affect" all groups. LUCHA FAC ¶368. That is undoubtedly true of virtually all election statutes ever drafted, and does not make out a plausible VRA section 2 claim.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Complaints should be dismissed.

Respectfully submitted this 16th day of September, 2022.

MARK BRNOVICH
ATTORNEY GENERAL

By: s/ Drew C. Ensign
Joseph A. Kanefield (No. 15838)
*Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
*Solicitor General*
Drew C. Ensign (No. 25463)
*Deputy Solicitor General*
Jillian B. Francis (No. 030117)
Robert J. Makar (No. 033579)
*Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Email: Beau.Roysden@azag.gov
Email: Drew.Ensign@azag.gov

**Fennemore Craig, P.C.**
Douglas C. Northup (No. 013987)
Timothy J. Berg (No. 004170)
Emily Ward (No. 029963)
2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
Telephone: (602) 916-5000
Email: dnorthup@fennemorelaw.com
Email: tberg@fennemorelaw.com
Email: eward@fennemorelaw.com
*Attorneys for Defendants State of Arizona and Mark Brnovich, Attorney General*

**LOCAL RULE 12.1 CERTIFICATION**

Pursuant to Local Rule 12.1, I certify that before filing the instant motion I contacted opposing counsel on September 13, and informed them of the State's intention to file seek dismissal of all Complaints. The United States and the four Private Plaintiffs in the consolidated action all indicated that they did not intend to amend their complaint.

Alone among Plaintiffs, counsel for AAANHPI, on September 15, demanded additional detail on the State's planned motion before responding. After noting that the detail was sufficient for all other Private Plaintiffs to reach a decision, the State provided a 232-word overview of its planned motion and indicated that it "will assume that you do not intend to amend your complaint unless you tell us otherwise by 5pm PDT [Friday, the filing deadline in the Consolidated Matter and AAANHPI]."

Counsel for AAANHPI did not respond by 9pm when the State began finalizing documents for filing.

s/ Drew C. Ensign
Drew C. Ensign
*Counsel for Defendants the State of Arizona and Mark Brnovich, Arizona Attorney General*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of September, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

s/ Drew C. Ensign
Drew C. Ensign
*Counsel for Defendants the State of Arizona and Mark Brnovich, Arizona Attorney General*